JAN 22 2024 ᴀᴍ8:48
FILED - USDC - FLMD - ORL

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**STEPHEN LYNCH MURRAY**,

  **Plaintiff**,                                        **Case No.** _____

**v.**

**JANELLE IRWIN TAYLOR**,

**PETER D. SCHORSCH**, AND

**EXTENSIVE ENTERPRISES MEDIA, LLC**,

  **Defendants**.

_____/

## COMPLAINT

COMES NOW the undersigned Plaintiff STEPHEN LYNCH MURRAY pursuant to the Ku Klux Klan Act 42 USC 1983, the First, Fourth, Fifth, Sixth, and Fourteenth Amendments, and the "stigma plus" standard in Paul v. Davis (424 U.S. 693, 711 (1976)) and loosely Codd v. Velger, with this Complaint for monetary and injunctive relief against Defendants JANELLE IRWIN TAYLOR, PETER D. SCHORSCH, and EXTENSIVE ENTERPRISES MEDIA, LLC, supported by law and fact as follows:

### DEFENDANTS DEPUTIZED TO ATTACK POLITICAL SPEECH

**Attack on Political Speech Delegated to Private Party**

1.    Florida State Attorney Phil Archer is a habitual offender and serial violator of rights and due process, through schemes using false testimony in legal proceedings and specifically cops lying (which Florida law gives Archer discretion to orchestrate

and not prosecute), and then covering up what happened.

2.    When Plaintiff exposed Archer's crimes through political grievance speech, Archer took defensive steps to protect his scam and insulate his conduct and maintain voter approval, and did so repeatedly over an extended period.

3.    This background is relevant, because deputized with state privilege by an arrest with Phil Archer as the only witness, Defendants baselessly defamed Plaintiff as approaching a housewife with stealth and with a sexual motive, when in reality Plaintiff was sending political grievance emails to Phil Archer having nothing to do with any housewife, and posting political "COPS2PRISON.ORG" fliers publicizing Phil Archer's crimes nowhere near any housewife. (3.1) Defendants ignored the facts because, in their own words, acting as Phil Archer's agent made them money.

4.    Leading up to the 2020 election, Plaintiff sent thousands of emails to Republicans warning them that their crime policies, and in particular scumbags like Phil Archer, were pissing off enough suburban white people to lose the election. (4.1) Republicans remained certain that white people loved everything cops did, only black marxists objected, and Republicans would therefore win by a landslide.

5.    Republicans lost the election, and exit polls showed Trump gained in every demographic except white males without college degrees like Plaintiff.

6.    When Trump's mob of raggedy rural white people raided the US capitol on January 6th, Plaintiff sent State Attorney Phil Archer a link to a Youtube video showing a similar mob of white people. The white people in the video were defeated not by black gangs or marxists, but by another group of white people in suits. In the video, an FBI-looking city guy tells the rural white people "look at me, I did this to you". Plaintiff communicated that white people's legitimate grievances were being ignored with the crazy delusion that it was just black felon marxists. By saying Trump lost because of fraud, the mob that raided Congress was saying white people who didn't vote for Trump don't exist, their ballots were faked. So Plaintiff included his own caption directed at the defeated biker mob like "White voters to Trump: look at me, I did this to you."

7.    Defendants would later characterize that email, without any basis except the most malicious innuendo, as "stalking Shannon Sprowls" and saying "lewd" things to her and "threatening" her, (7.1) and thereby give political cover to Archer stopping Plaintiff's speech about his crimes for five months, under color of law (and later to Plaintiff being threatened by police to not report perjury to the Florida Inspector General).

8.    This inaccurate stigma at a minimum qualifies as "an adverse action" in retaliation for speech, according to the three criteria in Mount Healthy v. Doyle:

(1) activity protected by the First Amendment (posting cops2prison.org fliers, emailing everyone that Phil Archer and Republicans are deluded criminal scum and election losers)

(2) an adverse action (being arrested, triggering state action stripping Plaintiff of standard due process against defamation)

(3) a causal connection between the protected activity and the adverse action (arrested on the day Plaintiff posted fliers, based on email criticizing January 6th mob, which email was mischaracterized as a sex crime in the stigma)

(Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977))

9.    Defendants will claim they are licensed by the State of Florida to attack people who have been arrested, with such stigmatizing sex-crime inventions as Plaintiff sent Shannon Sprowls multiple lewd and multiple threatening emails and approached her with stealth, (9.1) because of the existence of an abandoned arrest affidavit which combined four unconnected events from Plaintiff's thousands of instances of political speech (none of which was lewd, stealthy, or involved being anywhere near Shannon Sprowls, nor was alleged to), 1) Plaintiff's already-mentioned email to Phil Archer comparing the January 6th mob to bikers in a movie (having nothing to do with Shannon Sprowls), 2) Plaintiff's bible quotes about hubris posted on Twitter, which

Plaintiff tagged Shannon Sprowls in with a picture of Trump on Air Force One, when she was politically supporting Trump trying to overturn the 2020 election on Twitter (after Plaintiff saw Florida Republicans posting Bible quotes around Christmas), 3) Plaintiff needling Phil Archer about how local prosecutors never prosecute VIP sex crimes (e.g. Joel Greenberg, Epstein), and about Republicans losing the election and their minds at the same time, when Plaintiff sent Archer an email that included a picture of an unidentified woman sitting with Trump on Air Force One and called one person in the picture "whore", and 4) weeks later, Plaintiff driving across and back without event, the largest bridge in Florida to spend 94 minutes in Pinellas County posting COPS2PRISON.ORG fliers about Phil Archer. (9.2) Never before in the history of mankind, has someone being harassed by a lewd person, needed multiple different people or a cop to tell her she was being harassed! You would need a chalkboard to convince Shannon Sprowls exactly how she was being harassed or spoken to lewdly. It was a cop who made himself witness of all of that Plaintiff did and combined it, because he disliked Plaintiff's speech.

10.    If Plaintiff said "fuck you", Defendants would know he doesn't actually want to (and nor would they assume Plaintiff meant Taylor rather than Schorsch). And if Plaintiff then went to the beach, Defendants wouldn't claim Plaintiff was stalking anyone. (10.1) But when Plaintiff is talking to politicians about their crimes, suddenly those very same politicians will say they have discretion to call that speech a crime. (10.2) Just not in criminal court, in civil court, like Whole Woman's Health

v. Jackson. (10.3) And specifically a civil court where politicians enjoy special license to approve media coverage of their own crimes, (10.4) while avoiding all witnesses and discovery to this day.

11.    Defendants will claim this Complaint is too long and tedious with too many details, and rather it is "fair" to call Plaintiff a sex criminal without being bothered to read anything. (11.1) But real journalists who are not negligent promoters of malicious clickbait should recognize the overriding value and necessity of recounting actual details in official proceedings "so that the public may be kept informed of the workings of government." (Ortega v. Post-Newsweek Stations, 510 So. 2d 972, 976 (Fla. Dist. Ct. App. 1987))

12.    While Plaintiff is not an expert on law, he is an expert on his own experiences with Florida government. The actions of Florida government which Plaintiff has observed are not previously covered in any university class or recounted in any bar exam, so someone with a legal education should not presume to second-guess the witness.

13.    Of all Plaintiff has seen he is the firsthand witness, without the fake theater of an Oath, but with no legal reason to be second-guessed by anyone's gossip, hearsay, or imagination of what is plausible.

# **TABLE OF CONTENTS**

## DEFENDANTS DEPUTIZED TO ATTACK POLITICAL SPEECH

1    Attack on Political Speech Delegated to Private Party

## PHIL ARCHER'S PATTERN OF CONDUCT

9    Mulrenin Case All Lies
12   Plaintiff Uncovers Fishy Stuff
14   Plaintiff Alerts Archer about Fake Case
16   Phil Archer Supervised Employees to Hide Video
18   Archer Coaches Witnesses to Change Testimony and
     Fake Evidence after Plaintiff's Complaints
25   Archer Coerced Inmates to Accuse Plaintiff of Murder
29   Plaintiff Documents Archer's Perjury Online
31   Seminole Clerk Hides Jackson's Trial Exhibits
35   Archer Supports Internal Affairs Ignoring Crimes
37   Plaintiff Starts Political Speech about Police
43   Political Speech Around January 6th, 2021
49   Archer Sends Cops onto Plaintiff's Property
53   Posted Fliers About Archer at Stetson University
55   Plaintiff Illegally Barred from Social Media for Five Months
58   Jackson Loses Opportunity for Appeal caused by Archer as Witness
59   Phil Archer is Only Witness in Scam Arrest Affidavit

## INTERNET AND DUE PROCESS IN FLORIDA

71   The Voter is the Designed Regulator of Due Process in Florida
77   Why Governance of Due Process was Handed to Voters
86   Political Communication is the Transcript for Review of Due Process
96   Internet Quorum Stronger than Law
98   Constitution has Jurisdiction over Trials in the Media

## FLORIDA CIVIL DEFAMATION ACTION

100  Fair is Determined by Who Decides under What Standard
107  Defendants Maliciously Defame Plaintiff
121  Florida Civil Defamation Complaint
132  Florida Motion To Dismiss Hearing
140  Standard For Dismissal
146  Motive Of Florida Judges
147  Nexus Between Okeechobee Court And Police

## DEFENDANTS ARE STATE ACTORS

152   Defendants' Speech Not Protected by First Amendment
155   Public Benefit is Truth, and Who Decides
157   Florida Law is Designed Negligently to Deprive
163   Never Got to a First Amendment Standard in Court
166   Intent of the First Amendment
168   A Real Official Proceedings Standard
170   Criminal Activity Not First Amendment Speech
174   Schenck and Government Speech
177   Mentioning or Believing the State Do Not Immunize
179   No Duty-Free Zone between Defamation and State Action
180   State Action Tests
182   Created by State Law and Action
187   Encouragement, Symbiosis, and Nexus
294   Alito Says Government Approval Muffles Disfavored Viewpoints
198   Assuming Government Goodness and Truthfulness
199   Florida Shapes Speech by Extending and Withdrawing Privilege
202   Interdependence With Due Process
208   Interdependence With Prosecutorial Immunity

## STIGMA AND PLAINTIFF'S PROTECTED RIGHTS

212   Stigma Deprived Plaintiff of Reputation and Opportunity
221   Loss of Employment Opportunity is Between Witness and Jury
225   Stigma and Political Grievance
227   Stigma and Political Speech About the Mulrenin Case
229   Defamation Deprived Plaintiff of Due Process
233   Due Process in the Pinellas Case
236   Due Process after Inspector General Complaint

## PARTIES, JURISDICTION AND VENUE

238   Plaintiff and Defendants
239   Jurisdiction, Venue, and Jury Trial

## LIST OF CLAIMS

241   I     STIGMA PLUS A PROTECTED INTEREST
248   II    PLUS DEPRIVED OF POLITICAL SPEECH
254   III   PLUS DEPRIVED OF DUE PROCESS

## RELIEF REQUESTED

256   A      Enjoin Defendants from Speaking about Plaintiff
257   B      Award Compensatory Damages
257   C      Award Deterrent Punitive Damages
257   D      Grant Any Other and Further Including Declaratory Relief

257          CONCLUSION

## PHIL ARCHER'S PATTERN OF CONDUCT

### Mulrenin Case All Lies

14.    Phil Archer prosecuted Seminole County 2016-CF-003668 based on a fabricated narrative of the robbery a strip-club manager and convicted pimp James Mulrenin.

15.    The strip club sold $40,000 of dance coupons to two unnamed men on their credit cards, in an unusual event despite it being a tiny dive where tips are normally a dollar. The strippers were strangely owed less than $4k of the $40k. The manager was supposed to get cash from the bank the next day to exchange for the coupons. Except before the cash was ever withdrawn from the bank, the manager was reported to jump off his fifth-floor balcony in an apparent suicide, by two joggers who saw him and shouted "don't do it, don't jump".

16.    The manager Mulrenin took a young female employee Mandi May Jackson home with him who has a brain injury and had been a hooker since age 13, and who was short on cash for not being able to get paid until the next day (and because the

manager made her sit with him all night rather than with cash customers). Plaintiff and others had many times known the manager to do this, including from when Plaintiff first met the manager in 2012, and according to testimony when the manager was prosecuted for racketeering at another strip club with the same owners.

17.    Mulrenin drugged his employee without her knowledge (leaving her without memory of much of what happened), which was also supposedly Mulrenin's common practice according to many firsthand witnesses. Security video showed the female employee's boyfriend wandering around the manager's apartment building, and finding the female employee's car in the garage.

18.    After the manager's death, the female employee was seen with her boyfriend using the dead manager's credit cards at Walmart. When the other managers heard the manager was dead and a blonde girl was seen on video with him, the other managers claimed the $40k had vanished. There was a sensational but incorrect story in 100 newspapers that the employee was once arrested with GHB (6.7 pounds!), which made it easy to promote the fake idea that the employee had drugged the manager and stolen the $40,000 which never left the bank.

19.    The names of the two customers who held more than $30k in dance coupons have never been revealed. Altamonte Springs police lied that they couldn't see any video at the strip club, and most of that video was deleted.

20.    Altamonte Springs police wrote an arrest affidavit that the employee and her boyfriend arrived at the manager's apartment at the same time (perjury), the boyfriend was on video texting the female employee inside the manager's apartment (perjury), they spent 85 minutes robbing the manager (invented), and after the manager went over the balcony, the employee stayed in the apartment ransacking the apartment until police came (perjury). But the apartment was not ransacked and many valuables in plain sight were not taken, the employee had no communications of any kind and the boyfriend did not even have a phone, the boyfriend and girlfriend were never seen together on video, and the police deleted the video timestamps and lied at trial about the timestamps being wrong. And there is no evidence the employee actually stole any cash, but rather that she had no cash.

21.    To support a planned-robbery narrative, Phil Archer and police orchestrated an enormous body of perjury, involving more than 10 state witnesses committing more than 50 instances of perjury. The primary elements were a) faking video times to make it look like the boyfriend arrived in concert with the employee, b) faking the manager's blood and DNA on five gloves with the boyfriend's DNA, and c) coaching witness perjury that the victim was shot while fleeing.

22.    A large part of the robbery narrative was invented in the regional newspaper "Orlando Sentinel" with a series of six immune lies and embellishments by an editor

whom Plaintiff found to have some personal connection to the dead manager. Witnesses were then let out of prison as payment for reciting this public gossip in court.

**Plaintiff Uncovers Fishy Stuff**

23.    Plaintiff was familiar with the strip clubs on Orange Blossom Trail. Plaintiff knew the female employee Mandi May Jackson was a hooker, and was familiar with her pimps and boyfriends. Plaintiff got a copy of the arrest affidavit and went to the crime scene. Based on behavior patterns of the participants which Plaintiff was very familiar with, Plaintiff had a good idea what really happened, and that it was not a robbery. For this reason Plaintiff spent more than $100,000 hiring lawyers for Jackson, to protect an innocent person.

24.    When the lawyers Plaintiff hired got Jackson's discovery, they started acting different and refused to show any to Plaintiff. Plaintiff paid to get public records to see the discovery. When Plaintiff saw some of the evidence didn't match what police said and didn't add up, Jackson's lawyers seemed to passively agree, but then stopped talking to Plaintiff and also to Jackson and her family. Plaintiff saw in court that the lawyers were friendly with the CSI Alison Smolarek who faked the glove and bullet evidence, and had some subtle social dynamic going on.

25.    When the state disclosed the first fake jailhouse confession, Jackson's lawyers went dead silent to Plaintiff, Jackson, and Jackson's family, and asked for

continuances. At the same time, strip-club drug dealer Chris Dahl's lawyer Adam Reiss filed to seal the case in Orange County where he was Dahl's lawyer. Plaintiff saw the star jailhouse confession witness Julie Madara had a lawyer from the same office as the lawyer of the dealer Chris Dahl, who was also once Jackson's boyfriend. Jackson's lawyers had no comment when Plaintiff emailed them about this.

26.    Jackson's lawyer was previously jailhouse witness Madara's lawyer (in barter for services at a nail salon). As soon as his case working for Dahl was sealed, Dahl's lawyer Reiss who was paid cash to represent Dahl in Orange County, walked into court in Seminole County as the new lawyer for confession witness Madara, who had not paid cash to a lawyer in years of being a criminal. Dahl's lawyer basically bribed Jackson's lawyer by getting a confidentiality waiver from her previous client Madara, that guaranteed Jackson's lawyer could keep her $100k retainer.

27.    According to Jackson and a lot of corroborating evidence, boyfriend Love was not actually in Jackson's car, but was at Dahl's house before coming to Mulrenin's apartment looking for Jackson, and Dahl drove Love there. (Love has sworn twice that he borrowed a motorcycle, which Dahl had many of at his house.) Dahl is a witness that Love was at Dahl's house, and not with Jackson as faked in the video and by jailhouse confession witnesses. (The moment Plaintiff says jailhouse confession witness, any honest judge with a clue should know the whole thing is a scam faked by Archer, and any other conclusion by a judge makes a mockery of

courts and his profession.)

28.    Plaintiff discovered that Dahl's lawyer had met with confession witness Madara, and substituted in as her lawyer, at the same time as Madara came up with her fake confession which she then told prosecutors to get from Dahl's lawyer, and around the time he negotiated Dahl's plea bargain in Orange County. But all this was hidden from Jackson, who was held without bond (or even a bond hearing) and kept sedated in isolation so that Plaintiff was unable to communicate with her.

29.    Plaintiff complained to the Florida Bar that when Dahl and Madara's lawyer Reiss arranged to keep Jackson's lawyer on the case with Madara's confidentiality waiver, Reiss being Dahl's lawyer was hidden from Jackson, and Jackson's lawyers were doing a lot of sketchy stuff. The Bar said the judge approved it, Plaintiff had no legal right to talk to Jackson, and so it was none of Plaintiff's business.

30.    Everybody mentioned either got paid, got out of prison, or got elected, by lying, hiding things, and taking Jackson's life for a crime that never happened.

**Plaintiff Alerts Archer about Fake Case**

31.    Plaintiff saw there was no evidence of a planned robbery, and knew from his own knowledge that the star jailhouse confession witness was lying. Plaintiff was naive, and was not aware of the politics involved. Plaintiff misunderstood that

perhaps Phil Archer and others did not realize the alleged crime did not even happen. So Plaintiff emailed some government officials in Seminole County that the evidence had parts police had lied about and misrepresented. Plaintiff sent paper letters to Phil Archer, basically saying what is up with this fake case where the boyfriend obviously did whatever happened, and letting felons out of prison for lying?

32.    Starting in 2018, Plaintiff sent Crimeline tips about the fake evidence that were forwarded to the Florida Department of Law Enforcement in Orlando. Plaintiff's tips included documentation that there was something wrong with inconsistent statements and impossible evidence, particularly CSI Smolarek's bullet evidence, the video evidence from Mulrenin's apartment, and the witnesses who changed their stories to match Detective Sprague's "shot while fleeing" narrative. Plaintiff sent documentation showing how what police were saying about the evidence was lies, but Plaintiff had not yet fully pieced together exactly how and why all the evidence was tampered.

33.    When Plaintiff finally went to the FDLE office in person to try to get a response, the FDLE agent suggested to Plaintiff basically they had talked to the lawyers in Seminole County and there was nothing to see. They said it is up to private defense attorneys to prosecute cops lying in Florida, and Plaintiff should let the lawyers handle it. The FDLE revealed that they talked to the cops in Seminole

County, and it later came out that the cop who faked the video, Officer Jackson Athaide, worked for the FDLE.

**Phil Archer Supervised Employees to Hide Video**

34.    The video clips from Mulrenin's apartment provided to the defense had no timestamps of any kind, and could not be explained in any way that made sense. Key moments claimed by police to be in the video were strangely missing, including Jackson supposedly distracting the manager in the garage so her boyfriend could enter the apartment, her boyfriend Love propping open the door to enter the murder, and Love leaving.

35.    For this reason Plaintiff looked very closely at the clips, and also at video of Detective Sprague showing video clips to another witness who was coached to lie, Neisha Cintron. Plaintiff saw Sprague accidentally showed Cintron a clip of a dog walker in the garage at the same time as Jackson and Mulrenin. Sprague told Cintron it was the wrong clip and he had not showed it anyone. That clip was not included in the discovery provided to the defense.

36.    In an effort to figure out what Detective Sprague was hiding, Plaintiff made a public records request to Phil Archer's office, including screen grabs and describing the undisclosed video. Archer's employee Crystal Martin lied to Plaintiff that the undisclosed video of the dog walker who could tell you what time he walked his

dogs, was exempt from public records because it contained state surveillance secrets.

37.    When Plaintiff asked Jackson in prison about the impossible timeline, Jackson said she told her lawyers Love could not have arrived when police claimed he did. Jackson's lawyers told Jackson she was the one who was lying. But at the same time as Jackson's lawyers were telling Jackson she was the one who was lying, on the outside they were acting in court and in front of other people like they knew the video times were fake. Jackson's lawyer told Plaintiff in the courtroom that she knew police faked the video time of Love's arrival, saying "Oh I know, can you BELIEVE they did that?" But again, when Jackson said it in private without knowing what her lawyers were saying to other people, her lawyers told Jackson she was the one lying.

38.    Archer's employees also hid pawn shop video and what was left of the video from the strip club, from Plaintiff's public records request and the defense.

39.    When Plaintiff got his public records of Jackson's discovery, Plaintiff immediately noticed the pawn shop video was missing. Archer's employee gave Plaintiff a CD labeled "pawn shop video" with a folder labeled "pawn shop video". But the video in the folder showed someone stealing TV's from an office. Plaintiff emailed Archer's employee right away to ask for the correct video. After responding to all Plaintiff's previous emails promptly, Archer's employee did not respond or ever email Plaintiff again.

40.    Plaintiff continued leaving messages and asking in live calls for the pawn shop video he paid for, as much as a year later. Plaintiff mentioned in an email to the prosecutor and judge's assistant that the pawn shop video was obviously missing. There was no doubt after Plaintiff's contacts with four different people and getting nothing but silence, and after no pawn shop video was shown at Love's trial, that they were aware the pawn shop video was missing, or that they failed to provide it.

41.    Archer then violated the rules of discovery by failing to provide some different pawn shop video they actually had before Jackson's trial, which the prosecution previously argued regarding a motion in limine, portrayed a necessary element of their narrative. This contributed to a judicial error allowing unnecessary cumulative evidence, which included strange and irrelevant "bad acts" at a pawn shop.

42.    During Jackson's trial, her lawyers tried to ask Detective Sprague about the pawn shop video (the imaginary one prosecutors claimed to have, not the one they actually had and hid) and the prosecution objected because it wasn't in evidence. Jackson's lawyers said the defense never received the pawn shop video. They had a Richardson hearing and Archer's assistants lied to the judge that they had provided a different pawn shop video to the defense, one that did not show Love and Jackson pawning anything as Archer previously claimed.

43.    Plaintiff knows this was a lie, because he tried for years to get the video they claimed they had and which Plaintiff paid for, and Archer's employees hid that they did not have it and had a different video, by stopping responding.

**Archer Coaches Witnesses to Change Testimony and**

**Fake Evidence after Plaintiff's Complaints**

44.    After Plaintiff's emails and Crimeline tips about the undeniably perjured and tampered evidence, Archer's employees coached witnesses to change their lies and fake new evidence to cover up what Plaintiff had discovered.

45.    In the months before boyfriend Love's trial, Plaintiff contacted multiple people about the missing apartment garage video with the dog walker. Plaintiff requested the video from Archer's office and was lied to. Plaintiff emailed the prosecutor and judge's assistant that the video was sketchy, and sent Crimeline tips. Plaintiff asked apartment manager Michelle Ervin about the dog walker in the video, who told Plaintiff police took the whole hard drive, and then defensively said "I want justice" after which she called the police (whom she was shown in various ways to have personal connections to, with ASPD being nearby and cops living at and visiting and seemingly working at the apartment complex).

46.    And the apartment video was obviously sketchy, to anyone who was prompted by Plaintiff's emails to look at it, with no timestamp data, parts missing,

and not really making sense.

47.    In court in December 2018, maybe a week or two before Love's trial, Plaintiff witnessed Judge Recksiedler make a cryptic comment seemingly with an inside meaning known only to the prosecution, that the apartment video had been verified and would be allowed at trial. Recksiedler's comment can be taken to mean she thought the video in discovery prior to that point was fishy.

48.    Whether Recksiedler told the prosecution the video was sketchy through some back channel, or whether prompted by something else, the result was Officer Jackson Athaide made a new set of video clips right before Love's trial, supposedly from a hard drive CSI Smolarek later said had been lost. And they got apartment manager Ervin, who was a party to altering the original timestamps, and also a Mulrenin associate, to sign the disk as authentic and misrepresent that it was the original clips Athaide screen-grabbed two years earlier.

49.    Plaintiff was stunned at Love's trial, to see new video clips on the screen that he had never seen before. There were a variety of differences, including some that revealed previous clips had secretly been edited together. The new video clips Athaide made had timestamps that matched the prosecution narrative.

50.    One of the new video clips had a dog walker that had never been disclosed

before. Only there must have been some confusion, because it was not the dog walker in the garage Plaintiff had been asking about. It was a different dog walker who let boyfriend Love in the freight door. The existence of this dog walker had been redacted from all documents and kept secret for two years to this point, while Love's entry was blamed on "a non-functioning latch."

51.    It came out later that prosecutor Stone himself had asked police for the new video clips with new timestamps. But Stone did not disclose the new video clips to the defense before Love's trial. One can infer prosecutor Stone realized Athaide's new clips had the wrong dog walker. Or even worse, it was the same dog walker at the wrong time. Either way, Stone must have seen its potential to totally screw up the timeline, or add a new witness with a contradictory narrative.

52.    Even with the fake timestamps, the differences in the new video were material to the prosecution and defense narratives, and Plaintiff has elsewhere argued how Love not having this video contributed to his guilty verdict.

53.    The testimony adjustments in response to Plaintiff included Jackson Athaide saying the screen grabs he took from Mulrenin's apartment video had timestamps on the video that could not be manipulated by him. Prosecutor Lori Sacco coached Athaide to lie at trial that the timestamps Athaide was showing, and which Athaide made the previous week at the police station, were the ones he screen-grabbed two

years earlier at the apartment and could not be manipulated, when those original clips from the apartment are still hidden to this day.

54.    The testimony adjustments also included prosecutor Stone coaching Detective Sprague to say he did not recognize the unnamed dog walker who let Love in the building, and coaching Ervin to say that dog walker had moved out, as well as some sketchy things about the timestamps being off seven minutes compared with gate and door swipe logs, and AT&T and T-Mobile phone records.

55.    When Plaintiff mentioned the dog walker who let Love in to Jackson's lawyer, she had no idea what Plaintiff was talking about. But at Athaide's deposition a few months after Love's trial, Jackson's lawyer suddenly realized Athaide made new video clips which had not been disclosed to anyone. Prosecutor Stone revealed himself to be the one who requested the new clips with new timestamps, and then hid them from the defense, when Stone cut off Athaide and started answering the deposition questions himself as witness, about how and when the new video clips came to be.

56.    The testimony adjustments at Love's trial in response to Plaintiff's complaints about the evidence also included CSI Smolarek testifying a physically impossible narrative of how she found the bullet. The adjustments included some other things Plaintiff cannot immediately recall, and also Detective Sprague coming on the stand

in obvious terror of what he was about to be confronted with from all Plaintiff's complaints.

57.    But Love's lawyer didn't say a thing, because lying that Love arrived with Jackson became useful to Love, and because Love's attorney was caught completely off guard by Smolarek's fake glove testimony, among other reasons.

58.    Between Love and Jackson's trial Plaintiff sent new tips, including that CSI Smolarek had switched out gloves at trial or cross-contaminated two different sets of gloves, to put Love and Mulrenin's DNA on the same gloves when there was no other evidence Love was in the apartment or wore gloves.

59.    Plaintiff also made a Bar complaint about the faked video evidence emphasizing the timestamps being off seven minutes, about prosecutor Stone telling Neisha Cintron to lie on the stand, about witnesses of Mulrenin's death being coached to change their story, and about some other things. Plaintiff sent a copy of this complaint to The Bar priority mail and left a copy at Archer's office in Sanford, but never heard a peep back from either of them.

60.    Shortly before Jackson's trial Plaintiff was contacted on his cellphone (and later harassed in person) by Seminole County deputies who told Plaintiff to stop talking to people about the lying.

61.    In response to Plaintiff's new complaints about the fake evidence he had seen at Love's trial, witnesses changed their stories again at Jackson's trial. Smolarek now admitted there were eight total gloves, not five total as she swore at Love's trial, and that they are sometimes taken off inside out. Smolarek changed from saying they realized a tear in the sofa was a bullet hole after they found a bullet, to saying they looked for a bullet because they saw the bullet hole (which is all impossible lies either way).

62.    Athaide was more sparse and ambiguous and cautious in his claims about the apartment video at Jackson's trial. Athaide mentioned that the timestamps disagreed with some other documents, and said some dishonest nonsense about not being sure what camera was off or something. But Athaide was not at all ambiguous when he patched up the seven-minute problem, by lying that the timestamps were wrong seven minutes in the opposite direction from reality, which helped his narrative compared to the truth which ruined his narrative.

63.    The witnesses of Mulrenin's death changed their testimony again at Jackson's trial, by including a gunshot now immediately before Mulrenin came out onto the balcony. And Detective Sprague was also more cautions and evolved at Jackson's trial, and they changed a bit of other testimony Plaintiff complained about, which Plaintiff cannot recall all of at this moment.

64.    Archer's employees supervised evidence and testimony to be changed and faked in other ways Plaintiff cannot recall off the top of his head. The point here is not to document all that was done, just to show Archer's pattern of using lies to cover up crimes in response to Plaintiff's political grievance speech. And all without once responding to Plaintiff or admitting to being aware of a thing Plaintiff said.

65.    In summary, you email Archer's office with complaints about misconduct, he silently responds by sending out cops with perjury.

**Archer Coerced Inmates to Accuse Plaintiff of Murder**

66.    From 2016 to 2019, Phil Archer offered to let a series of dangerous felons out of prison, for swearing Mandi May Jackson confessed to them in the Seminole County Jail. (Bar associations are accessories victimizing the innocent, when they prohibit members from publicizing that judges who entertain this garbage are a joke.)

67.    None of the various Jackson confession stories fit the other evidence. Just a tiny subset of examples, Julie Madara said Mulrenin was drugged and thrown off a balcony which was contradicted by his blood and urine tests and witnesses who saw him jump. Kaylee Simmons said Scott Love hid in the back of the car and the gun was a black Glock, which contradicted video and the ballistics evidence. Maletta Young said the strip club was Rachel's, which seemed to be a common thread of

jailhouse witnesses, where the strip club was whichever one they lived close to; Madara said Dollhouse, Ishnar Lopez-Ramos said Cleo's. (The newspaper story which invented the fake narrative which all witnesses eventually conformed their testimony to, said in their factually inaccurate headline only "Strip Club Manager Tied Up, Robbed, and Shot Before Fatal Fall".)

68.    Around this time, Jackson was influenced to offer a story that dovetailed with fake confessions and other fake evidence, to try to get a plea deal saying Scott Love planned a robbery (which never happened), and avoid going to trial. The story Jackson came up with included the strip-club drug dealer Chris Dahl driving Love to the robbery, and did not fit the fake evidence.

69.    Jackson did not know that Chris Dahl's cash lawyer had already become at the same time the free lawyer of one of the jailhouse witnesses Julie Madara when Madara came up with her fake confession. Jackson also did not know that Jackson's own attorneys then accepted a bribe from Chris Dahl's lawyer which they hid from Jackson. And Jackson also did not know that the fake evidence which Jackson's story did not fit, was faked by her own lawyers' cop friends from back when they were local prosecutors. It would be hard for Jackson to come up with a story that would get her a plea bargain under these circumstances.

70.    Jackson got no plea bargain. (To this day, Jackson doesn't understand they

don't need a fake confession witness unless they have already arrested a person with no evidence.)

71.    In the summer of 2018, Jackson was moved to the Orange County Jail to separate her from the jailhouse confession witnesses in the various pods in the Seminole County jail.

72.    But for some reason Jackson did not get to bring her discovery she kept in her cell, and which the other inmates were given the opportunity to read when the guards variously threw it in the day room, locked Jackson in isolation, or took Jackson to court.

73.    When Jackson went back to Seminole County for court, her discovery was no longer available to her in jail, and they would not tell her who took it.

74.    The elected State Attorney Aramis Ayala was removed by Governor Rick Scott from murder cases, for refusing to seek the death penalty for the most infamous murderers like Ishnar Lopez-Ramos.

75.    Jackson was placed in a pod in the Orange County Jail with Ishnar Lopez-Ramos.

76.    During this time Ishnar Lopez-Ramos produced a series of at least 10 fake supposed confessions by other inmates, and was offered a plea bargain for 40 years in prison, down from a previous offer of 60 years.

77.    One of the fake confessions which Lopez was coerced to produce, was a fake confession by Jackson that your Plaintiff "Steve Murray" - rather than connected party Chris Dahl - orchestrated Mulrenin's murder with Jackson and Love in the 18th Judicial Circuit where Phil Archer was the elected State Attorney.

78.    This confession included that your Plaintiff provided GHB to incapacitate Mulrenin, whereas in reality connected party Chris Dahl was the one who was providing Jackson and everyone else with a different substance "G". "G" is actually a legal solvent butanediol that is primarily a placebo. (One can go to Sunbiz.org and see Chris Dahl created a company "American Industry Solutions Inc", which is the standard procedure to import butanediol from China.)

79.    Mandi May Jackson called Plaintiff from jail in September 2019, and reported what Phil Archer had done out of distress for several reasons. Jackson noted that Ishnar Lopez-Ramos admitted her crimes in jail frequently and yet no inmates were let out for claiming Lopez confessed. Whereas Jackson never confessed and yet inmates were let out of jail by Phil Archer for lying that she did.

80.    And more important, Jackson saw notes from Lopez's cellmate who had transcribed Lopez's confessions for her own use, and the notes said Jackson confessed that your Plaintiff "Steve Murry" had set up the (hoax) robbery of James Mulrenin, and your Plaintiff provided the (existing only in gossip) drug to incapacitate Mulrenin. This distressed Jackson, because what Lopez claimed Jackson confessed to contradicted the narrative Jackson wanted to testify at that time. Jackson was angry at her own boyfriend Love for Mulrenin's death and for pointing the finger at Jackson, and wanted it blamed on Love, not on your Plaintiff.

81.    Plaintiff instructed Jackson to mail the written notes of Lopez's 10 so-called confessions out of the prison which Jackson did, as evidence of State Attorney Phil Archer's informal arrangement to pay inmates for lying.  An example of these fake confessions coerced by Phil Archer in the handwriting of both Kourtney Straubel and Ishnar Lopez-Ramos - specifically the one where they were coerced to say your Plaintiff was guilty of murder - can be seen in US District Court Middle District of Florida "Case 6:23-cv-01351-CEM-DCI Document 1-14 Filed 07/19/23 Page 9 of 16 PageID 152"  and "Case 6:23-cv-01351-CEM-DCI Document 1-14 Filed 07/19/23 Page 9 of 16 PageID 153".

**Plaintiff Documents Archer's Perjury Online**

82.    Jackson was then convicted in a trial where every material witness lied. The testimony and narrative was contradictory slop from end to end.

29

83.    But as in all jailhouse witness cases, it was accepted by the jury for the same reason that Walker v. Texas says people consider license plates government speech but Matal v. Tam says they don't consider trademarks government speech: because the government manufactured one and not the other. And in this case the State of Florida selected the jailhouse witnesses and let them out of prison for saying what they said, which extra layer of selection, changing the locus of origin of the testimony from felons to government officials, is all the credibility the jury needs.

84.    Phil Archer awarded the cop who faked the original evidence, Altamonte Springs Detective Ben "Brady" Sprague, "Hugh Thomas Officer of the Year". The lead prosecutor who orchestrated the perjury, Stewart Stone, also seemed to receive some kind of award, in photos of the ceremony posted online.

85.    Plaintiff walked out of the courtroom where Jackson was convicted in November 2019, and immediately wrote a book and put up a website documenting Archer's perjury and fake evidence scams, at seminolescam.com. Crime Circus, arguably the most popular true crime Youtuber, later posted that it was the best book he ever read.

86.    Evidence that is hidden by Archer to this day includes a) the video clips of the dog walker in the garage with James Mulrenin (which State Attorney employee

Crystal Martin lied were exempt from public records for containing state surveillance secrets), b) the name of the dog walker who let convicted murderer Scott Love into the building on video, c) the audio or even a transcript of the 911 calls from multiple witnesses of the death of James Mulrenin, d) the location of the missing sofa with the blood and fake bullet hole where James Mulrenin was shot, e) the location of the "three plastic gloves with suspected blood" which CSI Alison Smolarek lied about and hid the existence of at trial and left out of her evidence log, f) the names of the two customers who bought $40,000 in dance coupons using credit cards the night Mulrenin died, and g) the name of witness who saw Mulrenin supposedly leave with $2500 cash in tips from the two customers who use credit cards, necessary to provide the robbery motive in the arrest affidavit.

**Seminole Clerk Hides Jackson's Trial Exhibits**

87.     The scans logging trial exhibits (at least the photos presented at trial), had been available for the public to view on the Seminole Clerk website for as long as Plaintiff could remember, going back three years to when they first made case documents viewable to the public online. Call this "Strictness 0".

88.     While writing the book about Phil Archer's crimes throughout December 2019, Plaintiff referred to Jackson's docket on the clerk website for scans of the trial exhibits, which showed things like how Smolarek faked glove and bullet evidence.

89.    In early January 2020, Plaintiff started showing people passages of the book he told people he was writing documenting Phil Archer's scams.

90.    On January 8, 2020, after being publicly visible as long as Plaintiff could remember, including Love's trial exhibits which were visible starting a year earlier, Plaintiff saw the scans of the trial exhibits were suddenly marked as "confidential" on the clerk website, and Plaintiff could not see them any more. Call this "Strictness 1".

91.    Plaintiff called the Seminole Clerk, and they said Plaintiff would have the same access to trial exhibits as before, if he provided his name and email and became a registered user. Every government employee in the courthouse seemed to know who Plaintiff was during Jackson's trial, so Plaintiff did not fill out the application to provide his name.

92.    Plaintiff bought the domain name "seminolescam.com" on January 14, 2020. That same day, Plaintiff put up a web page starting with a link to a map of the cell tower records from Jackson's discovery, some pictures of Jackson, and a notice that all the evidence from the Mulrenin case would be posted on the page.

93.    On January 15, 2020, Plaintiff added the pages of his book about Phil Archer to the seminolescam.com website, and worked on that for two days.

94.    On January 17, 2020, Plaintiff added evidence photos documenting CSI Smolarek's glove scam, and how police staged credit cards and other evidence in Jackson's car, on the web site. Plaintiff continued adding evidence photos and explanations of the perjury and tampered evidence to the web site for several days.

95.    During the period from January 17 to January 21, Plaintiff started posting links to his work, so that people would be able to see how Smolarek faked the evidence.

96.    On January 21, 2020, the scans of Jackson and Love's trial exhibits went from being blocked from view as "confidential" on the clerk website, to no longer being in the list at all on the clerk website. Call this "Strictness 2".

97.    On January 21 and again on February 4, 2021, Plaintiff emailed the Seminole clerk to ask if becoming a registered user would still allow Plaintiff to see the trial exhibit log scans, given they were removed from the online document list. Plaintiff also included a link to Plaintiff's website.

98.    On February 5, 2020, the clerk emailed back that logs of trial exhibits were only scanned in for cases that were on appeal, but were viewable for those cases. (The clerk seemed to imagine the exhibit scans were still in the list, and if they weren't there it was because the case was not on appeal.)

99.    The clerk asked what case numbers Plaintiff wanted to look at, to see if the cases were on appeal and therefore the scans would be viewable by Plaintiff. The clerk wrote "the exhibits are not scanned into the case file unless the file goes to the appeals court... Would you like to share with me the specific case numbers that you would like view so that I can see if the exhibits for those cases are scanned and available online?" Call this "Strictness 3".

100.    Plaintiff immediately emailed the clerk Jackson and Love's case numbers. After about an hour, the clerk responded with a new answer that the exhibit scans were also not available for cases on appeal, saying "the current business policy is that no access to exhibits is allowed, neither electronic nor physical, on cases on appeal." Call this "Strictness 4".

101.    Between February 5 and February 20, 2020, Plaintiff continued adding photos of the fake evidence to his website, and sending links to people in Seminole County including court officers. Plaintiff did not contact the clerk or ask the clerk any questions during this time.

102.    On February 20, 2020, without having been asked anything by Plaintiff for weeks, the Seminole clerk emailed Plaintiff out of the blue with yet another policy that was even stricter still, saying "based on a July 1, 1973, General Administrative

34

Order... access to criminal case evidence can only be granted through a written order of a division judge." Call this "Strictness 5".

103.   After being unchanged and viewable for years, Seminole Clerk policy for whether scans logging trial exhibits were viewable went up five times over 44 days, almost exactly timed to Plaintiff telling people how Smolarek lied at trial, posting pictures documenting how the evidence was faked, and sending people links to the documentation on Plaintiff's website.

104.   Plaintiff pointed out to the clerk that the scans logging trial exhibits were not the actual exhibits, they were low-grade photocopies in computer files which are public records under Florida law. At the time of the 1973 order saying nobody could access trial exhibits, there were no photocopies on hard drives. In 1973 the order referred to the actual exhibits, like actual guns and bloody shirts and stuff. The clerk didn't care, they were absolutely never giving Plaintiff access to the scans logging Jackson and Love's trial exhibits again.

**Archer Supports Internal Affairs Ignoring Crimes**

105.   Starting in February of 2020, Plaintiff provided the documentation of cops committing perjury to Internal Affairs ("Professional Standards") at the Altamonte Springs Police Department. The other cop who picked up another extension said Lieutenant in Internal Affairs Marcos Ramirez was right there and would pick up his

phone. But IA Ramirez never picked up his phone or responded to Plaintiff's messages. Plaintiff sent multiple emails to IA Ramirez and Police Chief Daniel Smutz and never heard back.

106.  Ramirez did seem to get Plaintiff's messages and emails and tip off the prosecutors or seek direction, when the links Plaintiff provided to Ramirez instantly got clicked by a Windows desktop PC on cable Internet in Altamonte Springs, followed immediately by clicks on the same links from the Sanford courthouse where the prosecutors are. On one occasion, those clicks were immediately followed by cellphone clicks in Cocoa where prosecutor Phil Archer seemed to be. On another occasion those clicks were immediately followed by clicks from Daytona Beach which happened to be where the Florida Attorney General appeals lawyers were at that time working on Jackson's appeal. This gives the appearance that rather than investigate his fellow cops, Ramirez immediately asked the prosecutors what to do, and the prosecutors said to ignore Plaintiff and the crimes Plaintiff documented..

107.  Throughout the Spring of 2020, Plaintiff sent documentation of Archer's crimes to government institutions all over Florida. This included a complaint to the Office of Executive Investigations in Tallahassee. They said they were forwarding it to the Altamonte Springs Police Department, because ASPD was the only office with jurisdiction to investigate their own crimes according to Florida law. Plaintiff never heard anything in response.

**Plaintiff Starts Political Speech about Police**

108.   When George Floyd died in May 2020 in the middle of a Presidential campaign, it was easy for Plaintiff to find people interested to discuss police misconduct, to use Plaintiff's website to show them examples of police lying without punishment, and to hear back from people who support police lying and why, including cops themselves. This was helped by the anonymity of web forums, and the existence of forums where everyone had the same beliefs and received positive feedback for expressing them.

109.   Plaintiff eventually heard from enough cops and their supporters, to discover they held a common moral philosophy that police lying and coerced witnesses lying is good, and why. But nor was this philosophy promoted from any central institution or person. The same philosophy seemed to form spontaneously in different places, independently of each other. The most common influences were the false "hands up don't shoot" accusation of officer Darren Wilson, Heather McDonald's book "The War on Cops", and the OJ Simpson and Casey Anthony trials.

110.   Plaintiff discovered some amusing curiosities, such as that each town had a group of lying cops who thought they were the only ones doing it, without realizing there were cops in the next town doing the same thing. And when Plaintiff talked about what the cops were doing, Plaintiff was told repeatedly that they knew Plaintiff

must himself be a cop to know their secrets, and Plaintiff is only objecting because he is the rare one who got punished for some reason, and now Plaintiff is bitter and wants to ruin it for everyone else.

111.    Plaintiff also heard from countless ordinary white people like Plaintiff, who were livid about cops lying and the lack of any institutions to stop, punish, or deter it. It seemed like every random white person Plaintiff met around town had some story of cops lying. They were not accustomed to a sympathetic ear, but they would eagerly open up and start ranting about the lies cops told, if you indicated you were receptive to hearing such facts. The conversation usually started like "What's up?" I'm writing a book about cops who lied about my friend. "Oh, some cops lied about me or my friend also!"

112.    Many people experienced almost identical patterns of official misconduct, which includes that there is a social stigma attached to openly complaining about it. So that you cannot form a "the cops lied about us" group, or go around with such a bumper sticker. They usually referred to the problem as "the old boys network", which was their way of saying court outcomes were decided socially and then fixed with lies. They dared not speak up about it in public, out of fear of retaliation in the street by the cop cult.

113.    These people were natural Republicans (rural, white, business owners), but

they were not turning out to vote at all, or even voting libertarian. They were not a "silent majority", more like a "silent group large enough to swing close elections".

114.   Being naive and new to all of this, Plaintiff was at first shocked at all the standardized lying intentionally going on in criminal courts. Plaintiff got a list from the Florida Secretary of State website, showing every candidate running for office in Florida before the primary elections (which were not until August 18, 2020). Plaintiff emailed every Republican running for the legislature and said they needed to stop fraud in the criminal justice system, because it was negatively affecting swing voters and Republican voters and helping Democrats win elections.

115.   Plaintiff also called his representatives by phone, and contacted every prominent Republican in Congress. Plaintiff sent links to his web pages and complaints about cop perjury, to at least 500 politicians, political activists, and government institutions in thousands of emails and posts, over and over every day.

116.   Plaintiff was surprised by the strong emotional attacks he got in response from his fellow Republicans, who Plaintiff thought shared his own belief system. They ignored Plaintiff, told Plaintiff to shut up, or called Plaintiff an evil marxist enemy combatant (somewhat in proportion to the anonymity of the setting). Plaintiff tried to raise their interest by saying there were more people like Plaintiff than they knew, who were tired of being victimized by lying cops - it was not all black Democrats

protesting police - and white Republicans like Plaintiff would cost Republicans the 2020 election.

117.    Plaintiff made up some math about what percentage of the time cops lie, how many traffic stops or interactions per county per week, how many counties in the United States, and how many years it takes someone or his family to forget about cops lying. It came out to something like four million people who hate cops lying, pretty close to the number by which Trump lost to Hillary Clinton in the popular vote. Plaintiff started sending that around.

118.    Plaintiff also compared families with someone in prison to immigrants who vote Democrat, to show that Republicans have a bigger electoral problem based on the prison population than the Mexican population. Plaintiff started sending that around.

119.    Plaintiff searched the web for political candidate email addresses on Facebook pages, email addresses on campaign websites, and contact forms on campaign websites. Plaintiff preferred the contact forms as the best chance to make it into the inbox rather than the spam box. If the contact page emailed Plaintiff an automated response, he could reply to the response and not be spam. The contact forms also asked for a phone number, and occasionally Plaintiff got a call. Sending 1,000 emails is a numbers game, and not very personal.

120.    Plaintiff emailed hundreds of politicians without getting any response. The only result was occasionally being added to a fundraising blast list. Plaintiff understands such addresses are not used for dialog, but more for politicians to get a feel for the level of interest on issues, and the passion on one side or the other. Sending an email to them is more like participating in a poll or shouting in a crowd. Even if you get someone to pick up the phone, they just give you stock or answers or in Plaintiff's case hostile answers, and never any individual acknowledgment of your statements, unless you are a donor.

121.    Plaintiff found State Attorney Phil Archer's email address advertised on what appeared to be a campaign Facebook page, prior to his 2020 primary. Plaintiff emailed Archer before the 2020 election that Republicans would lose not because of black marxists, but because of white people like Plaintiff who don't like lying cops. Plaintiff specifically noted how Trump was pardoning black people and letting them out of prison, in a desperate bid to overcome the damage Archer was doing. It seemed Archer's assistant or whoever if anyone monitored the mailbox, was not reading anything Plaintiff said, to even get to the point of ignoring it.

122.    After the Florida elections primary on August 18, 2020, the number of people running for office went way down, and attention turned away from police misconduct to the November election. Plaintiff wrote an essay about the general

41

belief system he had been told as the moral justification for cops lying and faking evidence. On August 20, 2020 Plaintiff bought the domain name "cops2prison.org" to sort of journal and record what he had learned, and put this essay on the front page titled "Massive Demand to Lock Up The Innocent in a Democracy".

123.   In October 2020, Plaintiff undertook to email every relevant Republican legislator in Florida that Phil Archer and his scumbag activity was going to cost them the election. The emails all said something close to "Have you noticed Republicans coming up dry at the old crime well, among white voters, and in swing states, in the 2020 election?" Plaintiff wrote a custom email each time, so that mail servers would not think it was spam, and also because Plaintiff was developing his ideas.

124.   After emailing every state legislator on the 2020 Florida candidate list, Plaintiff started emailing every Republican State Attorney who ran for office in Florida, telling them scumbag Phil Archer was destroying all of their reputations. There were Republican prosecutors who were not on the candidate list, so Plaintiff emailed every Republican prosecutor he could find, and said that they would lose because of Archer. Again, Plaintiff said something a little different each time, developing his ideas, and using different email accounts in hopes that it would not get tagged as spam.

125.   Plaintiff combined all the variations of this email about why Republicans

would lose into a single essay on cops2prison.org, titled "Timeline of Destruction of the Republican Party".

126.   State Attorney Phil Archer later characterized Plaintiff's political speech as a crime, when he said "In his own statement, Plaintiff admits to sending over a thousand emails to elected and government officials." (US-FL-SD 2:21-cv-14355 ECF 20 page 2)

127.   The Pinellas Sheriff later referred to Plaintiff's political speech as "Murray's toxic emails and social media posts" (US-FL-SD 2:21-cv-14355 ECF 9 page 2).

**Political Speech Around January 6th, 2021**

128.   Trump lost the 2020 election, as Plaintiff predicted. More specifically, exit polls showed Trump gained in every demographic compared to 2016 except white people, and specifically white males with no college degree like Plaintiff. (128.1) When Trump said the election was stolen in Democrat inner-city districts in Michigan, his advisor told Trump that he actually did better than 2016 in the inner city, he lost white votes in the suburbs.

129.   After sending literally hundreds of emails telling Archer and other Republicans that Archer would cost them the 2020 election among white people, Plaintiff sent a series of "see-I-told-you-so" emails.

130. Plaintiff emailed Phil Archer copies of reply emails from legislators after Plaintiff told them Archer was a scumbag who cost them the election, so that he would see legislators were reading what Plaintiff said about blaming Archer.

131. Plaintiff emailed Archer a log of IP address hits from "U.S. House of Representatives (house.gov)" on Plaintiff's website seminolescam.com. The log included "state_attorney_phil_archer.gif" in the filenames requested, to show Archer that Republicans in Washington were reading Plaintiff's documentation of Archer's crimes and should blame Archer for their election loss.

132. Plaintiff also sent Archer the January 6th biker video email which Plaintiff referred to in the opening paragraphs of this Complaint, which Defendants said was "lewd" and was "stalking Shannon Sprowls". (132.1) Despite Plaintiff telling Republicans in this email and elsewhere that white voters cost Republicans the 2020 election, they are still searching for voter fraud, and still have no idea that Trump lost, or whose votes he lost, and are still calling Plaintiff a sex criminal for saying it.

133. After emailing every Republican who ran for the legislature a second time, and emailing every Republican State Attorney candidate calling Phil Archer nasty names, Plaintiff began to consider that there was also a list of judges running for office. Since judge candidates do not advertise a party affiliation, Plaintiff wondered

if there was a way to search which judges were Republicans. Plaintiff also was not sure how to contact judges, and ended doing web searches, before ending up on the Florida Supreme Court web page, and looking for a way to contact or file a complaint with the Florida Supreme Court.

134.   Somehow prompted by something Plaintiff saw on the Florida Supreme Court web page, at the same time as maybe trying to find out the party of a Pinellas County judge candidate, Plaintiff came across news stories that a Pinellas State Attorney McCabe had just died, and found out that the Speaker of the Florida House of Representatives was a Republican former prosecutor named Chris Sprowls. A news story featured a Tweet from Sprowls about McCabe and about Sprowls working at the prosecutor's office. As a leading legislator and former prosecutor, Sprowls seemed like the perfect person and place to direct Plaintiff's political grievances to.

135.   Plaintiff clicked on the Sprowls tweet about prosecutor McCabe, and landed in a conversation death-glorifying the proud legacy of a Florida prosecutor. Plaintiff took the opportunity of all these people saying how great McCabe was on Twitter, to say Florida prosecution during McCabe's life became a cesspool of coerced testimony, fake evidence, and perjury, and posted links to Plaintiff's documentation.

136.   Plaintiff was used to comment websites. Plaintiff did not yet understand how Twitter worked and did not understand the difference between a Tweet, a reply, a

tag, and a comment, or whom he was replying or sending his messages to.

137. One of the political participants was Shannon Sprowls. Twitter showed Plaintiff Tweets from Shannon Sprowls, perhaps because she posted political Tweets more often or more recently than Speaker Sprowls. Shannon Sprowls's Twitter background was a picture of herself on Air Force One with President Trump. Shannon Sprowls was advocating for Republicans trying to overturn the election.

138. Plaintiff thought they were vain for not realizing their criminal justice policies cost them the election. Because this was around Christmas many Republicans posted Bible quotes to signal Christian values, so Plaintiff found a list of Bible quotes on hubris, and posted them with the picture of President Trump on Air Force One with Shannon Sprowls.

139. The most popular public grievance against Phil Archer at that time, and the only one papers seemed interested to report on - and which Phil Archer stubbornly remained silent on - was Joel Greenberg and the underage trafficking case, and why does Phil Archer let Republicans get away with all this brazen crime in Seminole County.

140. Ghislaine Maxwell had also been charged in New York at that time, for crimes committed by Jeffrey Epstein in Florida. People said a Florida prosecutor let

Epstein off because Florida prosecutors don't prosecute VIP's for sex crimes.

141.   Epstein was not as directly associated with Archer as the Greenberg/Gaetz/Dorworth stuff. But given the extreme media coverage of Ghislaine Maxwell supposedly collecting young girls from around Florida and taking them to Epstein's Florida mansion, making fun of the Epstein and Greenberg cases is the only reasonable reference for any politically-involved person to take from Plaintiff's question emailed to Archer "Is pimping legal in Florida?" (141.1) No witness has ever claimed to misunderstand Plaintiff when he sent this sentence in a private email to Archer, no matter how cute judges may find it to wink and live in a world of make-believe.

142.   It was reasonable to expect after federal prosecutors charged one Republican elected official Joel Greenberg for having paid sex with a minor, and the minor reportedly said other Republican elected officials including Matt Gaetz and Florida House speaker-designate Chris Dorworth paid to have sex with her - and everyone was accusing politicians of pimping and all this took place in Archer's jurisdiction by members of his faction - when you say to Phil Archer "is pimping legal in Florida" he knows exactly what you are talking about. And that is all these trollops being purchased in his jurisdiction. (142.1) Which includes Mandi May Jackson by James Mulrenin (who had a Trump keychain and went to Trump rallies), if you were familiar with Plaintiff's book, which all these people were.

143.   It should be noted that Plaintiff never got one response from Archer, or even an indication that he read Plaintiff's emails (apart from possibly the clicks after contacting ASPD Ramirez).

144.   As such, Phil Archer is not a crime victim or even a reasonable person, but a politician who chose to ignore and not respond to dozens of grievances about his own felonies. Plaintiff did not put his emails on the side of a blimp, but sent them in private to a known scumbag who ignored dozens of felonies reported to him by Plaintiff.

145.`  Plaintiff had previously sent dozens of emails calling Phil Archer an "axxhole", a scumbag, and similar such things, including to his prosecutor peers. (145.1) Plaintiff thought Republicans were a joke, in denial that the Black Lives Matter side actually won, and white people who hate cops and Phil Archer cost them the election. (145.2) Plaintiff sent Archer an email making fun of them, with a photo of an unnamed woman on Air Force One with Trump, who was supporting their silly claims that the election was stolen. The tone was along the lines of "Your practice is to let off VIP's like Jeffrey Epstein and Joel Greenberg for sex crimes, while pretending to be tough on crime. Look at this crazy bitch with the ridiculous claims the election was stolen. Losers!" No party to it has said otherwise.

146.   That email was sent in private to Phil Archer, and did not contain the name Shannon Sprowls, just a picture of Trump with one of his supporting political operatives. (146.1) These slimy elected officials are a joke, and it is fair to use the tone used in common discourse between common citizens, to address them. (146.2) You may not like this email, but it was not sent to you, and it is not "stalking Shannon Sprowls" in any reality in which people speak English. (146.3) And nor was anything else "brought to light" in any official proceeding that could be fairly characterized that way, without being a government attack on Plaintiff's speech. (146.4) Which every person not involved in the fake reality of a biased Florida judge knows, including the Pinellas prosecutor.

147.   Defendants would later characterize this political speech email as approaching Shannon Sprowls with stealth, (147.1) and thereby give political cover to Archer stopping Plaintiff's speech about Archer's crimes for five months, under color of law.

**Archer Sends Cops onto Plaintiff's Property**

148.   The spirit of the moment on January 6th, 2021, was the Republican faction believed it was justified to break the law to save the country. They believed the "Black Lives Matter" people who were at that time criticizing police and Trump's election claims were the enemies of their faction and a threat to America.

149.   This culture was popular in the Tampa area; dozens of people from the Tampa

area were prosecuted for crimes committed on January 6th, 2021.

150.    The people who are supposed to protect us from violent disenfranchised people - local police - had become the aggrieved ones looking for revenge. They had a grievance over the Black Lives Matter riots and Trump losing and cops being prosecuted for the deaths of George Floyd and Ahmaud Arbery and others, and they didn't know how to cope with it. (150.1) So they lashed out by using perjury and attacking Plaintiff.

151.    The course by which Florida police became radicalized to where they were willing to break the law and harm others with a perceived moral justification, followed a standard pattern.

152.    The first stage is the loss: A cop gets shot, a jury sets OJ free trashing Det. Fuhrman, a cop is falsely accused like Darren Wilson in Ferguson, Missouri.

153.    The second stage is humiliation, anger and blame: Millionaire sports stars go around wearing "hands up don't shoot" t-shirts and accusing cops of shooting an innocent man Big Mike Brown. Cops then blame imperfections and their misery in this evil world on the bad people, Democrats, blacks, and marxists.

154.    The third stage is ideation: Academic polemicist Heather McDonald writes a

book "The War on Cops" in which she characterizes the situation as a war, with police as heroes, and common citizens as a threat to western civilization.

155.    The fourth stage is the solution: Police chiefs, mayors, sheriffs, and prosecutors start looking the other way on accusations of police misconduct, with the vain imagined moral mission "to save lives".

156.    The fifth stage is violence: Members of the political opposition faction are seen as enemy combatants, a threat to the tribe. It is a quiet necessity to ignore their rights and the law, to conserve our way of life. Courts are subverted with perjury arranged by government officials. Fake crimes are invented and incompetents are condemned in show trials. (156.1) So-called journalists are granted special "privileges" to broadcast any lie the government tells as the truth (and sell a lot of papers) with immunity from any repercussions from the targets of government aggression.

157.    Pinellas Sheriff Bob Gualtieri thinks it is justified for deputies like Robert A. Weill to commit perjury, because their mission is more urgent than the law. (157.1) Some judges are radicalized also, and think the will of the mob is more important than the law.

158.    Like Trump, State Attorney Phil Archer took advantage of their grievance and manipulated them. Archer got cops from other counties to start harassing and

detaining Plaintiff and trespassing on Plaintiff's property multiple times without supporting legal cause.

159.   When Plaintiff sent links to his websites to elected officials, he would often see immediate hits in his server log, from the town or area where the elected officials are from. (159.1) Plaintiff noticed after emailing Archer he immediately got hits on cops2prison.org from "Pinellas County Government".

160.   Plaintiff saw them hitting cops2prison.org from Pinellas County Government IP addresses, and looking over and over at videos on Plaintiff's website. This included one video of black protesters looting and rioting with a nerdy white guy cheering them on, and another video that showed which streets to turn on to get to Plaintiff's property in Okeechobee County.

161.   Plaintiff then got a view on the same video showing where to turn to get to Plaintiff's property, coincident with an Okeechobee deputy actually appearing to watch the video up the street while standing outside his car, who then trespassed on Plaintiff's property and called in Plaintiff's license plate from Plaintiff's parked car.

162.   Another day, Plaintiff recorded video of police trespassing on Plaintiff's property in a military formation, with a military rifle and fingers poised to shoot, while Plaintiff was at the veterinarian in Jupiter picking his dog up from surgery.

163.   Another day, after trespassing on Plaintiff's property, Okeechobee deputies pulled Plaintiff over on a remote country road, and said there was no traffic violation, they just wanted to warn Plaintiff to stop sending emails to Washington.

164.   Plaintiff has not been able to obtain any court filing, police report with probable cause, or other legal justification for this and many other infringements of Plaintiff's rights by seemingly obsessed cops who have followed Plaintiff all over the place.

165.   Based on Plaintiff having a cops2prison.org website, Pinellas cops seemed to think Plaintiff was an undesirable who needed to be eradicated.

**Posted Fliers About Archer at Stetson University**

166.   By around Christmas of 2020, Plaintiff's web traffic had gone to zero because nobody wanted to talk about crooked cops, everybody wanted to talk about whether Trump won the election. Plaintiff realized he wasn't driving much traffic himself on social media, but it wasn't for lack of want, it was because there was nowhere to go where people were talking about the topic. People who cared about police misconduct weren't online having the same discussions.

167.   Plaintiff was inexperienced with mass marketing, but was determined to

continue reaching people one-by-one if necessary. Plaintiff decided to experiment with other ways to reach people whom the essays on cops2prison.org might resonate with. Plaintiff put up a Craigslist ad to pay someone to put up cops2prison.org fliers at University of Florida law school in Gainesville. Plaintiff did not get a response immediately, and even though it was a Sunday, Plaintiff was impatient and decided to post COPS2PRISON.ORG fliers himself.

168.   On January 24, 2021, Plaintiff found the closest law school on the map, which was Stetson University. Plaintiff had no idea what county Stetson was in, and had heard it was in Tampa. (168.1) Plaintiff drove there following the instructions on his phone, turn right here turn left there, and could not possibly have imagined someone would paint this as approaching Shannon Sprowls. (168.2) Plaintiff also never made any connection in his mind between Tampa and Pinellas County, probably because Pinellas County sounds like some rural redneck place, whereas a college of law in Tampa seemed urban.

169.   Plaintiff drove over the largest bridge in Florida, spent 94 minutes in Pinellas County posting COPS2PRISON.ORG fliers, and drove straight back home. (169.1) The next morning, January 25th 2021, Plaintiff was arrested at his property in Okeechobee. Plaintiff could not guess why.

170.   When Plaintiff asked Okeechobee deputies why he was being arrested, they

offered some vague guesses that had not actually happened, and then said they didn't know what crime or statute or act they were arresting Plaintiff for. They were unable to provide an arrest affidavit.

171.   Pinellas deputies immediately drove to Okeechobee to get Plaintiff's laptop and cellphones and do a recorded in-custody interview. During that interview they refused to provide an arrest affidavit, or tell Plaintiff why Plaintiff was arrested.

172.   Pinellas Deputy Weill's first question was "Cops2prison.org, that is your website, isn't it?" At no point during the interview did they use the name "Sprowls" or ask Plaintiff if Plaintiff had been to Pinellas County, or ask Plaintiff why Plaintiff traveled to Pinellas County and what he did there. Plaintiff's recorded in-custody police interview consisted of trying to get Plaintiff to admit he owned the website cops2prison.org, and nothing to do with stalking anyone.

173.   After the interview while walking Plaintiff back to the jail, an Okeechobee deputy told Plaintiff that he had been "arrested for pissing off the wrong people".

**Plaintiff Illegally Barred from Social Media for Five Months**

174.   The arrest warrant Pinellas deputy Weill transmitted listed a bond condition "subject is to have no social media". This was never signed by a judge. What the judge actually signed was "no social media", which has the common meaning of "no

social media activity". It is not even clear what legal meaning "subject is to have no social media" could have, given it was impossible to delete your Facebook profile, your social media is legally the property of the IT company that hosts it, and anyone has social media available at all times.

175.    Deputy Weill lied and hid the bond condition the judge actually wrote, seemingly to try to force Plaintiff to take down all his posts.

176.    They did not provide Plaintiff a copy of the arrest affidavit or make it available on the clerk website for 10 days, not until Plaintiff's relative who was a law professor called the Pinellas prosecutor to ask for it. (176.1) It is a fair inference that they kept the arrest affidavit secret for several reasons. They knew the arrest affidavit contained material perjury, including about who owned the web accounts, and they were still hoping to get Plaintiff to delete his social media without seeing what bond condition the judge actually wrote.

177.    They kept Plaintiff on bond with no charge for five months against the rules of criminal procedure, and thereby kept Plaintiff off social media for five months, illegally and without having to provide any evidence or witness of a crime.

178.    Over the course of five months Plaintiff made repeated demands for any evidence, including a motion for discovery, an email to the prosecutor demanding to

move forward and provide discovery already, and public records requests.

179.    After five months - when they were about to lose jurisdiction anyway for not filing charges within six months of arrest - the Pinellas prosecutor filed a "no information". (179.1) They never charged Plaintiff or provided Plaintiff any discovery, no witness statement, not even a police report much less one mentioning any witness statement.

180.    It is not conclusory that they kept Plaintiff on bond to restrict his political speech for five months, even though they knew their arrest affidavit was a scam with no evidence of a crime. Rather, it is conclusory to imagine there is some hidden "legitimate reason" why they broke the rules of criminal procedure to keep Plaintiff on bond and shut down his speech for five months, beyond their simple act on its face of restricting someone's speech against the rules without evidence of a crime. Why did the chicken cross the road? To get to the other side is not "conclusory".

181.    Plaintiff's lawyer had worked for like 15 years in Pinellas County including in the prosecutor's office, and said their handling of the case was unusual, out of the ordinary. He said they gave Plaintiff different and suspicious treatment compared to any other case he had ever seen.

**Jackson Loses Opportunity for Appeal caused by Archer as Witness**

182.    In the middle of January, 2021, Plaintiff was helping Mandi May Jackson file motions to try to get an honest appeals lawyer appointed, in a rush to get an actual appeal written before the appeals court ruled and it was too late.

183.    Jackson's state-paid appeals attorney never wrote her an appeal. He went through the minimal superficial motions to get paid, by copy-pasting parts of Love's appeal which were not relevant to Jackson's separate trial, and did not even change the name from Love to Jackson in most places beyond the first page. There were many objections and disputes and proffers and arguable judicial errors at Jackson's trial, but her appeals lawyer never knew about or mentioned any of them.

184.    Neither Jackson nor her family had any idea what her appeals lawyer did. And Jackson could not even ask the legal girls in prison about how courts work, for fear of every one of them being let out of prison for swearing Jackson confessed to them. (184.1) Fake confessions were well known in prison to be used regularly by lifers, as an easy and riskless way to get out of prison.

185.    Jackson had already filed something with the appeals court, but it was defective. Jackson was given only a few days to correct it, and needed Plaintiff's help to get something new filed before the deadline. While Plaintiff was trying to help Jackson get the appeals court what they needed, Plaintiff got arrested and had his

laptop seized, for emailing and posting fliers about Phil Archer, with Phil Archer as the only witness.

186. On the same day they arrested Plaintiff and seized his laptop, the prison seized all the documentation of Jackson's case and legal paperwork from Jackson's cell, that Plaintiff had provided to her.

187. As a result of Plaintiff being chased all over the state, and having his laptop seized based on Phil Archer as the only witness, at the exact time Jackson was facing a deadline to get a real appeal filed, Jackson missed the deadline to file the correct paperwork, and to this day has never had the opportunity for an appeal of the numerous judicial errors at her trial.

**Phil Archer is Only Witness in Scam Arrest Affidavit**

188. Plaintiff was arrested for posting fliers about Phil Archer, using an affidavit where the only witness mentioned was Phil Archer.

189. Deputy Weill's arrest affidavit contained no evidence that any crime victim witnessed the crime or that the crime even took place. The affidavit contained plenty of evidence that Weill hid the real story that led to the affidavit from the circuit court, including by using perjury to mislead the court about what happened. And the affidavit contained plenty of evidence that the real story hidden from the Pinellas

court, was Archer encouraged and supported it. And Plaintiff posting COPS2PRISON.ORG fliers at a law school in Pinellas county triggered it by providing more motive and the necessary color to feed the court.

190.    As Plaintiff said in his opening paragraphs, Deputy Weill – not any crime victim, but Weill himself – combined four unconnected events from Plaintiff's thousands of instances of political speech. The omissions and suspicious nature of Weill's contrivance of a crime out of these four scattered political grievances, can only be explained by an intention to mislead the Florida court or this Court.

191.    The arrest affidavit did not say the supposed crime victim witnessed any of these four activities, as required by the cited statute. Deputy Weill said rather that Plaintiff's activity "raised concerns" of some other witness, possibly Weill himself, but likely one of the prosecutors with whom Plaintiff actually communicated and insulted the work of their dead friend. But Deputy Weill wanted to hide from the court how and when he found Plaintiff's emails to Archer, and said only "Your Affiant was made aware" of Plaintiff emailing Archer. Weill similarly told the court in an intentionally nebulous way "your Affiant became aware of an investigation" by the Pinellas prosecutors whom Plaintiff had been criticizing on Twitter. (191.1) Weill refrained from revealing which State Attorney (Brevard or Pinellas) got the search warrant for the account that had been emailing Archer and his employees for years, which at that time had 523 emails with the word "Archer" in them, as well as all of

Archer's fake evidence.

192.    The Pinellas court had no problem with the secretive Weill saying only that "Your Affiant located an email" address. Weill probably located the email address on the Cops2Prison.org website as the contact in the "about" tab, after he found out about the fliers. The Pinellas court had no problem with Weill hiding how it came to be that "your Affiant was informed that the known Florida vehicle tag number belonging to Stephen Murray entered Pinellas". It is clear to the court that Weill is hiding from the court how all this happened, except that none of it is ever claimed to have come from the supposed crime victim. The only witness mentioned in the affidavit was Phil Archer. The Pinellas court should have realized that all this intentional mystery demanded an actual witness to create any idea of what probably happened.

193.    Weill's affidavit also did not include any parties to Plaintiff's communications as witness, to provide context and state whether the communications "served" any "legitimate purpose" or were a "threat" that was "credible" or "reasonable" to perceive, or had the required "intent", all of which was required by the cited statute. On its face, a bitchy email to an elected official from a constituent is First Amendment speech. No actual party who could provide context for any communication as witness, said it was intended or taken in any way other than bitchy political grievance. Rather, the context of Plaintiff's emails to Phil Archer, and

the fact that Plaintiff had no reasonable expectation that Archer would even read them much less that an unrelated person on the other side of the state would, was hidden from the Pinellas court. The name Sprowls was not in any email.

194.    There is no role for Archer preparing the arrest affidavit (which he later claimed immunity for doing) or being named in it, if the crime really took place. It should go from victim to cop to judge, but that did not happen. The narrative in the affidavit is complete without participation of the necessary crime victim but only police and prosecutors. And nowhere in the record – including hundreds of pages filed over years in US-FL-SD 2:21-cv-14355 – has any party disputed that the supposed crime victim did not witness any email.

195.    Plaintiff demanded any witness statement from the Pinellas sheriff, prosecutors, and Chris Sprowls, and they all refused to provide any. Plaintiff not only made requests in the Pinellas court and to the prosecutor for any discovery, but made public records requests to the police, and filed requests in the US-FL-SD 2:21-cv-14355 to produce any evidence to support the affidavit. For all that, Plaintiff received zilch but a "no information" and motions to stay discovery or refusals from all parties.

196.    The record in US-FL-SD 2:21-cv-14355 further fails to illuminate anything but color in Weill's affidavit. Archer said in his motion to dismiss that the substance of

Plaintiff's complaint was Archer had been sending armed deputies to harass Plaintiff. Archer then did not deny this, but claimed to be immune to do this as a prosecutor, and never a crime victim or witness. Archer never disputed he sent the cops to warn Plaintiff about political speech (every email to "Washington" and in the summer of 2020 was about Archer), that he directly told Deputy Weill about the email without any crime victim, that he and not Shannon Sprowls was the only witness to any email, or that the email account some unspecified State Attorney searched had 523 emails with Archer's name and was primarily used to complain about his crimes.

197.    That the affidavit originated with Archer as the only named witness, and that there was no crime because the supposed crime victim was not a witness, were never disputed in the US-FL-SD 2:21-cv-14355 record by any party.

198.    They never denied to this day, that the affidavit contained perjury, (198.1) or that Plaintiff posted "COPS2PRISON.ORG" fliers.

199.    Plaintiff sends political email to Archer, followed by threaten-lie-arrest-threaten-lie, all claiming basis in those emails, and by mischaracterizing them without any actual witness from 2021 to this day.

200.    Counterman v. Colorado says witnesses who are sent statements and courts, cannot color those statements as threats at their own discretion. This could otherwise

be abused to color a large body of speech that people don't like as crimes. But Counterman v. Colorado involved non-political statements sent to a private party as actual witness of threats, whereas Plaintiff's emails contained unwitnessed political grievances sent to an unrelated elected official on the other side of the state. Politicians given expansive arbitrary power to protect themselves against political speech under color of a crime against a private party (or in this case against a political operative), while depriving private parties who were actually sent and witnessed non-political threats the same color, runs against the intended current of the First Amendment.

201.   Driving over the largest bridge in Florida - and back without event 94 minutes later - to the extent it crosses a county boundary, cannot constitute a threat intended or credible in these circumstances without a witness. It was not Plaintiff's "intent" for anyone to know where he was and communicate it, as required by the cited statute. Police discovered and "caused to be communicated" Plaintiff's location that day without his knowledge and against his wishes. There was no witness that either Plaintiff or Shannon Sprowls ever thought they were in the same county or intended to be, or that they ever were; the affidavit did not even mention where Shannon Sprowls was or lived relative to the largest bridge in the state, which Pinellas process servers later said was so far away that it was not cost-justified to drive from the bridge area.

202.   When Deputy Weill swore Google and Twitter identified accounts as belonging to Plaintiff's name, race, sex, and birthdate, and that Weill got Plaintiff's phone number from Florida Department of Corrections phone logs of Plaintiff calling Jackson in prison, both never happened, that was all felony perjury. It was impossible even for Jackson to call the phone number Weill claimed he got from a DOC log, based on DOC policy at the time. (202.1) Weill's perjury was designed to hide where he really got Plaintiff's name and phone number. And the only party to these events who knew Plaintiff's name and phone number was Phil Archer.

203.   It makes no sense that a housewife in Pinellas who called police would know or care or have anything to do with Plaintiff calling Jackson in prison. Plaintiff's communications with Jackson are of interest to Phil Archer. (203.1) Weill also said in the affidavit that Jackson was Plaintiff's "known girlfriend". Apart from that being wrong, how in the heck would a crime victim who is harassed online, have any idea who the anonymous person's girlfriend was? Shannon Sprowls certainly did not tell Weill "I know this guy's girlfriend" or anything else. Plaintiff's relation to Jackson is only of interest to people involved in the Mulrenin case, e.g. Archer.

204.   Plaintiff also observed that when he sent emails to Archer calling Archer "Dirty Philly and Sheriff Heehaw" or something, Plaintiff immediately got hits from the Pinellas County Government IP address. Plaintiff therefore has numerous points to infer, that Archer was channeling aggression at Plaintiff through Pinellas County.

A deputy who swore incorrect statements which must have been provided to him by someone else, was not responding to an actual complaint of a crime victim, but to this other manipulative party who knew Plaintiff's phone number and provided the assertions in the affidavit.

205. When Plaintiff therefore twice demanded all communications between Pinellas and Phil Archer as discovery (both by motion in criminal court and letter written to the Pinellas prosecutor), the Pinellas prosecutor instead filed a "no information".

206. And in fact Phil Archer claimed he prosecuted Plaintiff's grievance emails to him, resulting in Plaintiff's arrest and harassment, in US-FL-SD 2:21-cv-14355 when Archer invoked prosecutorial immunity for the events Plaintiff suffered.

207. Whereas hypothetical crime victim Chris Sprowls joined motions in US-FL-SD 2:21-cv-14355 making factually incorrect statements such as that Plaintiff was detained and questioned by police while he was in Pinellas. This shows the supposed crime victim has no idea what happened leading up to Weill writing the arrest affidavit, and only got an incorrect version from police. Given dozens of chances to provide any example of being a victim of or witness to any crime in response to numerous motions in US-FL-SD 2:21-cv-14355, Sprowls instead chose to claim that he only and always acted as a government official, in the course of various events

and deprivations of Plaintiff's rights.

208.  Weill's probable cause is basically reduced to "I don't know of anything legal Plaintiff could have been doing for 94 minutes". In US-FL-SD 2:21-cv-14355, police claimed a lot of contact with Plaintiff as being done for the purpose of investigation, they colored all their harassment and detention of Plaintiff with that purpose. But given the chance to ask Plaintiff "What did you do in Pinellas County for 94 minutes?" they still never asked anything. Not even during five months on bond.

209.  Except the first question they asked Plaintiff after arresting him and turning on the tape recorder (and a week before they finally stopped hiding the arrest affidavit where they claimed to know this already) was "Cops2Prison.org, that is your website isn't it? Cops2Prison, that is your Twitter handle isn't it?", which the deputy lied he already got from Twitter. (209.1) But rather than provide the recording of this interview revealing Twitter did not actually say it was Plaintiff's Twitter account and Weill lied, they filed a "no information", and later a motion to stay discovery, when Plaintiff demanded the interview recording.

210.  Since the phone number played no role in the criminal allegations, but was known to a deputy Plaintiff never gave it to, the deputy including the phone number but leaving the reason why out of the affidavit, corroborates other evidence that police were tracking Plaintiff's phone, which they hid from the Pinellas court (at least

in the affidavit).

211.   There was no way for them to know Plaintiff was in Pinellas County, unless they either saw Plaintiff's fliers about Archer (which the Stetson security guard's activity supports), or were already tracking Plaintiff's phone before he even drove to Pinellas County, based solely on emails to Archer. But if they were tracking Plaintiff's phone - if the warrant was based on Plaintiff entering Pinellas, rather than the fliers that were discovered right before Plaintiff leaving - you would think Weill could have arrested Plaintiff on his way out, as there were plenty of cops on the bridge after Plaintiff passed through the toll booth on the Pinellas side.

212.   Given Weill did not arrest Plaintiff on his way out of Pinellas County, the only available explanation was that news of the Stetson security guard finding the Cops2Prison.org fliers right before Plaintiff left Stetson, did not reach Weill until Plaintiff had already left Pinellas (which fits the IP hits on cops2prison.org), at which point Weill checked the toll records. (Note that Plaintiff turned his phone off when he left Pinellas, because he was accustomed to cops tracking him and had seen a cop do a U-turn behind him before being lost in traffic and then another one circle a block away, both when Plaintiff first arrived).

213.   It is very difficult for them to know Plaintiff is in Pinellas County, without also knowing where Plaintiff is in Pinellas County, and that he is nowhere near Shannon

Sprowls. (213.1) Weill told Plaintiff he wrote the arrest affidavit in the evening after Plaintiff left, and it doesn't really work out that he wrote it solely in response to Plaintiff passing through the toll booth, particularly when Weill's first question to Plaintiff was "Cops2Prison,org, that is your website, isn't it?"

214.    Combining all this, they knew Plaintiff was in Pinellas because of his phone but the cell towers only told them within a few blocks. And/or they heard about the fliers at Stetson right around the time Plaintiff left. But they had to think of some color before they could ask state troopers or Manatee deputies to stop Plaintiff. But Plaintiff was already back in Okeechobee and had never threatened anyone, before they could invent their color to arrest Plaintiff. (214.1) And it was best to use a reliable faction judge from Pinellas who would be politically forced to sign anything with the name Sprowls in it.

215.    This all supports that Defendants knew where Plaintiff was - posting anti-cop fliers nowhere near Shannon Sprowls - and the arrest affidavit intentionally hid their true knowledge of what Plaintiff was doing and their motives from the Pinellas court. (215.1) Either that or Weill knew his probable cause was a scam, and he would have to reveal too much to get Manatee deputies or state troopers to arrest Plaintiff immediately, and he needed time to put a fake story together for a Pinellas judge.

216.    Even if all that is too much to get your head around, you still cannot answer

the simple question "Where is the witness statement and other discovery and the prosecution of Plaintiff for his crime that day?"

217.  Unless your answer to that question, is when a deputy sees an undesirable person in Pinellas he is allowed to arrest that person even after the person has left the county. And if there turns out to be no law that person can then be prosecuted or even arrested under and the arrest affidavit is perjured nonsense, so what. It is still legal for a deputy to arrest someone based on his suspicions, regardless of whether what he tells the judge actually articulates this right in any valid legal way. And if the deputy says he felt Plaintiff was a threat even if that is not an actual Florida statute, and the deputy says the "COPS2PRISON.ORG" fliers with a logo of a geriatric cop suffering in prison did not have anything to do with provoking the deputy, we have to take him at his word.

218.  There is no need to go to law school or even have courts or laws to say things like that. That is an old-fashioned Gulfport sundown town arrest, which 42 USC 1983 is designed for.

219.  Plaintiff does not doubt that Weill and even many judges, think posting Cops2Prison.org fliers is a crime (or jokingly referring to a political player as "whore" in a private email to an unrelated party), and Plaintiff is a marxist threatening America. (Particularly in the heat of their battle to stop Joe Biden "stealing" the 2020

election.) (219.1) But that is not an actual law, and they are conscious of that or else they wouldn't have needed to contrive such strained color for it, which this Court would allow them to do without a witness, not even a police report referring to a witness.

220.   A witness of a crime can't just be a cop saying "I don't like what this person said to that person." It has to be a victim saying "I don't like what this person said to me." That victim was the cop who didn't like Plaintiff coming to his county and posting COPS2PRISON.ORG fliers, and they hid that. That's why they never produced a witness, charge, or discovery. This is not "conclusory", but supported by and the only explanation of dozens of details.

## INTERNET AND DUE PROCESS IN FLORIDA

### The Voter is the Designed Regulator of Due Process in Florida

221.   Harvard Constitutional law expert Alan Dershowitz recently said on "Forbes Newsroom" that Section 3 of the Fourteenth Amendment is not meant to be enforced by judges, rather it is up to voters to decide if a candidate for federal office committed insurrection. ("In America, we don't take the decision away from the people by having the judges make electoral decisions. Let the people decide, they're not going to vote for a person they believe to be an insurrectionist.")

222.   In a dissenting opinion, Colorado Supreme Court Justice Carlos Samour said the adversarial process used by his court to bar Donald Trump from the President

election ballot did not provide procedural due process, by lacking the typical elements of a trial (perhaps he demands they coerce murderers to swear Trump confessed insurrection to them).

223.    According to this line of thinking, the Colorado process itself was not sufficient to determine Trump should be removed. It was a minimal tool that was only accepted to the extent voters and elected officials already supported removing Trump, after which the court ceremony only needed to be a minimal formality.

224.    Dershowitz and Samour disagreed as to what the correct process should have been, Dershowitz believing it should be turned over to a 51% majority of the peasant mob, and Samour believing it already had been. But they both agreed it either should be up to voters, or already was up to voters, to choose who has or hasn't violated the 14th Amendment.

225.    Fourteenth Amendment Section 3 is a law which in theory can be measured against fact the same way in different places. But whether different states bar Trump from the President election ballot in a legal ceremony, is ultimately determined by whether doing so is popular with voters in the state.

226.    This illustrates a common body of thought that says due process is created and protected by decisions of voters. The same philosophy says the people are not going

to vote for a judge or prosecutor who locks up people who shouldn't be locked up.

227.   The voter is the designed regulator of due process in Florida.

228.   State officers will literally tell federal courts that various determinations are the business of local voters and not the domain of federal courts.

229.   Decisions about processes that are said to be the domain of local voters, include whether prosecutors encourage or prosecute perjury, how court officers use their discretion, what post-conviction relief is available, and how much government-paid defense attorneys get paid.

230.   Decisions about how individual cases are prosecuted, that in practice are subject to governance by local voters not federal courts, include whether a prosecutor decides to prosecute a case or charge, and if he does, whether it should be reversed or repeated; if a prosecutor decides to let one person out of prison for lying about another person whether that should be reversed or repeated; and how and whether cops who lie in official proceedings will be punished, and whether police misconduct information will be hidden without voter objection, or available for public review and for defendants to use in court.

231.   Officials who do not interact with and respond to public influence in these and

other decisions, risk losing elections.

232.   Judges can relieve themselves of the painstaking work of obtaining legal outcomes, by gently steering proceedings over a series of decisions, toward politically convenient outcomes already successfully prosecuted in the public square.

233.   This often included courts condoning perjury and accepting false averments, so that the judge has the raw material of a sufficient variety of lies to select between, to enable discretion to choose any politically viable outcome and make it appear legal. Put simply, a judge can copy paste and sign perjury (as happened in pretty much every case Plaintiff will mention), and as a practical matter the voter is the only regulator to approve or disapprove of what the judge has done.

234.   Public oversight then excuses this discretion by elected officials - including discretion used to overlook misconduct - because the discretion is used to fix court outcomes consistent with the public verdict. Court outcomes are ultimately dictated in the oversight process, which is the fallback and true locus of protection of Constitutional rights, which in Florida is the voter.

235.   As a general rule, Florida voters support local prosecutors who never prosecute perjury which supports their own prosecutions, who never prosecute cops lying in affidavits or shooting people unnecessarily, and who hold broke black people

without bond and use fake confessions to establish premeditation, for the same crimes where old white retired cops would be sitting at home claiming self defense. The majority of local voters only very rarely object when prosecutors break the law, it is by far the exception and not the norm.

236. Sheriffs occasionally put on a show of disciplining cops who steal cookies or something - and blather on TV about police being held to high ethical standards – but only when the misconduct was not done in service of some prosecution the public supports, and punishing the cop does not benefit some undesirable.

237. Every person Plaintiff has heard from who has reported cop perjury, judges breaking the rules, and other local misconduct to Tallahassee, has gotten the same answer: It is not the jurisdiction of Tallahassee to do anything to punish or deter the wrongdoing.

238. But if you try to sue or otherwise get accountability from the cop or elected official, then it is the responsibility of the Florida Attorney General to use lawyers to defend the cop or elected official from the wronged individual. The Florida Attorney General only protects government employees breaking the rules from being regulated in courts, and tells you it is up to the voters to stop them breaking the rules.

239. When Plaintiff reported perjury in the Mulrenin case to the FDLE Office of

Executive Investigations as previously described, they told Plaintiff the matter was solely in the jurisdiction of local elected officials (e.g. Florida Statute 112.533 which says only the local elected officials supervising cops have jurisdiction to investigate them).

240.   When Plaintiff reported perjury in the Mulrenin case and Plaintiff's own Pinellas case to the Florida Inspector General as Plaintiff will get to, the Florida Inspector General Replied:

"Please understand that the Governor's office does not oversee local law enforcement agencies and the State Attorneys operate independently of the Governor's office. As elected officials, local Sheriffs and State Attorneys answer to the voters of their individual jurisdictions. Please be advised that this office does not have jurisdiction over elected officials, such as a State Attorney, a Florida House of Representative, or Sheriff."

241.   If Florida voters don't object to elected officials using perjury in individual cases to achieve objectives which have been sold to the public as more noble than what the law can achieve, and don't object to standardizing the use of perjury by using discretion to never prosecute it and other abuses of discretion, there is no other check in the legal system to penalize abuses of discretion, which are used as shortcuts through superficial legal rituals such as judges signing warrants and jury trials.

242.   Things like judges accepting cop perjury, and letting convicted felons out of prison as a reward for lying in court, are not seen as plain corruption. Voters are not seen as tools of manipulative demagogues who have appealed to their basest impulses and vanity, to gain power. Rather it is all seen as part of some virtuous populist democratic system by which common folk take back power and heroically save the world.

**Why Governance of Due Process was Handed to Voters**

243.   Court rituals may appear from a distance to be superficially unchanged over the decades, but there are many and gradual changes in the process, so that courts have to constantly be adjusting and taking whatever new steps are due, to continue delivering due process. One of those changes has been the many shifts in governance between federal judges and state and local voters.

244.   It is therefore relevant to this case to examine how the present paradigm came to be, and the philosophy behind the legal decisions which support it at every turn, the philosophy which many powerful actors in Florida perceive as giving moral justification for their whims and practices, and which influences their actions and decisions at numerous points in the legal system, from the design of laws and processes to the use of discretion.

245.    In the 1980's, the US federal government sort of looked like, or looked at risk to become like the USSR, by being home to various popular political trends. States' rights and local voter choice were seized upon as a convenient tool to counter such trends, without any reflection that individual free states could become equally similar to Sparta or Cuba.

246.    Federal judges were seen as a big part of the problem, including perceived federal judicial errors creating novel "civil rights" while eroding separate "economic rights". Federal judges were seen as pointy-headed communists, detached like central planners from the costs of their decisions suffered by local people.

247.    Reducing the power of federal judges, to give it to the local "people", was given moral mandate and made more urgent, because "judicial activism" seemed to be part of the ratcheting federal power, and the resulting perceived threat of the United States turning into the Soviet Union.

248.    Intellectuals proposed the idea that power needed to be "devolved" to the states, and started inventing interpretations of American tradition that reduced federal power, as a way to sell their antidotes to communism.

249.    This intellectual movement had an economic element taken from the problems of Soviet agriculture, where local farmers were seen as more in touch with

the knowledge necessary to make optimal decisions. The independence of local decision makers was seen as a sort of judicial capitalism. A fairytale of American freedom against "oligarchs" (really just any Independent Knowledge Institution not consciously controlled by the local collective) was born.

250.    There was also a cultural element, argued as necessary for American institutions to survive, where people were seen as giving culture to institutions, contrary to the historical reality that institutions give culture to people. Judges - and in particular federal judges - were seen as vessels for dangerous intellectual fads like gay marriage, whereas "the people" were seen as a force in favor of conserving American traditions.

251.    The common man in the United States was seen an unconscious vessel for cultural beliefs and traditions which he blindly follows, so that the rule of law and many other important things would manifest in the choices and prejudices of the local 51% majority, from their inherited wisdom. Local voters were seen as more virtuous than federal courts, as a means of regulating the choices of judges and prosecutors, and whether court processes were valid.

252.    Whereas our Founders thought a strong federal government was necessary to conserve the nation, the popular thought among local voters became just the opposite. They decided we can't trust the federal government or intellectuals and it is

up to us common people not just to run our businesses and raise our children, but to save the country and preserve and interpret the Constitution.

253.   As a practical matter, this saving of America does not take the form of a senate of wise old men reforming courts and institutions. In practice, it implies a takeover of the Independent Knowledge Institutions that have gone astray - e.g. courts, billionaires, the Federal Reserve, the FDA - with a self-anointed tribal quorum of local people who know better and must take the law into their own hands.

254.   Judicial independence was seen not as essential, but evil. A religion developed that it is appropriate to insulate the choices of local voters from interference by judges rather than the other way around. This is really just reverting to tribal instinct, little different from replacing private business decisions with the collective will. This was substituting local communism for independent decision institutions, but was confused and conflated as stopping central planning and preserving the freedom of local decision makers.

255.   Whatever the confusion, local communes rather than judges choosing court outcomes - some kind of pre-Magna Carta garbage harkening back to primitive agricultural society and witch trials - is packaged and sold today as uniquely American tradition.

256.    On page 251 of his 1987 book "A Conflict of Visions", Thomas Sowell said "surrogate decision-makers in general — and non-elected judges in particular — should severely limit themselves to drawing up rules defining the boundaries of others' discretion, not second-guess the decisions actually made within those boundaries". This articulates the popular belief at the founding of The Federalist Society, that judges are impulsive lawless pointyheads, who will only follow the law if regulated to do so by the inherited traditional values of the majority of common voters.

257.    This was always a contrivance, where the Constitution was designed not as a remedy to disrupt industrial central planning, but to impose checks and balances into the tribal impulses of primitive agricultural communities. Federal courts were meant to insulate rights from the irrational currents of common peasants. If you swap land-controlling barons for judges, our land-owning Founders never would have given over their decisions to a majority vote of peasants like Wat Tyler.

258.    The emergent asymmetric solution to the coincident problems of communism and judicial activism, has become an ill-conceived frankenstein creation of judicial restraint, arbitrary power of state executive-branch officials, harsh criminal sentencing, and voter and states' rights.

259.    Dismantling federal jurisdiction to save us from becoming the USSR was

conceived as an economic safeguard. But it coupled itself with some kind of KKK criminal justice revival giving power to the pitchfork, and exposes us to the whims of the public mob that men like Madison, Hamilton, and Jay feared.

260. Even the jury came to be considered trash compared to the local majority represented by the prosecutor, influenced by various events such as the OJ and Casey Anthony trials.

261. This philosophy has manifested in how government is structured and law is enforced in Florida courts today.

262. Throughout Florida history, judges have been various combinations of elected and appointed. Today they are the most chosen by popular vote they have ever been, with even the Florida Supreme Court and vacancies being largely shaped by immediate political currents through selection by a populist Governor.

263. Every official with the power to make decisions protecting due process in Florida, from sheriffs to appeals judges to prosecutors, is elected. (The Florida Supreme Court very rarely participates, and is never a jury.)

264. The local voter majority, not the federal appeals court, is seen as appropriately having final appellate jurisdiction as to law and fact, to the extent that any criminal

activity in the courtroom such as perjury (which subverts the jurisdiction of federal courts) is considered acceptable so long as the voters approve of the outcome.

265.   The implementation of this philosophy is supported by such devices as Imbler v. Pachtman and AEDPA, where a prosecutor is free to mislead the jury with false statements "in the public interest", and no federal court will do a thing about it.

266.   And local judges never bar prosecutors presenting coerced perjury, but have the discretion to bar nearly any type of defense presentation, including examination of and instruction to the jury about the investigative processes through which prosecutors coerce and coach and select false testimony and never prosecute it when caught. And nor can you instruct the jury that neither the prosecutors or the liars can be sued or penalized in any way, no matter how much misconduct comes to light.

267.   You are not even allowed to mitigate juror preconceptions and biases, such as by instructing them about prosecutorial immunity, about how prosecutors never penalize the perjury they themselves have frequently been found to orchestrate, and about the historical record of voters reelecting prosecutors who use perjury to torture the innocent, while dangerous felons who lie to torture the innocent are documented to walk free without any risk.

268.   The jurisdiction of federal and appeals courts can thereby be risklessly

undermined with perjury, relocating appellate jurisdiction away from "activist" federal judges to the general public through elections.

269.   These practices move the locus of determination of guilt to "the people" represented by the local executive branch, after which the jury can be greased off and nullified with fake testimony to guarantee the "right" outcome, which federal courts cannot interfere with.

270.   When jurors are so blinded to this well-documented scam with the fake theater of an oath, state witnesses can lie without penalty, and federal courts don't even have any jurisdiction because the transcript is fixed by the time it gets to them, it only comes down to whether voters care about or even know about the lies.

271.   This goes unchecked so long as the voters don't care and can't be bothered to protest or even investigate the railroading of undesirables, which of course the public actually supports or else we would not have invented rights and courts in the first place to push back against the public will. Courts were designed to usurp such voter decisions.

272.   The mock court system then uses such devices as clemency and conviction integrity units to make the real decisions when the public changes their mind, as a substitute for court proceedings the outcomes of which are externally predetermined

and legally unrecoverable; Courts are only required as a superficial formality to check off federal review of "was there a jury". Once that is fixed with lies, the real decisions can all be a social process.

273.   When Phil Archer announced his retirement, one of the first things the candidate to replace him told the local paper is that "he is currently leading an effort to review of a piece of evidence in a controversial, high-profile local conviction". Plaintiff can locate no corresponding court proceeding, and no jury ever knew what he knows. Determination of guilt is seen as the business of a local paper, but not something for a court and defense attorney and jury.

274.   There was even a vote recently in the Florida legislature, about whether to compensate a single person Leonard Allen Cure who had been wrongfully convicted, and who had no avenue to sue anyone.

275.   Cure was convicted when multiple cops lied to the jury, who perceived a reward for getting the conviction, and no risk of penalty if caught lying. But of course no jury was told the cops risked no penalty for lying, which is prohibited to say, despite it being the empirical truth. By this process, police picking who is guilty, is masqueraded in front of all courts as a jury picking who is guilty, thereby depriving courts and the law of jurisdiction.

276.   Cure was selected at the whim of lying cops, released after 16 years in prison at the whim of the executive branch's "Conviction Review Unit", and compensated at the whim of the legislature. No juror, trial, defense attorney, judge, or even law, ever had any genuine role in Cure's decades-long interaction with the government.

277.   Court outcomes have so reverted to a primitive social process, where the final regulator of the processes and outcomes is whether the public approves of them or complains about them.

278.   We took an elaborate criminal-justice process, and added equally elaborate rules at every node, to "devolve" it back to the primitive social process that human impulses are inclined to.

279.   This paradigm is of course older than rocks and needs neither judge nor court, but is somehow presented as the special creation of the US Constitution.

280.   Nobody wants to tell schoolkids their nation is great, as a result of their Founders recognizing that they were too inherently evil and stupid to be trusted to vote in Presidential elections or on who goes to prison.

**Political Communication is the Transcript for Review of Due Process**

281.   The Florida voters who regulate due process will never sit a day in court,

rather they get the testimony upon which they base their decisions from crap they read on the Internet.

282.  Because popular vote is the designed means by which local officials are regulated to produce due process in Florida, First Amendment speech provides the transcript used for voter review.

283.  Because first Amendment speech provides the transcript used for voter review, First Amendment speech to voters is a designed part of due process. (And Plaintiff will show, it is additionally regulated by the State of Florida.)

284.  Because Internet gossip is the designed regulator of due process, in practice it is a dominant factor governing many court outcomes in Florida (which in turn is originally created and regulated at the whim of the state, as Plaintiff will show).

285.  Public records are costly, not entertaining or easily consumed, and in many cases are simply unavailable, often made unavailable at the discretion of local officials under color of some legal excuse, like the Seminole County Clerk did with trial exhibits as previously herein described. Public records requests will generally be resisted when there is anything to see, and things like confessions and medical records and state surveillance are barred from public view.

286.   Plaintiff previously provided examples of Phil Archer's office responding dishonestly to multiple public records requests in the Mulrenin case. Also in Brevard County, elected Sheriff Wayne Ivey said video of Gregory Edwards dying in jail strapped to a chair with a bag over his head, was exempt because it could reveal security features at the jail. Ivey successfully hid this video until the week after his reelection.

287.   Plaintiff was quoted $1,773.60 to get the public records in the St. Lucie County Leigha Day case. This for the simplest case with one defendant that took minutes, when a girl rolled her car, stabbed a responding cop who walked up behind her in the dark, both went to the hospital, she supposedly confessed during her police interview, and a search of the car produced no incriminating items. And this price does not even include the material evidence of Day's medical records or her supposed confession.

288.   The records of any brain injury Day might have just suffered during a rollover crash, are secret to protect the privacy of patients. As a substitute, the prosecutor instead offered to give Plaintiff for free, the sworn affidavits of cops who claimed in their professional medical opinion that Day appeared to be crazed on meth. According to Day's toxicology report, Day was not under the influence of meth. But the FDLE tech refused to tell Plaintiff whether the result was considered positive or negative, unless Plaintiff provided him the case number (which would inform him

how his words might hurt the state).

289.    And TV reporters quoted what cops said about Day, that a motorist crazed on meth stabbed a cop during a traffic stop. Later clickbait parroted and embellished upon the false details in the arrest affidavit, that rather than being confused and in emotional distress in the dark and blinded by a flashlight, Day had full presence of mind when she lured the cop into an "ambush". Reporters also recited the claim which is unverifiable through public records, that Day confessed a motive for this premeditated murder plan, of wanting to avoid a ticket for having no insurance.

290.    Such inaccurate news stories are effectively the only transcripts which voters review to make their regulatory decisions, like whether a prosecutor who decides not to prosecute a case, or decides to let one person out of prison for lying about another person, should be reversed or repeated, and how and whether cops who lie in official proceedings (like Day's arrest affidavit) will be punished, and whether police misconduct information will be available for public review and for defendants to use in court.

291.    Day's public defender filed a document asserting Day's "absolute right to remain silent in jail", in an apparent hopeless effort to stop the government-designed news stories coming back through the mouths of inmates as fake jailhouse confessions.

292.  Because all this allows influence and control of the gossip narrative to have a strong influence on court outcomes and elections, an important power of Florida government officials is to manipulate speech - abridging and protecting at will - to control the outcome of that voter oversight process.

293.  This control of speech by government is achieved with discretion and using false pretense under color of a variety of misappropriated devices, whether granting exception to defamation traditions, wearing the flag of First Amendment protection in special situations, using laws like Marsy's law or "Cyberstalk" laws or public records exemptions to instead hide information and limit speech, and simply invoking immunity and the lack of any controlling legal authority with jurisdiction, to obstruct oversight by hiding records.

294.  Elected officials doing what they please, and letting the voters decide based on information produced and withheld by that same government, is represented as some virtuous government of, by, and for the people. Whatever the people have chosen, reigns supreme. But in reality it is just a device for old-fashioned demagogues to manipulate peasants with gossip. And the Founders never intended to entrust our rights to laborers, slaves, and peasants without checks and balances and the rule of law over popular will, which Plaintiff urgently petitions for in this Complaint.

295.   The simplest example is the state produces a gossip narrative, and uses jailhouse witnesses and immunity to coach witnesses to get that gossip through the courtroom door. Police and prosecutors solicit tips and jailhouse witnesses to come forward, and non-coerced witnesses to change their testimony to conform to the prevailing social narrative. The public then regulates whether court outcomes match the product of public opinion, formed out of the same social gossip process that influenced the witnesses.

296.   The public will never want prosecutors, judges, or witnesses punished, for lies that support court outcomes consistent with the narrative the public themselves have bought into. The public only objects when they are unable to use devices to get their gossip through the courtroom door, such as in the Crosley Green case, when a federal court found that the new contradictory testimony of police and coerced witnesses which conformed to the narrative promoted by the local newspaper Florida Today, was irrelevant.

297.   In the James Mulrenin Dollhouse robbery hoax, every witness including both defendants has been steered into reciting the narrative which originated in the "Orlando Sentinel", and was subsequently supported by tampered evidence, that James Mulrenin took home a bunch of cash and was tied up and shot while escaping over a balcony. This narrative is exhaustively proved impossible by an overwhelming majority of surrounding puzzle pieces of physical evidence and testimony.

298.   Love conformed his testimony to gossip and fake evidence for a number of reasons. It was helpful to him to accept doctored video which showed him arriving at the same time as Jackson, his lawyer was so blindsided by Smolarek's fake evidence that he did not know what else to do but invent a story to fit the fake evidence, and it was later necessary to falsely confess to tying up Mulrenin, either because he promised Jackson he would accept blame for what happened, or because he again perceived no choice but to build his story around what people have been told.

299.   Jackson conformed her testimony to gossip, because she has been instructed that the only way out of prison is to lie that there was a robbery, and she wants to get revenge on Love and Chris Dahl for what happened to her friend Mulrenin, and she has been pressured at every point by everyone except Plaintiff to conform her story to the popular narrative.

300.   But regardless of what those defendants wanted to say or not, the primary gatekeeping mechanism for whether testimony was accepted as admissible at trial and not a crazy diversion, was perceived by Judge Recksiedler as whether it conformed to the popular narrative. Recksiedler would not admit any testimony the defense tried to present, which strayed too far outside the popular narrative (and the other lawyers perceived various political disincentives also.)

301.    For example, Judge Recksiedler allowed the prosecution to say Mulrenin jumped from five stories to escape danger because the grass was soft. But Recksiedler would not allow the defense to show restraints that were actually used to tie up Jackson, to show Jackson likes submissive rape kink, which she does. Jumping five stories because grass is soft was considered plausible, whereas Jackson being restrained was considered a crazy diversion, despite there only being hard evidence of the "crazy" one, while the actually crazy one was considered plausible for dovetailing with the "shot while fleeing" narrative created through privilege granted to newspapers to imagine events, and subsequently coached in fake testimony.

302.    Recksiedler allowed the prosecution to show some money hidden in a closet which evidence suggests nobody knew about, but would not allow the defense to show weed in multiple places, which Jackson loves and there is evidence in plain sight she smoked that night. The money was relevant to the popular narrative, the weed was only relevant to Jackson's defense narrative.

303.    Recksiedler allowed the prosecution to say crazy things in support of a narrative that was impossible based on the evidence, and even to coach testimony which the look on Recksiedler's face suggested she knew was brazen perjury, with no other incentive than Recksiedler will lose an election for publicly appearing to block justice. But Recksiedler would not allow the defense to show a half codeine pill which Mulrenin seemingly used to drug Jackson, based on evidence much stronger

and less circumstantial than prosecution stuff that was allowed.

304.   So you can tear down all walls to show money which was the motive, and Mulrenin fleeing for his life - neither of which could have happened if you look closely at the evidence - simply because the "Orlando Sentinel" said it. But you can't show plausible hard evidence of other narratives in plain sight but which narratives the public never heard of, and which there is no political cost for the judge blocking.

305.   As a practical matter there is no recourse for such discretion on appeal, so the discretion from which the verdict follows is shaped under the sole influence of local elections. If Florida newspapers were not selectively immunized by state actors to muffle disfavored viewpoints ("muffle the expression of disfavored viewpoints" Matal v. Tam, 137 S. Ct. 1744, 1758 (2017)), then an elected judge wouldn't be politically influenced to admit evidence and crazy theories at trial while barring similar evidence and more plausible theories, based on how much the testimony agrees with the popular narrative.

306.   And of course the prosecutor ultimately decides who says what, by encouraging a huge pool of fake stories to choose from and then selecting who gets out of prison for being coached to say exactly what he wants. And the judge has no say in that whatsoever, it is not even investigated in any court hearing or adversarial process. And the jury sees no actual or expert witness on the state's investigative

process for coercing testimony. The decisions are only approved by the voters or not, depending on whether the coerced witnesses recite the same narrative as the news.

307.   Every witness, juror, investigator, and judge is socially rewarded and penalized, to the extent their input either goes against the religion, or flows with the current of public gossip, which in turn is created by what click promoters have been selectively immunized by government to print. In this manner a social process is used to build a popular consensus or "castle in the air" of supposed facts, from which all other judicial and regulatory decisions descend.

308.   A defendant whose guilt is determined by false gossip, has a choice to either let the false gossip influence every other actor and give up his right to due process, his reputation and opportunity against defamation, and his freedom, by not participating in the media trial. Or he can give up his privacy and his right to remain silent by pushing back on the false gossip.

309.   And if a defendant does speak to participate in the media trial, this gives police a chance to fake even more witnesses and evidence in response to his defenses. For example they can just change the video timestamps or stage evidence in his car to make the defendant look like a liar, like they did in the Mulrenin case. And jailhouse witnesses can dovetail their fake confessions to the defendant's revealed secrets.

310. Depriving someone in advance of a trial with defamatory embellishments on the Internet, thereby forces him to either give up his privacy and right to remain silent by publicly pushing back on the lies to mitigate their impact, or give up his reputation and opportunity and ordinary recourse for defamation - and even his right to a fair trial - without due process.

311. These are not small rights, and nor is the First Amendment. But these criminal rights are not in practice balanced in court against real First Amendment benefits of people knowing what government was doing, but against the values of click promoters like Defendants making money serving the interests of local elected officials.

**Internet Quorum Stronger than Law**

312. Even federal legislators now think Internet quorum is stronger than law. To the point where even US Congressmen regularly take to Twitter to advocate people not be prosecuted for laws which they passed and have the power to amend and repeal.

313. Numerous congressmen advocate on social media that Julian Assange should not be prosecuted for a law which they declare "unconstitutional", thus revealing a belief that gossip not the Supreme Court determines what is "unconstitutional", and rather than repeal or amend the law which their own body wrote.

314.   Congressmen have also advocated that Trump should have pardoned some January 6th trespassers, all of which they have power to fix within their legislative rather than executive or judicial role.

315.   Numerous state executive-branch officials have recently said that the voter overrides Section 3 of the Fourteenth Amendment, with their right to pick whomever they want as President (which in any case was intended to be a senate of "electors"). To get elected themselves, legislators must publicly renounce court enforcement of this law.

316.   Federal drug and gun laws are enforced (and the Constitution is said to be interpreted) on a county-by-county basis at the whim of the local voter, like federal due process itself.

317.   If voters want to vote for Trump even after their precious state court prohibited it, or if they read about a criminal case online and then don't mind that a prosecutor uses lies, their opinions which are the product of public discourse can be a stronger force than the law.

318.   The impulse to make decisions by popular will has been amplified by new electronic mass media, to where the popular narrative reigns supreme over court

processes. Court and legislative processes have in many instances become vestigial rituals, with their outcomes already decided by external social processes.

319.  And the battle to determine the facts from which court outcomes descend, takes place on Google and Twitter.

## Constitution has Jurisdiction over Trials in the Media

320.  The power of the Constitution is abstract and expansive, not easily circumvented with changes in details, such as some new method of execution, or trying cases outside the formal court record, and then fixing cases to trick the Constitution with dummy briefs (that ignore actual facts), per curiam opinions, and publicly-approved lies.

321.  The Constitution has jurisdiction over the whole process that is used to infringe rights - whatever the process in whatever venue - and does not relinquish its jurisdiction at the courtroom door.

322.  If criminal trials take place in the media and the mind of the voter - to which witnesses face social pressure to conform their testimony, and from which elected judge and prosecutor decisions to select and condone perjury and other testimony follow - then due process must be enforced where a large part of the determinant process takes place, in the media and on the Internet.

323.   If the process takes place on the Internet after which courts are just a mock formality where jailhouse witnesses can spout what they have read on the Internet without any possible penalty, then the accused must have due process on the Internet, including the right to confront witnesses, and penalties for lying.

324.   If the Constitution does not guarantee due process in public-square litigation, or permit restrictions and require fair rules in public-square litigation, then the Constitution must prohibit and certainly not protect public-square litigation. The Constitution guarantees these rights, and has jurisdiction to regulate any activity or venue which affects them.

325.   The word "perjury" does not appear in the Constitution, and enforcement based on the words "oath" and "perjury" is usually taken as given, before discussions of procedural due process begin. But these words about truth are necessary to the foundation of due process.

326.   If a set of rules allows state action to improve state odds in prosecution outcomes, and increases or amplifies the impact of prosecutions, it affects and involves the rights in the Bill of Rights.

327.   Because First Amendment speech to voters is a designed part of due process in

Florida, government slanting speech and government-selected immunity for defamation which influences outcomes in criminal proceedings, violates due process.

328.   If the Florida government has jurisdiction to shape private Internet speech ("qualified privilege to report on matters brought out in public proceedings" Ortega v. Post-Newsweek Stations, 510 So. 2d 972, 975 (Fla. Dist. Ct. App. 1987)), then the Constitution has jurisdiction over what the Florida government has jurisdiction over.

329.   The penalties for damaging false and reckless statements should be greater in a situation where criminal rights are litigated, and certainly not less, than for plain defamation. Falsely broadcasting that someone is a rapist, causes greater damage in the context of a legal proceeding, than simply saying it without the imprimatur of the state. The Constitution mandates people who have been arrested be given greater protection from defamation used to advance their prosecution, not less.

330.   When defamation of a private citizen involves his criminal rights, negligence requires more strict scrutiny for due process, not more lax scrutiny or more government discretion.

## FLORIDA CIVIL DEFAMATION ACTION

### Fair is Determined by Who Decides under What Standard

331.   There is no problem deciding what is fair in the abstract. If someone is arrested for murder, and there is no information as to how the murder took place, it

is not fair to say it was done with a knife, and represent this as any kind of fact. But the moment we enter the real world where Plaintiff was arrested, we will be surprised by various embellishments being characterized as fair. The problem comes in deciding fair to whom, who decides, and what is the cost of even deciding?

332.    It is never fair to falsely and negatively portray sexual activities of a private citizen in public, without any supporting evidence. That's why people want laws against deepfake porn. The fact that people might in theory look like that naked or having sex, doesn't make deepfake porn a "fair" inference of something they truly do.

333.    It is never fair to portray a private citizen's political activity, as sexual activity.

334.    Neither saying "fuck you" nor calling someone "whore" are ever lewd, these are universally understood to be derogatory (not entreaty or threat). It is therefore never "fair" to use the word "lewd" to describe such expressions.

335.    When somebody says "fuck you", it not "fair" to say that person asked to have sex with you, or tried to rape you, or solicited prostitution, unless you are given some legal license to lie like that with a straight face. The same applies to all derogatory private speech, regardless of the word.

336.    Fair is determined by who decides, under what standard, and pursuant to

what incentives and constraints.

337.   People who have something to gain or lose by the decision of what statement is fair, are people for whom the difference between statements is material. They have something to gain or lose specifically because the difference between statements is material. They have something to gain by calling "fuck you" lewd, rather than derogatory.

338.   Controversy in fairness therefore arises from and exposes the materiality of costs and benefits to decision makers, resulting from the difference between two things. If someone argues one thing is "fair", it is because he perceives a material difference compared to what another person thinks is fair, not because the two things are substantially the same.

339.   Suppose a family member of a murder victim contacted a newspaper and said "Nobody knows how the murder was done, please correct your story that says it was done with a knife." If the difference was immaterial to the substance of the story, the newspaper would say "Sure, we will erase that part." It is only if the difference is somehow material to the newspaper, that they would insist on leaving it in.

340.   People who have something to gain or lose by the decision of what is fair will market their interests in the costume of some unbiased justification, and others with

a common interest will validate the costume's authenticity. Others still with no interest, or a quorum of such people, will say anything is fair, where by this they simply mean it has no cost or benefit to them and they cannot be bothered to even look.

341.  Stalk is a verb form of stealth, which means to approach quietly. (341.1) This is materially different from "Cyberstalk", which is a legal term that only has meaning in a Florida court, where it means to loudly speak to electronically. (341.2) The two cannot be conflated, even if there were only one word with two definitions, in which case the definition would still be distinguished by the context.

342.  A person chooses one word or the other - "Cyberstalk" or "stalking" - because of the material difference, to obtain the effect of that material difference. (342.1) Such a difference may be that one word has a known public meaning, the other does not, or the meaning of one word may be more interesting to the public than the other.

343.  Whether one word is used in place of the other - "Cyberstalk" or "stalking" - depends on the materiality of the difference to the person doing the choosing, meaning whether the difference creates a cost or benefit to him. (343.1) A person is not free to choose one word to describe the meaning of the other, unless his goal is to mischaracterize and defame his subject or somehow enrich himself. (343.2) A person is not resistant to changing one word for the other, unless doing so creates a material

cost for him.

344.   What word is chosen, is therefore based on whose costs and benefits are weighed when the choice is made, the speaker, the target, or some third person who doesn't care about the difference. There can even be a fourth person who perhaps is paid to do such things, and who applies a predetermined standard to decide what is fair. (That standard cannot be "I dislike both equally".)

345.   Plaintiff cannot have been arrested for "Cyberstalk" of Shannon Sprowls, based on the actual statements in the January 2021 arrest affidavit. Before the Court wants to disagree with this, answer the question: Who was the only witness named in the affidavit, if any? Can you clarify your standard in a written opinion, that allows this to be "Cyberstalk" of Shannon Sprowls? Keep in mind that you have not seen any email, and none were alleged to be addressed to or contain the name "Shannon Sprowls".

346.   So we have to decide what is the standard. Does the cited statute alone make it fair to say Plaintiff "was arrested for Cyberstalk of Shannon Sprowls"? Or do the statements in the affidavit have to support that is what Plaintiff was arrested for? And if the statements don't support the headline, is it fair to ignore what is in front of our faces, and instead confuse ourselves inventing and changing the meanings and imputing from and reinterpreting the statements, to contort them into something that

supports the headline?

347.   Is it fair to then lie about what we have done, to say our headline is based on the actual statements, rather than our statements are invented perhaps loosely inspired by confusion trying to reconcile them with the headline, even if not actually contained in the arrest affidavit?

348.   Does the mere fact that Plaintiff was arrested, make it fair to invent that there were multiple lewd and multiple threatening emails, and mislead people that Plaintiff sent these multiple lewd and threatening emails to a housewife whom he then approached with stealth?

349.   The fact that Plaintiff was arrested, does not make it "fair" to invent reasons where there are none. Even if you want to say Plaintiff was arrested "for alleged Cyberstalk victimizing Shannon Sprowls", the only fair elaboration would be "by quoting the Bible on Twitter, and sending bitchy private emails to Phil Archer (none with the word Sprowls, but one having a picture of President Trump and an unidentified woman, elsewhere identified as Sprowls, together)".

350.   It cannot be a fair characterization of the statements in the affidavit that Plaintiff was arrested for either "Cyberstalk" or "stalking" of Shannon Sprowls. (350.1) That it cannot be, was the reading of the affidavit by the Pinellas prosecutor

picked by Sprowls himself, implicit when he never filed charges. Someone who is forced to care what is fair and apply a standard, because he has to back it up in court, reached the obvious conclusion based on all visible information that the affidavit did not support the statute cited.

351.   For a person who is not free to enrich himself with caprice, the only way to accurately report the affidavit, is "nonsense" or maybe "arrested in a set of circumstances made confusing in the affidavit". There is no other "fair" explanation, only invention, imputing by the mere existence of the affidavit, something invisible and not actually supported by the text of affidavit, and given the freedom to do so by lack of any legal constraint or standard or personal cost to make that invention.

352.   There is no evidence Plaintiff had a "lewd" or sexual motive, not in the arrest affidavit, not in reality. It is therefore never "fair" to say Plaintiff had a "lewd" motive, much less to insinuate that Plaintiff approached a housewife with stealth with a lewd motive.

353.   Or if you are going to use your own discretion of what is fair to impose material costs on others for whom it is not, cite the standard, and the process for measuring whether the standard has been met, rather than just saying the differences are immaterial to those for whom the material difference has no cost and all benefit. And we will see if that standard and process has been met, to impose material costs

on others.

**Defendants Maliciously Defame Plaintiff**

354.   No so-called journalist invented any story about Plaintiff's arrest, until the
prosecutor had already realized he could not charge Plaintiff. (354.1) Is not lack of
an official proceeding, an official proceeding with lack of a charge? Wouldn't not
being charged, be the fair characterization of how officials were proceeding? Like
"government arrests someone, but strangely fails to charge him"? (354.2) That
depends who you ask. If you ask the government, it is fair to say whatever trashes
their target and makes the government look good.

355.   It is reported to be a common practice in Florida to trash people who have
been falsely accused, by state officers getting colorful defamatory stories published in
the local media, coincident with pressuring defense lawyers to get their clients to take
a plea bargain and sweep the lies under the rug. (Different reasons why have been
offered, such as making defendants think they have gotten their money's worth from
the lawyer for getting the deal, and making sure cops look good even though the
person was never charged.)

356.   When the Pinellas prosecutor filed a "no information", the Pinellas Sheriff was
still unwilling to give Plaintiff's laptop and cellphones back until Plaintiff's lawyer
went back and forth with the prosecutor who told them to give it back. Their

emotional attachment to Plaintiff's property was consistent with their well-communicated beliefs that, as a "Cops2Prison" Black Lives Matter type, Plaintiff is a danger to society and we need this evidence of his crimes to save America. To the cops, all Plaintiff's political speech in his laptop was evidence of crimes and therefore still useful to the general goal of finding some basis to arrest Plaintiff.

357.   Plaintiff knows Defendants were talking directly to the cops, not just fishing on the court clerk website. So it is possible the Pinellas deputies wanted to generate public support for the prosecutor to file charges against Plaintiff, and that is why they encouraged Defendants to push out some defamatory gossip at the very moment the prosecutor was choosing not to file charges.

358.   Three weeks is an informal deadline for prosecutors to file charges in Florida. (This might be because people have to be released from bond conditions after 30 days if there is no charge, pursuant to Florida Rule of Criminal Procedure 3.134).

359.   On February 14, 2021, after around three weeks had passed and the Pinellas prosecutor failed to file charges or provide any discovery for Plaintiff's arrest - at the very moment official proceedings failed to accuse Plaintiff – (359.1) Plaintiff was made aware of a post by Janelle Irwin Taylor on the floridapolitics.com website based in Pinellas County. The post falsely characterized Florida's "Cyberstalk" statute to mislead readers that Plaintiff had sent a housewife lewd and threatening

emails, and crossed a bridge to approach her with stealth, in addition to other material false statements not in the January 24, 2021 arrest affidavit.

360.   It is notable for Defendants to overlook in their story that Phil Archer and not the crime victim was the witness mentioned in the affidavit. Even though it is hard to believe that Phil Archer and not the crime victim was the witness, it is still a fact that Phil Archer and not the crime victim was the witness mentioned in the affidavit. It may seem to make sense to draw from the affidavit that the crime victim and not Phil Archer must have been the witness. But just because the affidavit does not make sense, does not mean a story that makes more sense is supported by the affidavit. There is no logic to say one thing is the other, but only casual convenience to some and reckless cost to others, with such self indulgence costumed in the color of logic.

361.   Here is what Defendants put on the web, at the moment the prosecutor seemed to fail to find any basis to charge Plaintiff:

*[photo of Speaker Sprowls speaking behind a podium with official seal]*

*A man was arrested for stalking House Speaker Chris Sprowls' wife, Shannon Sprowls.*

*TAMPA BAY*

*Okeechobee man arrested for stalking Chris Sprowls' wife*

*The man made lewd comments and threats in an email about Shannon Sprowls.*

*by Janelle Irwin Taylor on February 12, 2021*

*A man who sent threatening and vulgar emails threatening Shannon Sprowls, House Speaker Chris Sprowls' wife, was arrested on cyberstalking charges in late January, according to court records.*

*Stephen Lynch Murray of Okeechobee was arrested Jan. 25 in his hometown after he previously sent an email to State Attorney for Florida's 18th Judicial Circuit Phil Archer with a photo of Shannon Sprowls with former President Donald Trump.*

*"Hey Phil, look at the attached photo," Murray reportedly wrote. "Is pimping legal in Florida? Because I'm going to make the b\*tch in the attached photo my whore."*

*The email was sent Jan. 6, the same day an angry mob of Trump supporters sieged the U.S. Capitol in an insurrection at the center of Trump's ongoing impeachment trial in the Senate. It's not clear whether Murray's email was related to that event.*

*Concerns escalated on Jan. 24, the day before Murray was arrested, when a Ford F-150 belonging to Murray crossed the Skyway Bridge into Pinellas County. Judge Phillip Federico issued a bench warrant for Murray that day,*

*concerned Murray would act on his threats to the Speaker's wife.*

*Murray was charged with cyberstalking. He has since obtained an attorney and pleaded not guilty to the charge.*

*The warrant for his arrest was issued in Pinellas County and carried out in Okeechobee County. Murray was released on bond the next day, Jan. 26.*

*The Pinellas County Sheriff's Office obtained permission to perform a forensic analysis of Murray's cell phone, which was found in his truck. According to the criminal complaint, Murray's email address is associated with a website, Cops2prison.com, which contains incendiary posts critical of the police, criminal justice system and other institutions.*

*The Sprowls live in Clearwater with their two young sons.*

*janelle@floridapolitics.com*

362.    There is a big difference between "Murray was arrested for Cyberstalk, for sending Phil Archer an email about the January 6th mob", and "Murray was arrested for sending multiple lewd emails threatening a housewife and her children, and then driving over a bridge to approach that housewife with stealth". (362.1) Only one of those is supported by the affidavit.

363.    When Defendants subsequently refused to say "Sure, we'll correct the headline from stalking to Cyberstalk", they revealed they perceived a difference between

"Cyberstalk" and "stalking" that was material to them. If there is no difference, then why start a fight over it? Because Defendants wanted to communicate approaching with stealth rather than sending emails to an unrelated person, this was the substance of their story, this was a substantial difference revealed in their decisions. They know "Cyberstalk" has a different meaning, a different substance and feel to their readers.

364.  The general character of Defendants' post is to embellish juicy and misleading statements to paint Plaintiff posting political grievance fliers about Phil Archer at a law school, as a sort of salacious sex story.

365.  The general character of Defendants' legal defense, was to paint their malicious sex story as political speech informing readers what their government was doing. They implied Plaintiff is sexual and Defendants are political, when the opposite was true. (365.1) This is false color.

366.  If you take a vote of three people whether this difference matters, and only one is Plaintiff, while the other two stand to lose by saying it matters, you will get a two-to-one vote saying it doesn't matter. If you instead ask three people who have nothing to gain or lose from their vote, you might get a different answer.

367.  Absent such an impartial panel, you might ask upon whose cost and benefit should we decide whether this difference is material? Cost and benefit to the judge,

the voter, Plaintiff, or Defendants? If you give any weight to the cost of the difference to Plaintiff, the difference is material. If you apply any sort of legal standard that the difference between sexual and political speech is material, the difference is material. If your goal is to scrutinize the activity of government rather than sell clickbait fluff, the difference is material.

368.    Anyone who looks at the actual content and context of what Plaintiff said to Phil Archer, is going to see that "lewd" is not the right way to describe it, not any more than "fuck you" is lewd. Coarse and sarcastic is a little closer. Lewd implies actual sexual suggestion towards someone, not disdain for supporting Trump's activity which was the context sent to a politician. Courts do not have such wide discretion to choose sexual criminal color for speech, or to award such privilege to someone else, and especially not to invent such color without even seeing any email.

369.    Defendants mislead the readers that their false statements - such as Plaintiff sent at least two emails containing at least two lewd comments and two threats to and about Shannon Sprowls, before driving over a bridge to approach her with stealth - were supported by some official facts or evidence by saying "according to court records".

370.    The word "threat" did not appear in any court document. No witness said any threat took place, no court found that any threat took place. The best you could say

is if you combined Plaintiff being arrested with the assumption that courts are honest
and police are always right and never lie, it is a reasonable inference that a threat
might have taken place in some way. (370.1) Speaking such a guess costumed as a
fact, moves the speech away from scrutinizing government, and toward baselessly
defaming a private citizen.

371.   The inference which every reader made and was reasonably expected to, is
that Plaintiff sent Shannon Sprowls lewd and threatening emails. (371.1) But such
inventions are not supported by the official statements, and therefore are not First
Amendment speech reporting the activities of government, this is just reckless gossip.
(371.2) It is never reasonable for government to promote such reckless attacks, which
attacks chill political speech such as Plaintiff posting political fliers at a law school,
and which thereby avoid rather than advance the scrutiny of government.

372.   On February 14, 2021, Plaintiff sent an email to the two contact addresses
provided at the bottom of the post and for the website, janelle@floridapolitics.com
and peter@floridapolitics.com with the subject "please correct false story".

*please correct false story*

*Dear Janelle,*

*You have published a story containing false and inflammatory and damaging*

assertions about a private citizen, Stephen Murray.

You have published this assertion that Stephen Murray's email address is associated with a website containing incendiary rhetoric. I reject this assertion. I request that you correct it ASAP, or provide evidence of your assertion. If there is a website with incendiary rhetoric, this should be an easy task for you to set the record straight.

You have also suggested that a threat was made against a political figure. Please make clear what you believe that threat was. Are you suggesting a judge of the State of Florida actually harbored a fear, based on this allegation that the subject of your article crossed a bridge for the purpose of pimping out Shannon Sprowls?

If you are saying a judge believed the subject of your article intended to make money by engaging in prostitution with Shannon Sprowls, please make clear that is the threat you are talking about. And also provide evidence that a judge believed the subject of your article intended to pimp Shannon Sprowls and that is the purpose for which the judge believed a truck crossed a bridge, or provide a prompt correction saying that is not actually the case.

Please specify clarifying examples of each of the things you have asserted, the threat and vulgar and the lewd text, or provide a correction if any of these was not actually alleged.

Also, please provide any supporting documentation that this truck crossed this bridge. Was there some type of tracking device on the truck? Was there some kind of warrant to allow this tracking device? How did the truck become

*associated with the supposed email?*

*Your story makes damaging insinuations based on lies and unfounded facts. I demand you clean it up immediately, with corrections, clarifications, and retractions. There is no law that protects you making money with false and inflammatory statements at the expense of private citizens.*

*Stephen Murray*

373.    Defendant Schorsch quickly emailed back:

*We will provide no such thing as none of this is asserted by us, but by the criminal complaint, which I am sure your attorney can obtain for you.*

*I will not be replying to any further correspondence from you unless it comes under the cover of your attorney. Any further attempts to contact me will be viewed as harassment and will be addressed swiftly in the legal system you know so well.*

*Peter Schorsch*

374.    Plaintiff replied:

*There is no reasonable basis to infer from any criminal complaint, many of the assertions in your article. Unless you simply provide a copy or direct quote of the criminal complaint, then you are providing editorial embellishment for the sake of misleading the reader for profit.*

*You cannot dispute that when you write sentences that are not in the criminal complaint, they are your own original assertions and hypotheses. And there is no law which prohibits me from requesting you stop libeling me. In fact, courts prefer that requests are made in writing to you by me, before I hire a lawyer use the court to serve you with the complaint. It is the standard civil procedure in the United States that I contact you in this way. Even your email to me, suggesting that my complaint to you is criminal harassmennt, can be considered libel in the right context.*

*You want to say I am a criminal for complaining about your misleading article, that is more libel!*

*If you wish to publish defamatory statements, then publish your email addresses, then consider a request to correct your defamatory statements a crime, then make that clear. Make that criminal complaint, and I will make that libel lawsuit. And we will see who prevails in court.*

*Or you can correct or retract your story, as requested. rather than make false and misleading statements for money under the guise of "journalism."*

*Stephen Murray*

375.   Schorsch replied:

*Please - PLEASE - sue me for libel.*

*Please - PLEASE - let me go to court against the guy harassing a Florida House Speaker. You'll guarantee my business for the next eight years.*

*We look forward to hearing from your attorney.*

*Happy Valentines Day!*

*Peter*

376.   After a few more emails, Plaintiff replied the next morning February 15, 2021 with a draft of a civil complaint detailing extensively how Defendants' story was false and not supported by the arrest affidavit.

377.   Schorsch replied:

*I have added the criminal complaint in its entirety to the post. I'll let readers judge for themselves what you have done.*

*I have deleted ", concerned Murray would act on his threats to the Speaker's wife" from the text of the story.*

*We are not deleting "Murray's email address is associated with a website, Cops2prison.com, which contains incendiary posts critical of the police, criminal justice system and other institutions." as this information comes directly from an official criminal complaint.*

*As for your complaint, when you file your document with the courts, we will respond in an appropriate fashion.*

*Peter Schorsch*

378. Plaintiff replied with a sworn statement that much of the affidavit was false:

*I still have a concern that your repeated use of the word "threat" is intended to mischaracterize the content of the affidavit in a misleading way. And with more energy given to exaggerating and inflaming the content, than to even attempting to verify whether anything that is actually in it is even true.*

*Not only has the content not been litigated as to veracity. But no charge has even been filed, which is a necessary prerequisite for me to have any avenue or venue to dispute them. So the State Attorney and therefore the State does not even currently stand behind the accusations written therein. Much of it is false. And I hereby swear that much of it is false.*

*There is not currently a formal accusation by the State for me to respond to or the reader to judge. Suggesting otherwise, and saying there are any established facts upon which readers can decide any judgment, is misleading and exaggerating.*

*Stephen Murray*

379. Schorsch replied:

.

*That's not our business or concern.*

*That's for a court of law to judge. An official criminal complaint has been filed. That is the basis of our story and it is a shield against any intended litigation.*

**THERE IS A FORMAL ACCUSATION.** *You've been arrested! That's the accusation.*

*A criminal complaint by the state could literally say you intended to invade Mars and they've arrested you for threatening martians. So long as it is from an official government entity, we have not "knowingly" written something false.*

*Your issue is with the state, not us.*

*I am done here. For real this time. I am not responding further, unless it is to a specific request.*

*If you want to file your complaint, please do so, but I have to focus on other matters.*

380.   Plaintiff sent Defendants an updated draft of a civil complaint detailing how

their story was false and not supported by the arrest affidavit.


381.   Schorsch replied:


>   *You are welcome to file your complaint.*
>
>   *As this email is not a request for anything - a demand letter so to speak - there
>   is nothing i can respond to.*
>
>   *Im sure you, arrested Florida man, will be able to overturn mountains of
>   precedent about libel law.*
>
>   *Best of luck!*


## Florida Civil Defamation Complaint

382.   Plaintiff initially contemplated there may have been some kind of confusion,

so that perhaps one or the other of Defendants maybe really didn't know what the

facts were and was misled by the other or someone else. Plaintiff later learned the

hard way that all parties knew exactly what is going on, they simply believe it is their

right in Florida to deprive and harm broke nobodies with malicious lies without due

process, for sport and amusement without civic benefit.

383.   Plaintiff filed a civil defamation complaint in Okeechobee County. But because of the possibility that one of the Defendants might not know what the facts were and may have been misled by the other, Plaintiff did not serve his complaint on Defendants while waiting for more facts to come out in Pinellas criminal court. Plaintiff filed a motion in criminal court demanding discovery, and even emailed the prosecutor requesting that he get on with it already and provide discovery, so that Plaintiff could clear his name.

384.   That never happened. After five months without any charge or hearing, Plaintiff's criminal defense lawyer filed a motion to ask why Plaintiff's speech was being illegally restricted for five months without a charge in violation of the rules of criminal procedure, after which the Pinellas prosecutor filed a "no information". Plaintiff never had a day in court.

385.   Because Plaintiff never got a chance to bring out the facts in criminal court, Plaintiff amended his civil complaint to document thoroughly that he was posting political fliers, when Defendants said he was "stalking Chris Sprowls' wife". The documentation included receipts, photographs, emails, text messages, and even the IP address, phone model, search app, and physical description, of a Stetson University security guard who saw Plaintiff's fliers and then visited the website from the flier.

386.    Plaintiff then served his amended defamation complaint on Defendants in July of 2021, five months after they put up their story.

387.    Plaintiff's defamation complaint recounted that his relationships and opportunities for association had suffered as a result of a story that is totally out of character for what Plaintiff actually does, and which story does not resemble the actual allegations in the affidavit that Plaintiff emailed Phil Archer about Republicans and January 6th.

388.    Plaintiff was prepared to prove these damages in court, despite the difficulty of getting people to even come into court who no longer want to associate with Plaintiff, because they think he is hiding some secret side that they never knew about. This upon discovering that Plaintiff is a clumsy oaf who cannot restrain his impulses to go approach housewives, when all along they had thought Plaintiff was a nerd who sits at home on his laptop arguing about politics, or telling anyone who will listen that cops who break the law should go to prison.

389.    Plaintiff's complaint argued police using Defendants to slander Plaintiff was some kind of illegal quid pro quo, transferring state immunity to deputize private parties, and perverting case law from a different era before the Internet that could not have intended this, to trash broke nobodies in collusion with elected officials for money.

390.   Plaintiff argued reckless disregard for the reputation of private citizens is inherently malicious, and Schorsch displayed malice when he said he is allowed to spread nonsensical lies about Plaintiff because Plaintiff is an "arrested Florida man".

391.   Plaintiff's defamation complaint argued Defendants' article was intentionally misleading, and intentionally diverged from and embellished actual official documents, in a maliciously reckless way to make money off a sexier story.

392.   Plaintiff's filings mentioned numerous statements in Defendants' story that are false, that were not in any official document, and that were invented for the material purpose to be juicier and more clear and vivid than anything in any official document, and therefore more damaging to Plaintiff. (392.1) Plaintiff now lists the details of his Okeechobee pleadings here.

393.   Defendants' headline "Okeechobee man arrested for stalking Chris Sprowls' wife" is false, because the statute "Cyberstalk" is not the same as the common definition of "stalking" which means to approach with stealth. The Cyberstalk statute means to harass with electronic communications, and impersonate on banking websites, nothing to do with driving over a bridge. Defendants' headline was used to mislead the reader that Plaintiff crossed a bridge as mentioned in the affidavit in the act of physically approaching someone with stealth, ignoring that is not what the

cited "Cyberstalk" statute means.

394.    The Cyberstalk and the crossing the bridge were two separate things, conflated
only to the extent the arrest affidavit was nonsensical and there was no fair way to
connect any of it. Plaintiff understands it can be hard to make sense of why Plaintiff
was arrested, in light of the fact that Plaintiff emailed Phil Archer not Shannon
Sprowls, perhaps giving the impression that the crime must have been driving over
the bridge, not sending a grievance email to an elected official. But misconceptions
which arise from ignoring that Phil Archer is the only witness named in the arrest
affidavit, are not actually supported by the arrest affidavit.

395.    The deputy knew Plaintiff was posting cops2prison.org fliers and never
believed Plaintiff was anywhere near Shannon Sprowls. Plaintiff was not actually
stalking anyone's wife, but sending emails to another person, which emails then
became the subject of gossip. The Pinellas sheriff effectively conceded in later court
documents (US-FL-SD 2:21-cv-14355, CA-11 22-13155-AA) that there was no
probable cause for either stalking or the "Cyberstalk" statute and switched to "threat"
which there was also no witness that Plaintiff ever did. There is a difference between
being "fair", and a person who is clueless of the actual facts being reckless for clicks.

396.    Defendants' sub-headline "The man made lewd comments and threats in an
email about Shannon Sprowls" is false and not in the affidavit. The affidavit

mentioned one email to an unrelated person which neither Defendants nor the Okeechobee civil court had seen. That email did not mention any name "Shannon Sprowls" but only had attached a photo of President Trump on Air Force One with an unidentified woman. (396.1) Plaintiff called someone in that picture "whore", but it was not specified whether it was Trump or the unidentified woman, unless you combine two baseless assumptions, 1) the word "whore" being used in a non-standard lewd rather than derogatory manner, and with that 2) Plaintiff not being gay. Or unless you have some preconception like "all women are whores". (396.2) But in any case, there was no witness to even get that far, by piecing together the email to Phil Archer and the driving over the largest bridge in Florida and the Bible quotes about hubris to say "The driving over the bridge makes the derogatory comment lewd, so all this taken together means Plaintiff wants to have sex with Shannon Sprowls." That was all artificially selected and connected afterward by a perjuring cop. It was not all witnessed and taken together by Shannon Sprowls.

397. That email contained one verb, which verb at best could be construed as lewd maybe in some far different context, such as in a poorly-scripted role-playing porn video. There was no witness who said it could be taken as lewd in the context known to the actual parties to the email. According to the arrest affidavit, the "whore" line followed the obviously sarcastic line "Is pimping legal in Florida?" This in a private grievance email from one middle-aged man to another about January 6th.

398.   Plaintiff's earlier email comparing the January 6th mob to some bikers in a movie was later characterized by people who were not parties to it and had never seen it, as threatening. But that email was not about Shannon Sprowls and did not attach the photo of Trump with the unidentified woman. And it was not labeled "threatening" in the arrest affidavit, nor by any party to it as witness.

399.   Defendants' detail "a man who sent threatening and vulgar emails threatening Shannon Sprowls" which was not in the affidavit is false and misleading. The affidavit mentioned an earlier email comparing the January 6th mob to bikers, and a later email with a photo attached of President Trump on Air Force One with an unidentified woman, which later email was no more vulgar than what mainstream Republican VIP's do every day, which is whom the email was mocking. Both these emails were sent in private to someone on the other side of the state unrelated to Shannon Sprowls. There was never any allegation to this day, that Shannon Sprowls ever saw either email or was expected to, or that any actual party to the emails perceived them as a threat. The name "Shannon Sprowls" never appeared in any of Plaintiff's emails, and the arrest affidavit did not say it did.

400.   Defendants' detail "was arrested on cyberstalking charges" is false and not in the affidavit because there was one crime listed in the affidavit, Plaintiff was never charged and the case was abandoned without Defendants ever taking the false story down. The plural "charges" is used in a misleading way to bolster the plural "emails",

"lewd comments", and "threats", which were also all false, to create the impression of a large pattern of criminal sexual behavior that did not exist.

401.   Defendants' detail "Concerns escalated on Jan. 24, the day before Murray was arrested" is false, because the affidavit does not characterize any "concerns" prior to January 24th. This is material because it suggests some long pattern of lewd emails and threatening emails to Shannon Sprowls which didn't actually exist, and which the arrest affidavit doesn't even say anyone read. What Deputy Weill actually said was some intentionally vague obfuscation like "your Affiant located an email address... your Affiant was made aware that the address sent an email..."

402.   Remember, the woman in the picture with Trump was not identified in the email Plaintiff sent Archer, and there is nothing in the affidavit saying Archer knew who she was or even read the email. Archer's "concerns" at that time were Plaintiff documenting his lying and telling everyone he is a scumbag. Given Plaintiff was arrested, you might imagine Archer read the email and thought oh dear, I am concerned for this woman. But neither the affidavit nor the facts support that actually happened.

403.   Defendants' detail "Judge Phillip Federico issued a bench warrant for Murray that day, concerned Murray would act on his threats to the Speaker's wife" is false because there is no witness of any threat made "to" Shannon Sprowls, and the judge's

thoughts and motivations are not mentioned in the affidavit. There is no statement by a judge to the effect that he believed a colorful political email to a prosecutor about a crime - pimping - was a threat, or that a truck was driven over a bridge with the intention to engage in prostitution.

404.    A more reasonable inference is the judge was politically forced to sign the affidavit because it contained the name of the most powerful politician in the county. But Defendants' statement creates the false impression that an important person verified that threats had taken place, when in reality the judge was already shown to have carelessly signed garbage, by the lack of any official charge or discovery.

405.    Defendants' detail "Murray was charged with cyberstalking" is false because Plaintiff was never charged and the case was abandoned without Defendants ever taking the false story down. To this day people Plaintiff meets assume Plaintiff went to prison for his numerous crimes. Saying someone was charged, bolsters that any of this is true, and that there was discovery and an opportunity to refute the claims, neither of which is true.

406.    Defendants' detail "was released on bond the next day, Jan. 26" is false because Plaintiff bonded out the same day he was arrested. But there was some crooked stuff going on where deputies lied to bondsmen with specific intent to stop them from bonding Plaintiff out until the next day, so that it took hours for Plaintiff

to find a bondsman the deputies had not lied to. This is material because it shows Defendants are reckless agents for whatever false garbage deputies tell them to publish.

407.   "The Pinellas County Sheriffs Office obtained permission to perform a forensic analysis of Murray's cell phone" is false because it is not in the arrest affidavit, there is no evidence they had that type of permission, and they certainly had no such permission at the time Plaintiff was arrested. This is material because it makes it seem like the arrest was based on incriminating evidence in Plaintiff's phone when the opposite is true. They searched Plaintiff's laptop and two phones maybe a week after the arrest affidavit was sworn, and found zilch criminal.

408.   Defendants' detail about the cellphone "which was found in his truck" is false and not in the affidavit. It is material because it reinforces the overall narrative that the phone was in the truck that crossed the bridge in the affidavit and therefore contained evidence that Plaintiff was approaching Shannon Sprowls with stealth, when the opposite is true.

409.   Okeechobee deputies picked up two cellphones and Plaintiff's laptop off the ground on Plaintiff's property after Plaintiff was arrested. They then lied to a judge in an unpublished affidavit that they found these items in Plaintiff's truck, using these lies to strengthen the association between the items and the truck that went through

the toll booth, and thereby justify a warrant to seize them as containing evidence that the truck approached Shannon Sprowls. (409.1) When Plaintiff filed an exhibit in federal court with a screen grab of video of deputies collecting the cellphones and laptop off the ground on Plaintiff's property, the Florida Attorney General lied to the court that it was not deputies, it was not Plaintiff, and there is no video of deputize collecting the cellphones and laptop off the ground.

410.    Defendants' line "According to the criminal complaint, Murray's email address is associated with a website, Cops2prison.com" is false and not in the affidavit. The affidavit mentions cops2prison.org.

411.    Plaintiff immediately registered the cops2prison.com domain to see any traffic it got. When Plaintiff emailed Defendants to point out cops2prison.com was the wrong web address, the newly-registered "cops2prison.com" immediately got synchronized hits from both the Pinellas Sheriff's office, and Defendants' IP address in St. Petersburg (and one associated with their traffic in Tallahassee). This suggested Defendants were talking directly to police to ask them what the web address was, not getting it from the affidavit or official proceeding as claimed. (411.1) After Defendants talked to police, they left the wrong web address in their story, seemingly wanting to stop people from visiting the real link and seeing what it was really all about.

412.    Defendants' line "Cops2prison.com, which contains incendiary posts critical of the police, criminal justice system and other institutions" is false and not in the affidavit. Saying cops who commit felonies should go to prison, is only "incendiary" if you are a violent angry member of the cop cult. It proves that Defendants were reciting the real motive for the arrest as told to them by police - the opinion of cops that Plaintiff's website is "incendiary" - without Defendants even bothering to check the incorrect website address themselves, not even the correct one from the affidavit.

413.    This is only "fair reporting" if you think it is fair to be sock-puppeted by local cops through back channels, to maliciously defame with false statements posted forever, people who have never been charged with any crime. (413.1) And when Florida judges are so dumb or politically biased, that they will sign anything based on an arrest affidavit that a critical person would see as nonsensical.

**Florida Motion To Dismiss Hearing**

414.    Defendants responded to Plaintiff's defamation complaint and the aforementioned details, with a motion to dismiss and a proposed order to dismiss for the judge to simply sign. (414.1) Defendants' motion cited a variety of Florida-specific law rather than federal First Amendment case law.

415.    Defendants' motion to dismiss and proposed order cited several standards, primarily that their story was "substantially true" and that is was "fair" pursuant to a

"qualified privilege" created by Florida case law, and in particular by Ortega v. Post-Newsweek Stations. Defendants said they "merely reported on" which is the standard in a lot of Florida case law, i.e. saying "according to the government, the government said or alleged XYZ".

416.   But none of Defendants' narrow arguments was actually true. (416.1) Defendants' argument relied on an expanded definition and ambiguity in Ortega v. Post-Newsweek Stations, which gives them artistic license when writing clickbait about "matters" raised in official proceedings.

417.   "Substantially true" means the substance is true, which is not the same as "casually appears to be the general idea", and would rather require examination of details.

418.   Defendants argued they could ignore Plaintiff swearing to them that their story was wrong, because they have "no duty to go behind statements made at official proceedings and determine their accuracy before releasing them". They then argued their inventions were only "reasonable" guesses based on official proceedings. As such, they weren't selecting government quotes over doing their own investigation; they were selecting guesses over the sworn statements of the only firsthand witness, which statements were put right in front of them for free without having to go anywhere.

419.   Defendants thereby argued that the same protection of them saying "the government said XYZ" is extended to things they imagine, simply because it is imagination involving a matters of interest to government which imagination supports the interests of government. (419.1) Defendants so defined "reasonable" as designed with the reason to impute Plaintiff is a criminal and advance the narrative of government, and with the reason to be juicer than what is actually in the affidavit, giving them a reason to ignore a sworn statement by Plaintiff as the only actual witness. The sworn statement of the only witness was argued to not have any interaction with how "reasonable" Defendants' guesses are.

420.   Defendants' motion to dismiss and proposed order to Judge White contained numerous false statements, (420.1) and materially relied on two statements that were easily verifiable as objectively false, 1) "Murray had... no legitimate purpose for traveling to the county" and 2) "These revisions included removing a statement that Judge Federico had issued the bench warrant as he was 'concerned Murray would act on his threats to the Speaker's wife'".

421.   In the first false statement, Defendants quoted "no legitimate purpose" from the Cyberstalk statute which actually says "electronic communication... serving no legitimate purpose". But they conflated it to mean driving over a bridge with no legitimate purpose rather than sending an email with no legitimate purpose, to imply

that the affidavit somehow supported misleading people that Plaintiff violated the statute by driving over the bridge, making the crime approaching a person with stealth rather than political speech.

422.   The second statement was false, for the simple reason that Defendants did not remove the statement about the judge from their story as claimed; it was up on the Internet during the dismissal hearing and still is today.

423.   When Plaintiff raised these two false statements from Defendants' motion at hearing, Defendants' attorney again repeated the same false claim to the judge, that Defendants had revised their story in response to Plaintiff's emails, by removing the incorrect phrase as falsely claimed in their motion. Judge White nodded and accepted this as true.

424.   Not being a lawyer, Plaintiff never imagined a judge would quote averments from the moving party that Plaintiff could easily prove were false just by clicking a web page. Plaintiff's complaint included screen grabs and paragraphs showing Defendants had not removed the false statement as they claimed to, as it was still there six months later while Defendants' attorney said at hearing that it wasn't.

425.   Plaintiff had already mentioned the same false statement prominently in his response to Defendants' motion to dismiss and in a motion to strike. The interaction

between Judge White and Defendants' attorney proved she never read a thing
Plaintiff filed, and was learning about this for the first time in court from Defendants'
lawyer.

426.   Judge White then signed an order saying incorrectly that Defendants had
made this revision to their story, without ever bothering to read Plaintiff's multiple
filings or consider his statements at hearing, where Plaintiff proved over and over
that what Defendants' attorney was saying was not true.

427.   It is literally never "fair" to recite a statement from an official proceeding or
represent it as "true" like Judge White did, that a US citizen has "no legitimate
purpose" for driving over the largest bridge in Florida. That is simply not a valid
thought in United States cultural or legal traditions, and can never be true under any
circumstances. It is like Defendant Schorsch said in his email to Plaintiff "the state
could literally say you intended to invade Mars and they've arrested you for
threatening martians".

428.   Plaintiff also said over and over, in his complaint, in his response to motion to
dismiss, and at hearing, that there were not multiple emails as characterized by
Defendants, to materially bolster their false narrative with embellishments not
supported by the arrest affidavit. At hearing, Judge White frowned at Plaintiff's
statements as firsthand witness, and then asked Defendants' attorney if Plaintiff had

actually sent multiple lewd emails and multiple threatening emails. Defendants'
lawyer assured Judge White that Plaintiff had sent multiple such emails, despite
never seeing even one email.

429. Again, Judge White's actions can only be explained by never reading a thing
Plaintiff filed. Plaintiff examined in detail in his filings that the existence of multiple
such emails - which is critical to the substance of Defendants' story - was not
supported by the arrest affidavit.

430. Plaintiff said at hearing that the expected public definition of "stalking" and
particularly the way Defendants intentionally framed it - to approach someone with
stealth - was not supported by the affidavit. Plaintiff said "Cyberstalk" is an obscure
esoteric legal term with a specific narrow meaning in court, and the obscure legal
definition did not give Defendants freedom to mislead readers saying a different
word with a different publicly known meaning.

431. Judge White responded by reciting the Florida "Cyberstalk" statute to
Plaintiff, as if to inform Plaintiff of something he never heard of before. Plaintiff
quoted the Cyberstalk statute in its entirety in his response to motion to dismiss,
which the hearing was supposed to be considering. The way Judge White read the
statute to Plaintiff as if gifting Plaintiff a gotcha with something he never heard of
before, it proved Judge White never even read Plaintiff's response to Defendants'

motion to dismiss.

432.   Judge White went so far as to lecture Plaintiff by reciting the statute definition of "Cyberstalk", in an effort to explain to Plaintiff why the "stalking" headline meant to be read by non-lawyers, was true using the esoteric legal definition. Judge White basically said "The headline can be true even if you weren't actually stalking someone, because the elements of the statute include a variety of things like xyz".

433.   Judge White thereby admitted it was not expected for a layman like Plaintiff to know the statute definition until so informed by the the court. Therefore Judge White admitted it is not expected for readers to know what the arrest affidavit actually said, or find their way to that esoteric legal definition, when reading Defendants' headline that did not say "Cyberstalk" but "stalking".

434.   When plaintiff brought all this up at hearing - the factual details that Plaintiff thought were relevant to analyze and measure against the law (and which Defendants thought were material enough to invent for money) - Judge White had no idea what Plaintiff was talking about, and clearly therefore could not have read Plaintiff's complaint or motion filings. Judge White obviously never read Plaintiff's details, and was made aware of Plaintiff's issues for the first time during the hearing, (434.1) which she then looked to Defendants' attorney for a nod to casually dispose, as if to say "I'd prefer to hear what a real attorney has to say rather than this layman

criminal."

435.   Judge White's questions and statements at hearing did not seem to give any consideration to or even read Plaintiff's argument that case law was being used beyond the intentions or foresight at the time it was written before the Internet, with the state transferring their immunity to a private party, to put garbage in search engines forever for money in a quid pro quo. Judge White's questions and statements at hearing revealed she didn't even read that part, or stopped reading when she saw that.

436.   Because Judge White doesn't need to read any further once she sees it is police colluding with gossip promoters. Rather she knows exactly what is going on, she just believes it is within her legal authority to allow an "arrested Florida man" to be trashed with artistic license - a form of criminal punishment - and it is a waste of time for a court to examine facts and witnesses.

437.   Defendants' story was "fair" in the judgment of a Florida elected official, if you assume that since Plaintiff was arrested by our good boys in blue then he must have done something bad to deserve it, and it is fair to imagine an artistic vision of how bad he was, without actually bothering to read the documents. And it is "fair" if you confuse yourself by glaringly ignoring that the actual witness mentioned in the affidavit was Phil Archer, not Shannon Sprowls. And it is "fair" if you think

someone who referred to the either the king or the queen as "whore" (actually mocking Joel Greenberg) deserves to be punished.

## Standard For Dismissal

438.   Defendants' story, and later the Okeechobee court's dismissal, is unambiguously not based on the arrest affidavit, but based on the simple fact that Plaintiff was arrested.

439.   But nor was the truth hidden from Defendants and the Okeechobee court. Plaintiff put it right in front of their face, and they didn't care, they had other priorities.

440.   That makes any standard colored as "based on the official proceeding" not so much "misconstrued from the official proceeding" but in practice "legally permitted because of the official proceeding".

441.   We can consider five different standards for dismissal of a defamation complaint from a private citizen, before any discovery and without Defendants being burdened to provide any witnesses or response:

1) When defamation of a private citizen involves his criminal rights in the context of a criminal proceeding, a more strict scrutiny of negligence, which is due when voters

regulate due process with the Internet as their transcript.

2) A truth/negligence standard, appropriate to a typical First Amendment versus private citizen defamation case not involving criminal proceedings, which needs discovery and sworn testimony to measure the actual facts against the standard, or to at least read Plaintiff's filings, rather than discarding Plaintiff's statements as witness in favor of Defendants' lawyer's false gossip and obviously objectively false statements.

3)  When defamation of a private citizen involves his criminal rights meaning "matters" raised in criminal proceedings, a more lax scrutiny of negligence, as ambiguously suggested in Florida based on Ortega v. Post-Newsweek Stations (artistic license to adopt facts and lend your own credibility and embellishments).

4) An immunity standard appropriate for a state actor under Brown v. McKinnon, where there is a dismissal because it is undisputed state speech on its face (which would still require deeper examination of facts if Plaintiff claimed there was a waiver of immunity under Florida Statute 768.28 because a government employee "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property").

5) A sloppy dismissal recklessly copying false statements, and discounting the rights

of Plaintiff as a perceived undesirable or enemy of the judge's faction, where the judge got her degree from Stetson University in Pinellas, and went to class there with Chris Sprowls or his associates.

442.   By not even reading Plaintiff's pleadings or details or looking at discovery of what actually happened, Judge White went even beyond the fourth standard. Judge White exercised the fifth standard, using the color of an arrest affidavit to become a tool for the state to deprive a perceived enemy without due process.

443.   Okeechobee Circuit Judge Rebecca White took the mere existence of the affidavit - signed by and mentioning her peers - as a blank check to propagate falsehoods without examination both in court and on the Internet. (443.1) When Okeechobee Circuit Judge Rebecca White illegally accepted Defendants' false statements and inventions - gossip - over the sworn statements and averments by Plaintiff as firsthand witness to dismiss prior to response or discovery, she seemed to do so simply because Defendants' false statements were bolstered by the mere existence of an arrest affidavit, whereas Plaintiff was as Defendant Schorsch said an "arrested Florida Man".

444.   Florida custom so construes that being an "arrested Florida man" (Defendant Schorsch) causes a person to lose his rights to due process for deprivation, rather than simply creating facts which can be used as an input same as any First

Amendment/defamation case. The Florida court incorrectly treated Plaintiff as losing the process for protection against defamation on the face of the complaint based on being arrested, rather than Defendants gaining an opportunity to publish facts in the public interest. ((444.1) And this bad law is then insulated to the extent the voters who are misled with the false statements are the regulators of the same courts.)

445.   Judge White held an illegal bench trial to dismiss prior to response and without witnesses or discovery, and found fact that Plaintiff sent multiple lewd emails and multiple emails threatening Shannon Sprowls, based on the false hearsay of Defendants' attorney, accepted over the averments in Plaintiff's pleadings (the contents of which Judge White showed no knowledge about).

446.   No court ever progressed to the point of ruling that what Defendants indexed to Plaintiff's name to this day wasn't misleading and malicious, based on the idea that because it is irrelevant whether it is false when the state does it, it is irrelevant when Defendants do it to the same person, in some loosely connected way rather than an exact reproduction.

447.   Even if Plaintiff being arrested would often make it "fair" for a journalist to impute juicy unstated facts, Judge White failed to consider case-specific factors as should have instead discredited the arrest affidavit including "(1) the timeliness of the

investigation; (2) the special skill or expertise of the investigating official; (3) whether a hearing was held and the level at which it was conducted; and (4) possible motivation problems, as suggested by the Supreme Court in Palmer v. Hoffman, 318 U.S. 109 (1943)" (Barry v. Trustees of Intern. Ass'n, 467 F. Supp. 2d 91, 97 (D.D.C. 2006); Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 168 n.11 (1988)).

448.   Applying these factors, (1) The January 2021 arrest affidavit had been abandoned months earlier without charge, (2) the expertise of Florida cops is they know they are never prosecuted for perjury when there is public support for the prosecutions, (3) there was never any court hearing in the case created by the arrest affidavit, and (4) Plaintiff's fliers advertised that cops should go to prison, Plaintiff's speech attacked Pinellas County officials as crooked, and one of them, the supposed crime victim Chris Sprowls, was not actually a witness (the only witnesses mentioned were Phil Archer and unnamed current prosecutors) but Sprowls was the most powerful politician in the county, who previously worked with the deputies as a local prosecutor, and who chose the present Pinellas State Attorney for Governor DeSantis to appoint.

449.   Florida law did not afford Plaintiff the benefit of a judge considering these factors, in determining a "fair portrayal" of the proceedings.

450.   If the state merely lied or made unprovable criminal allegations in an arrest

affidavit, then whether Defendants publishing a copy of the official document is protected speech, could objectively be decided by a judge.

451.    The need for a jury arises because Defendants went far beyond that, with false embellishments, characterizations, and recited representations of what actually happened. Defendants did not merely say the state wrote an arrest affidavit and here it is. They said "this is what happened". And what they said was false, misleading, not supported by the arrest affidavit, plainly suspicious, and strongly disputed by the sworn statements of the only firsthand witness available, Plaintiff. And Defendants effectively admitted they knew all this, and it did not matter, saying it wouldn't matter if they said Plaintiff was "threatening martians". And because Defendants will dispute everything Plaintiff just said, and because this this gives people with a bias a chance to play word games, it must be up to a jury to decide injury and if it was misleading or not.

452.    When the state does not apply any diligent analysis of actual facts and witnesses to measure First Amendment value, but simply says sure you can defame this guy because we arrested him without any additional analysis, that is acting as an agent of state interests for cash, not public interests. (452.1) The state creates a huge financial interest not to publish "fair portrayals" in the public interest, but to develop relationships with state officials and become a conduit for false gossip on behalf of the state.

**Motive Of Florida Judges**

453.  To believe Judge White dismissed Plaintiff's defamation complaint in the disdainful tone Plaintiff witnessed, with nothing approaching due process, this Court might want some plausible motive for the behavior of Judge White, perhaps extending to any Florida judge. Fortunately Plaintiff was there through all these events, and was able to witness what was going on by applying his basic sense to everything the participants said and did, and to other information, including too many small things to recall or recount here.

454.  Ortega v. Post-Newsweek is a First Amendment or defamation case, not a sovereign immunity case. But in practice, Florida judges confuse Ortega's privilege argument that honestly reporting government activities cannot be defamation, with the general immunity of state actors and loss of rights associated with arrest, which these judges see in court every day (and treat very casually especially with pro se indigents who say "whore"). So they dismiss in the aggressive manner in which they dismiss cases against their fellow government employees based on immunity, but under color of First Amendment or defamation case law arguments.

455.  Florida judges are not satisfied to simply apply the law but, owing to the necessity of getting electoral support from their local faction, they pursue a duty to visibly attack as undesirable the same targets that other members of their faction

have visibly arrested to get elected. Sort of like a political faction who all recite the same talking points. So a judge doesn't just say the law calls for this or that, but uses discretion to punish the bad people and support the sheriff as some public duty. Judge White was politically encouraged to act in concert with her peers, and treat Plaintiff's rights in a casual manner.

456.   The fact that Plaintiff was actually engaged in the legally precious activity of posting political grievance fliers about the judge's faction (and college classmates at Stetson University) when he was colored as approaching a housewife with stealth, did not afford Plaintiff extra caution from the Florida courts as it should have. Rather the fact that Plaintiff was an outspoken enemy of the judge's political faction increased the judge's duty to use the opportunity to punish Plaintiff as an undesirable.

457.   Saying Plaintiff using the word "whore" makes Defendants' story fair speech in some abstract sense is not an actual law, there is no actual legal reasoning or check of facts underlying it. But judges using discretion in this manner to "say you deserve this", rather than "the law says this", is commonplace.

## Nexus Between Okeechobee Court And Police

458.   Plaintiff filed screen grabs from video of his arrest with his Okeechobee defamation complaint. Plaintiff labeled the exhibit "Images of Plaintiff's arrest,

showing Plaintiff's cell phone was not 'found in his truck' as published by Defendants" (document 15). This included an image of Plaintiff with the front of a white car in the background through some trees.

459.    This car in the background was precisely redacted out of the image, with black rectangles covering it, when Plaintiff's filing was made public on the clerk website.

460.    It is not possible from the picture to tell this was an unmarked sheriff car, unless a deputy told the court clerk. Even then there is no reason for the clerk to redact the front of a random unidentifiable white car behind some trees, unless a deputy sheriff gives the clerk a reason why they want to cover up the actual facts of what happened.

461.    The search warrant used to seize Plaintiff's property contained false and misleading statements. Plaintiff reasonably concluded based on a variety of information, that the Okeechobee deputies lied to the Pinellas deputies about the circumstances of Plaintiff's arrest (who then lied to the judge), and therefore wanted to hide the presence of their car in the image which contradicted their narrative.

462.    To dismiss Plaintiff's complaint in US-FL-SD 2:21-cv-14355, the Florida Attorney General also made a false claim about the same images, saying the man in the images was not Plaintiff, the other two men were not deputies, and it did not

show them picking up a cellphone or laptop off the ground.

463.    In-person hearings were blocked by order of the Florida Supreme Court because of the COVID pandemic. Plaintiff had to file a motion to be granted an exception, to appear in person in the Okeechobee courtroom rather than by video. There was nevertheless a man observing in the gallery, whom Plaintiff recognized to resemble one of the plainclothes agents of the Okeechobee Sheriff who had been following Plaintiff around.

464.    Given the Okeechobee deputies got the court clerk to redact their car out of an exhibit, and given an investigator got permission to sit in the courtroom against COVID orders for the purpose to investigate Plaintiff as a criminal, it is reasonable to conclude the Okeechobee Sheriff influenced the court to believe Plaintiff had committed some crime, and this ex parte gossip biased Judge White to dismiss Plaintiff's complaint without even reading the pleadings, and explained Judge White's disdainful demeanor from the moment Plaintiff walked into the courtroom.

465.    That Okeechobee deputies had contact with the clerk and judge about Plaintiff, was bolstered when Plaintiff went for jury duty more than a year later.

466.    While awaiting juror screening, Plaintiff went to sit by himself in a separate, vacant area of the courthouse. A random middle-aged white guy came and sat down

next to Plaintiff, and started talking to Plaintiff similar to various other occasions in the same period when uniformed deputies were also constantly following Plaintiff.

467.    This random guy said he was also a prospective juror. He later said he doesn't get called in for jury duty because he is law enforcement, and that if the judge saw him the judge would recognize him as law enforcement and tell him he couldn't serve as a juror. He said his juror number was a number that was impossible based on the documents every prospective juror had. Plaintiff said his juror number was not possible, and that his correct number was on the document he was provided as a prospective juror. He did not have any document. When Plaintiff asked him if he was law enforcement, he said he was not law enforcement. He said he worked in maintenance at the prison, and in security at Walmart.

468.    This random guy described what he considered to be unique customers at Walmart, based on where they parked and what they ate among other things. His details strangely matched exactly where Plaintiff parked and what Plaintiff ate, among other things. He described a unique trip to Miami that strangely matched a trip Plaintiff took to Miami, at a time when Plaintiff knows with certainty police were tracking his phone. He talked about prison inmates, when Plaintiff had just gone to visit a prison inmate and was supposed to go again the next week. He brought up some other topics that seemed oddly specific to Plaintiff.

469.   The only explanation is he was some kind of informant who works informally as an investigator for the sheriff, and he was provided with some various information about Plaintiff. And the clerk told the sheriff that Plaintiff was in the courthouse, so he came incognito to try to get information out of Plaintiff. In other words, Plaintiff was known as a criminal in the Okeechobee courthouse, not based on any actual crime.

470.   Judge White asked questions and took positions at hearing which showed she came in with nothing more than the most superficial information about the course of the case in Pinellas, nothing beyond that Plaintiff was arrested. Plaintiff should not even have been arrested, which Judge White could have recognized if she read the pleadings that there was never any charge or discovery. But Judge White seemed to assume the standard case progress happened where Plaintiff was charged and went through the plea bargain process or something. And given all that, maybe she believed Plaintiff was arguing over minutia, and that whatever Plaintiff was arguing over was not worth the court's time.

471.   To this day, police and others in Okeechobee (like pretty much everyone else in Florida) still think Plaintiff was charged in Pinellas and probably took a plea bargain and/or went to prison at some point. Given one of the g-men who was following Plaintiff around appeared to be given special permission to watch Plaintiff in the quarantined courtroom, and another did the same thing when Plaintiff showed

up for jury duty, it is very likely Judge White took her information that Plaintiff was a dangerous felon from some cop or clerk in her peer group, and from that ex parte information did not think it worth her time to investigate minutia.

## DEFENDANTS ARE STATE ACTORS

### Defendants' Speech Not Protected by First Amendment

472.   No member of the public could have guessed what really happened from reading Defendants' headline and story, specifically that Plaintiff drove to an unknown county to post "COPS2PRISON.ORG" fliers at a law school, spent 94 minutes doing that and only that, and left, and then when Deputy Weill found out about it - not the supposed crime victim, but Deputy Weill found out Plaintiff posted cops2prison.org fliers in his county nowhere near the crime victim and Plaintiff had already left the county - Deputy Weill committed felony perjury in an arrest affidavit, and Plaintiff was never charged or provided any discovery, not even a police report or witness statement, but had his anti-cop speech blocked for five months.

473.   The extra color provided by Defendants made citizens less likely to find out what really happened. If Defendants simply posted the arrest affidavit, citizens might have seen a need to investigate further - to "go behind". But the expanded color given by Defendants' while claiming they had no duty to investigate (Schorsch: "That's not our business or concern"), can be taken by citizens as substituting for any need to investigate further themselves. Citizens imagine their courts protect other citizens

from defamation, and so would never even guess there is anything to find out beyond what Defendants' said, to motivate them to investigate further.

474.   The "Cyberstalk" statute provides zero evidence in the arrest affidavit to impute that Plaintiff actually drove over a bridge to stalk Shannon Sprowls. This misleading implication was bolstered by Defendants' inventions of the multiple emails. The statement "knows of know other reason for Plaintiff to be in Pinellas" was not only a likely lie, but suspicious on its face that some random deputy would know everything Plaintiff thought and did, so that the one time he doesn't know would have only one explanation.

475.   This is not someone who put up a mugshot, with the common disclaimer "This information does not infer or imply guilt of any actions or activity other than their arrest." This is someone who knowingly cultivated a false narrative that Plaintiff drove across the state to physically approach a housewife with stealth, which there was evidence was not true from day one, which evidence was right in front of Defendants. And did so without any disclaimer.

476.   The difference between the truth and what anyone reading Defendants' story would construe - the false narrative that Plaintiff sent multiple lewd emails threatening a housewife then physically approached her with stealth and was caught in this act - was selected in the interests of the state and Defendants' clicks, and

against the interests of Plaintiff, and of the public monitoring the government. Plaintiff went to Pinellas to post fliers about cop perjury, and Defendants turned it into a sex story, because sex gossip about politicians gets way more clicks.

477.   It is not Defendants' fault that readers only want to click on colorfully exaggerated arrest stories, so that you will go out of business posting a followup story later when cases are dismissed. But it is dishonest to then pretend that fluff which sells in proportion as it exaggerates and damages Plaintiff, and which content is never measured in regard to civic value, is a "fair" portrayal of government activity. This is a device for inventing gossip while creating the color, wearing the costume of a public benefit.

478.   Defendants argue that "Cyberstalk", which is a legal term invented by some legislators, and includes things like logging into someone's bank website, is a form of what the public knows as "stalking". Which it is not, regardless of what terms Florida legislators choose to invent for their law. That is the color of law, saying we can mislead about what you did, but then say the statute lets us select these words. The headline "stalking Shannon Sprowls" has a common meaning, a real definition. And it is not anything close to what Plaintiff did that day, or was alleged to have done. And Defendants know this, but choose to mislead for cash, and believe either the law as written allows this flexibility, or the law in practice gives the State of Florida color to trash their targets, and color it as informative First Amendment speech.

479.   When Plaintiff's neighbor and family member and friend and enemy all said Plaintiff sent a housewife multiple lewd and threatening emails and then drove over a bridge to be near her, that is hard evidence that Defendants' story misleads people who read it. Hard evidence from people who actually read the story, explodes any word games Defendants want to play with "Cyberstalk" and "stalking". Plaintiff is witness that 100% of people who have seen Defendants' story have construed this incorrect narrative. Defendants' reasonably could have predicted this, and evidence indicates they did predict this and that is why they did it, for money, because sex sells.

## Public Benefit is Truth, and Who Decides

480.   The standard for defamation of private citizens and public benefit of speech is the same: truth. (There is not a workable standard of awareness as a benefit, such as we lied that the President played golf in Dubai, but it is valuable to the public to know the President went to Dubai, where the awareness benefit could eclipse the effects of defamation by any false portion.)

481.   The government cannot decide what statements benefit the public, unless the state is hosting a civil defamation case, or prosecuting threats and incitement or obscenity. There is not only no need, but no room for any special Ortega standard beyond "is this the truth" and "did it cause injury". The defamation case has to go

forward, without any special rules or privileges. And certainly not with confusing standards that give the government discretion to approve various falsehoods, and which standards are abused in that way.

482.    The difference between defamation and political speech, is who decides what is true. The government should not be deciding what political speech is true. The government gets into murky waters, deciding whether defamation which is also political speech about that same government, is true. The government gets into even murkier waters, when it first decides whether political speech about itself is true, as a prerequisite to even examining whether defamation occurred. The waters are murkier still, when the government expands what is true to what political speech is inaccurate but "fair", further intruding its judgment about political speech about itself, over the space left for defamation.

483.    The trick therefore is changing who measures the speech against his own values, to determine benefit. Any time Florida arrests someone, click promoters are given license to slander that person in a way that loosely resembles or was inspired by something in the arrest, is not a legal standard for reporting on the actual activities of government, or on any actual activities. It does not create First Amendment public benefits more than common defamation, but rather creates greater injury because it subverts public knowledge of government activities, unless politicians spreading their own faction's narrative is measured as benefit.

**Florida Law is Designed Negligently to Deprive**

484.    Ortega v. Post-Newsweek Stations veers wildly between merely "releasing
official statements", "reporting on information brought out in official proceedings",
"portraying official proceedings", and "reporting on matters brought out in official
proceedings". It always outruns the color of whichever statement it starts with, so
that even a judge who actually wanted to be diligent, could find little to persuade her
peers why she was forced to give Plaintiff anything. Any time spent trying to resolve
a standard could be wasted at the discretion of an appeals judge with a personal
connection to Sprowls, and a different opinion of "fair". Which of course is the point,
which Judge White is a party to.


485.    Ortega refers to Florida's negligence-based defamation standard ("if the press
is negligent in its reporting, then it is liable" Ortega v. Post-Newsweek Stations, 510
So. 2d 972, 975 (Fla. Dist. Ct. App. 1987)), implying the defamatory speech covered
is not First Amendment speech but speech that can be abridged. Ortega then
attempts to say you are not negligent when you say "this is what government said"
which is important speech reporting on government. But Ortega ultimately perverts
that into saying Florida "negligence" law doesn't apply when the government has
picked the topic and theme and publishers then "summarize it" for them, which is
effectively reporting on behalf of government.

486.    Ortega says the publisher cannot be negligent even if the publisher doesn't "go behind" things government says, which again is meant be something like "this is what the government said". But that is ultimately perverted into "you can accept what the government says as true".

487.    Ortega then goes further to say that publishers can invent things, subject only to the approval of whether a judge thinks it is fair to defame the target in that way, and without any appeal or recourse of the judge's total discretion, which in practice can include not even learning the details of the case when the defamation target has been arrested.

488.    Ortega broadly relies on this idea that reporting on official proceedings is necessary as part of some scrutiny and regulation of the government ("No government ought to be without censors" Miami Herald Publishing Co. v. Ane, 423 So. 2d 376, 386 (Fla. Dist. Ct. App. 1983)). This is then thoroughly perverted and turned around, into publishers are immunized from defamation when they recite the narrative of government, and can even embellish if a government officer approves it. Ortega thereby provides the government not with censors, but reciters and embellishers, a king's scribe.

489.    None of the government's misconduct - including perjury in the arrest affidavit, and holding a person against the rules of criminal procedure - was

"censored" whatsoever by Defendants' story, but rather given cover and glory by it. Judge White said Defendants could not just negligently, but intentionally ignore such things as Plaintiff swearing the affidavit contained false statements, Plaintiff pointing out their incorrect portrayals of the affidavit, and Plaintiff never being charged.

490. Florida law relieved Defendants of any obligation to even include a sentence like "When asked for comment, Murray said..."

491. Would it have been defamation if Plaintiff took the same actions except wasn't arrested for it, and Defendants' published the same story, except without mentioning an arrest? "Stephen Murray sent multiple threatening and multiple lewd emails to Shannon Sprowls, and drove to her county to approach her with stealth." What if they got that exact story from the same cop when he was off duty, and the cop was instead drunk in a bar when he lied that he saw this? That is false, and defamatory to a private citizen.

492. Florida says the difference that makes it not defamation, is because the same falsehood was first stated in a public proceeding honestly reported on, but then quickly shifts to something not necessarily stated but still "brought out" in a public proceeding ("report on matters brought out in public proceedings" Ortega v. Post-Newsweek Stations, 510 So. 2d 972, 975 (Fla. Dist. Ct. App. 1987)).

493.    The imprecise language thereby shifts from "report on statements" to "report on matters", with rather casual consideration of Plaintiff's rights. This is exploited to create the ambiguity: Are Defendants allowed to quote false defamatory statements by the government (only when attributing them to government), are they allowed to accept (and proceed as if) such statements are true, or are they allowed to (expand their artistic interpretation and) invent false defamatory statements about any matters brought to the public's attention by government action?

494.    Alternative definitions for "matters" might be "actual facts of what happened" or "events whose facts are disputed, where only the approximate time and place are agreed upon" or "events and government activities that matter to voters". There is no definition of "matters" that permits something false to be "brought out" but only invented, because there is nowhere for the falsehood to exist naturally before being brought out from that place. But "report on matters" is used by Defendants to say they are given creative license when discussing the matters (and saying what is true), because the official proceeding made the public aware of the matters. If they have "no duty to go behind statements" (Ortega) then they are not reporting on matters, they are limited to reporting on statements.

495.    License to mislead the public on events the government brought up, cannot retain its original color as benefiting public scrutiny of government. The false portion would have to be strictly limited to quoting government false statements and

attributing them to the government. Any extra color or interpretation of the matters beyond "the government lied in an affidavit and never filed charges or even provided discovery and a witness statement" is false. False is not fair.

496.    But notice how Ortega shifts from unbounded "matters" brought out in official proceedings, back to narrow "information" like a card magician ("the public may be kept informed of the workings of government. That purpose is served, notwithstanding any inaccuracy of the information, when the information brought out in official proceedings is reported." Ortega v. Post-Newsweek Stations, 510 So. 2d 972, 976 (Fla. Dist. Ct. App. 1987)). And reporting "statements" is lost back on the side of the road somewhere.

497.    Ortega basically simplifies to "blah blah blah this sounds like legal reasoning blah blah, if cops say someone is a criminal we are not going to stop anyone trashing those people."

498.    This nebulous standard equips Florida judges with broad discretion to give misleading falsehoods the color of law. The words of 42 USC 1983 make clear that the availability of the color of law does not automatically make something a legal deprivation. Elected state judges have a poor track record distinguishing between law, and the color of law, when local state action and the interests of their faction are involved.

499.   Plaintiff cannot think of a better example of "under color of law" than claiming misleading stories advance the people's interest to "be kept informed of the workings of government". The fact that a person reading Defendants' story could not possibly guess what actually happened, and this possibility was hurt rather than helped by Defendants doing more than quoting the affidavit, makes the citation of this purpose that citizens need to be informed the "color" of a legal justification, not a real one.

500.   The Okeechobee court then applied this unacceptable standard, that because an official proceeding revealed that "matters" exist, Defendants are free to defame Plaintiff with defamatory nonsense, as long as it has something to do with the "matters". But the Okeechobee court never even got to the point of investigating and deciding whether the differences between what Defendants said and simply quoting the government "information", was material and misleading. The Okeechobee court simply investigated in a casual way whether there were some matters, and then immediately dismissed on the face of their being an arrest and the nebulous license thereby created, where the dismissal order itself containing objectively false statements was seen as immaterial so long as cloudy "matters" existed.

501.   Hidden behind all this sophistry, is the belief that what they are doing is fair because the defamation target is a criminal undesirable who did something to

deserve this (compared to everyone else who is acting "in good faith"), whose rights are therefore less important compared to other values they are weighed against such as the court's time, and where the discretion of the judge to allow defamation is used to enact a criminal punishment.

502.   Florida courts do perceive a public benefit from licensing publishers to mislead the public on matters the government has raised in a way the government has selected. It's just not the benefit it is colored with, throwing up a smokescreen of case law. The actual public benefits obtained are punishing an undesirable with stigma, making money, conducting witch trials which the public craves, none of which a judge could legally cite, thus needing the color of some other more legal benefit to shoo away this Court.

**Never Got to a First Amendment Standard in Court**

503.   By "fair", Ortega can be taken to create discretion on any adventure beyond reporting "the government said XYZ", so long as the government doesn't mind. What they are calling "fair reporting" is not just reporting a story in an arrest affidavit as if it's true, rather than reporting that the government said XYZ. They go beyond simply adopting the assertions of government as if they are true, to allow some additional artistic component or private expression, so long as the state judge says that is one fair interpretation of what is going on, based on what the government said. Like this is what might have happened, except just saying it without saying

"might have".

504.   This artistic expression granted "privilege" by judges pursuant to Ortega, in this case amounted to "imputing criminal behavior" beyond the "Cyberstalk" in the affidavit, such as the multiple threatening emails and multiple lewd statements, and the driving to another county to approach a housewife with stealth. What the Florida court called "fair", is imputing criminal behavior beyond simply reporting the truth. That is defamation in any state. ("Imputing criminal behavior to an individual is generally considered defamatory" Paul v. Davis, 424 U.S. 693, 697 (1976)) Expanding the criminal behavior is not a summary or a fair interpretation, it is plain old defamation for money.

505.   You might say it is fair to impute unspecified criminal behavior on someone who has been arrested, that is in the public interest to discuss and speculate. One problem is if that is not even the standard of analysis applied by the civil court judge, because matters mentioned by government are given special license in Ortega. The problem is that the person who decides whether it is fair is the state, and on its face without even listening to witnesses or getting to the point of applying a defamation/public interest standard.

506.   Having this second standard for defamation of people who have been arrested, disguises state action as public scrutiny. The public takes the statement by a click

promoter, as an additional layer of scrutiny adding additional credibility on top of any credibility supplied by the state in official documents. Even if a click promoter has "no duty to go behind", the click promoter takes advantage of public preconceptions that there are civil penalties for defamation, to mislead the public that civil law and his own ethics compel him to go behind, before publishing the story.

507.   Defendants added their own facts, their own credibility, and the credibility of civil courts as their regulators, on top of the original state action. This plays a card trick to pretend it is private scrutiny of the state rather than speech by the state, simply by changing who says it to a private party. But it is still state speech given the false veneer of private scrutiny, to the extent state judicial enforcement then selected Defendants' additions for special immunity and reduced due process scrutiny.

508.   So unless the click promoter includes the caveat "I have no idea if any of this is true, and I believe I am immune to say it without looking into it, and I will invent things even if I know they are false because the law lets me", the click promoter deceives the public by exploiting their incorrect preconceptions about how Florida courts actually work. The public does not know there are multiple standards for private defamation, where the second standard gives private speakers special license to impute criminal behavior and other malicious embellishments.

**Intent of the First Amendment**

509.   The purpose of our way of life is to censor the animal actions of the powerful taking property from the weak. Courts and rights protect otherwise weaker individuals from more powerful private and government actors.

510.   The Constitution was not amended to protect the state from individuals, which would have been thought ridiculous. The First Amendment faces uphill, from the less powerful to the more powerful, to counterbalance the natural difference in rights flowing in the opposite direction.

511.   The First Amendment is designed to protect the weak from the powerful when speaking, not so the government can speak and select messengers to get their story out. There was never any fear of that being stopped. The anti-federalists didn't refuse to join the union, until they obtained written assurances that the government would be able to get its story out. They certainly did not create a right of private citizens to help the government get its narrative out, by creating a right protecting private newspapers from private citizens whose lives they ruined with government-selected lies.

512.   It's a long way from "The citizens have the right to petition the king without fear of repercussions" in the Declaration of Right in 1689, to "the citizens have the right to help the government get out the government's preferred version of events".

513.   The idea that it is reasonable for journalists to construe and broadcast - as a practical matter invent - that a crime took place any time police arrest someone, contradicts the intentions of the Bill of Rights, which are to protect accused criminals from government, including to protect speech critical of government from interference by government, and to allow public witness of violations by government of criminal rights.

514.   And Defendants are certainly not protecting people other than Plaintiff from the state, by blindly reciting the narrative that Plaintiff is a bad guy, there is no perjury in the affidavit, nothing to see here but the government doing a great job. How are you going to petition the government for a redress of grievances, when the government tells you they are doing a great job not swearing lies about citizens - that there is no risk they would ever lie about you for you to worry about - and there is no duty for journalists to "go behind" what the government says? No perjury, no grievance, no petition to redress it.

515.   This is judges granting some kind of probable cause privilege to other judges - protecting judges from the people they have arrested - and then coloring it as First Amendment speech by a private actor. The alternative is papers publishing every day "judge signs warrant based on lies even though no crime apparently took place", which is the actual intention of the First Amendment. Don't blame Plaintiff for

calling judges crooks, Imbler says they are ("often prejudice criminal defendants by skewing post-conviction judicial decisions that should be made with the sole purpose of insuring justice" Imbler v. Pachtman, 424 U.S. 409, (1976)).

516.   Coloring this protection of government officials from individuals, as one of the other paradigms of rights or immunity, is only accepted out of sloppiness, confusion, and political convenience.

**A Real Official Proceedings Standard**

517.   Artistic license under color of "official proceedings" that actively ignores official proceedings, is state-licensed slander under color of law.

518.   The real official proceedings from the time Defendants wrote their story to today, is that the state never provided any evidence that Plaintiff did any of the things which Defendants recited as true. The Pinellas prosecutor filed a "no information" - an official proceeding - prior to Plaintiff's amended complaint in Okeechobee and Defendants being served.

519.   Selective use of facts is one of the most widely understood generic forms of dishonesty. It is synonymous with dishonesty in every other human endeavor, except Florida courts where ignoring that the prosecutor never charged Plaintiff and filed a "no information" is called "fair". Leaving out material facts will get you in trouble

selling cars or real estate. If a car dealer said "this is from the new model year, making it more reliable" but left out that the car was subsequently under water in a flood, that would be a crime. First Amendment speech is different from commercial speech, but "political speakers are allowed to lie" is not the argument the Florida government is using here, rather they are coloring a pig with lipstick by saying "this is not defamation because it is true based on official proceedings".

520.   When Defendants use their artistic freedom to select which official proceedings to take inspiration from - selecting a subset of official proceedings while materially choosing to ignore others with the apparent motivation to make a juicier story than the prosecutor filing a "no information" - that is not faithfully reporting on official proceedings but artistic license.

521.   Defendants had evidence the official proceeding itself was invalid - that the proceeding was not conducted within the true legal authority of the state - when Plaintiff swore to them it was based on perjury, and this was bolstered by the state abandoning the case without charge or discovery. That is more reasonable than the inference that the judge was "concerned Murray would" promote prostitution. When you start to say there is an infinite variety of ways to subselect from and interpret official statements, and it is Defendants' artistic freedom to choose one, that is not "fair and accurate reports of statements made during official proceedings".

522.    When the Okeechobee judge approved of the artistic license of choosing to report one official proceeding as if another had not happened - despite the intervening "official proceeding" of the Pinellas prosecutor abandoning the case - that is a judge approving a story slanted in favor of the state.

523.    There is not a legitimate state or First Amendment interest served by ignoring official proceedings and sworn statements of firsthand witnesses to spread false narratives, to abrogate ordinary protections against defamation at the whim of the state.

**Criminal Activity Not First Amendment Speech**

524.    Schenck's "clear and present" danger threatened the nation, but Defendants' statements can be analyzed as an immediate threat to an individual, Plaintiff, through deprivation of his rights.

525.    When Defendants falsely report as true that Plaintiff sent a housewife multiple threatening and lewd emails and was caught in the act of approaching her with stealth, it creates a clear and present danger to Plaintiff, that Plaintiff will be deprived of immediate public oversight of due process, that public officials will thereby be given cover to continue to hold Plaintiff's speech without charge or discovery against the rules of criminal procedure, and that Deputy Weill's perjury will continue to go unpunished and the Pinellas court will continue to hold Plaintiff standing on it. This

danger is created because the voters have been immediately greased off their oversight function with some fake fluff.

526.    The balance of law switches from protecting speech, to protecting the rights of those affected by it, when the speech is likely to incite or produce imminent lawless action ("is likely to incite or produce such action" Brandenburg v. Ohio, 395 U.S. 444, (1969)), or is essential to criminal conduct ("criminal acts are not protected speech even if speech is the means" Packingham v. North Carolina, 137 S. Ct. 1730, 1737 (2017)).

527.    Florida law and process target precisely the conduct necessary to protect Deputy Weill victimizing Plaintiff with perjury, specifically accepting and broadcasting his statements as true, and accepting and broadcasting as true that Plaintiff committed the crime he was arrested for. The voter condones law-breaking in service of punishing those who deserve it; Why punish Weill when he arrests someone for doing something they actually did?

528.    Because Deputy Weill did break the law and because Defendants glorified and rationalized what he did, "advocacy of lawless action could be implicit" (Anderson v. Griswold, No. 23SA300, 119 n.18 (Colo. 2023)).

529.    The state spreading malicious false statements about criminal defendants is an

incitement to lawless behavior by the voters as regulators of due process. Voters will not care what crooked process is used to convict, if they have been led to believe a defendants is guilty. "The character of every act depends upon the circumstances in which it is done." (Schenck v. United States, 249 U.S. 47, 48 (1919))

530.   The current test of whether speech exceeds the boundaries of protection is whether "(1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech." (Bible Believers v. Wayne Cnty., 805 F.3d 228, 246 (6th Cir. 2015))

531.   That the government has an intent to break the law such as Deputy Weill committing perjury without sanction, and that the government selects the speech as Florida did with their special standard to permit negligent publications when people have been arrested, establishes that the speech has an intention to advance the goals of government, which includes breaking the law.

532.   The state spreading malicious false statements about criminal defendants is also an incitement to lawless behavior by state witnesses, and by prosecutors who decide whether the state uses or prosecutes perjury. State witnesses who are discovered to have committed perjury in support of the popular narrative, are widely

known to never be prosecuted in Florida.

533.   Florida law as applied by a Florida court construed the First Amendment in a way that defies broad historical tradition, when it elevated mass inciteful speech by government against individuals such as Plaintiff, over private non-inciteful speech by an individual, Plaintiff, against Florida government and Republican Party operatives.

534.   Plaintiff argues that inciting voters to ignore government crimes such as perjury by Deputy Weill, is imminent lawlessness resulting directly from misleading voters; but an alternative argument might say it is not speech inciting imminent lawlessness, but speech that is part of and essential to the organized crime of subverting voter regulation of due process. Either way it is still a nexus with the government to deprive Plaintiff of rights through crime, and an essential element to produce the lawlessness, in excess of any honest First Amendment value.

535.   You can't lie without public benefit, and subvert public governance by depriving Plaintiff of ordinary protections from defamation for speech selected by government, and not be in a nexus with that government to illegally deprive Plaintiff of liberty and property interests, which are criminal acts under 18 USC 242. (Unless the Court is firmly part of a religious cult that the government inciting against perceived undesirables who have been falsely accused of crimes, or facilitating and protecting false witnesses against them, is consistent with the intentions of our laws

and traditions.)

536.   This Court would say that breaking windows is "lawless behavior" because it seems violent, but locking someone in prison by winning public approval for perjury is not violent, merely because the "color" that the second criminal harm is done wearing suits and ties and courts of law. Both are lawless and harm the innocent, and are the intended immediate product of the speech. All these people whom The Innocence Project exonerates with DNA after jailhouse witnesses committed felony perjury by reciting popular gossip intentionally propagated by the state, suffered criminal violence.

537.   If publishers and jailhouse witnesses are not penalized for lying, then there is no point where this Court steps in to protect criminal defendants from the lawless mob, and rather invites lawlessness which other institutions such as The Innocence Project, Conviction Integrity Units, suburban Black Lives Matter protesters, and inappropriately legislatures, then have to pick up after ("license to lawless conduct" Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982))

**Schenck and Government Speech**

538.   What elected officials did to Plaintiff, is part of a larger pattern of behavior. Politicians do this over and over to whole classes of people, in an effort to portray that there is danger from crime or some other cost to society, and to get elected for

saving the good members of society by removing the bad people.

539.    The Internet and social media expose millions of people to such incitement against each other, at the suggestion of government actors. If you do this on a large enough scale to enough people over enough years, eventually you have mobs in the streets and civil war. That is not immediate danger in terms of minutes or hours, but the sense of immediate implied in Schenck is whether there is some intervening chance to stop it or make it less likely, or whether it is inevitable. In a Schenck context, whether something is clear and present, is a way of saying whether it is an inevitable direct consequence.

540.    Someone could argue it is not clear that demagogues using the Internet to incite people against their neighbors with blood libel will eventually dissolve the nation and lead to war. And nor does the possibility of death by 1,000 cuts make a single cut murder. But it has been established that the conservation and public spirit of the nation in times of unrest, are at least legitimate interests to consider when weighing whether speech is a crime.

541.    Whatever benefits you might want to consider for sovereign immunity, avoiding war and conserving government is not one of them. Our last sovereign, George III, lost the nation in the Revolutionary War. The previous sovereign, George II, had to fight the Jacobite rising to conserve his government.

542.    War is the end to which government speech is most often employed. As John Jay noted in Federalist 4, kings are inclined to war. A sovereign who through the power of his voice finds an alternative to peaceful solutions and perceives the spoils of war, will not seek a peaceful solution but war, through the power of his voice. Every power is corrupted, including government speech, and must be restrained with checks and balances.

543.    Lincoln, the prizefighting orator, spoke of union but ushered in war with his demagoguery of the "slave power" conspiracy. Lincoln appealed to the moral psychology of the mob, and advocated for war, with his insistence that the two sides could not coexist, find legal compromises, or find a peaceful course to resolve the issues, because the other side was too evil to tolerate.

544.    Like Lincoln, when the Pinellas deputies could not find a legal means to dispatch with their enemy Plaintiff - at the very moment when they could not, after searching all Plaintiff's accounts and phones and laptop and finding nothing they could bring to a court - they took the path to publicly incite against Plaintiff. When they had nothing to charge Plaintiff with legally, they resorted to their sovereign immunity to injure and incite against Plaintiff with words.

545.    Private speakers who have no army are forced to sell their values, rather than

sell the idea of obtaining their values by force. It is speech by government, not by private parties, which leads to war, destruction, and the end of nations. It is not private speech, but government speech, which most puts the nation at risk; not grassroots agitators with pamphlets, but their elected leaders.

546.   It is inconceivable that the Federalists intended to protect the right of kings to incite to war and unrest, when they wrote the First Amendment.

547.   The least protected speech is that directed toward the false and malicious defamation of private citizens, which advances no useful value, but only sows social conflict. More egregious when such speech, designed to incite neighbor against neighbor, originates with government, for the glorification of government at the expense of common citizens. Most egregious when such speech originates in government and takes the form of an attack on the right to scrutinize and petition that very same government.

**Mentioning or Believing the State Do Not Immunize**

548.   Under the loose standard applied in practice by the Florida court "so that the public may be kept informed of the workings of government", any mention of the state could be used to immunize a defamation. A click promoter could say the Florida government is doing a great job deporting pedophiles like Joe Smith to Mars, where Joe Smith has not even been arrested and there is no official document

mentioning him. And the Florida court could say this is protected First Amendment speech under Ortega, "so that the public may be kept informed of the workings of government". The release of an official document does not additionally tell you what the government is actually doing, except limited to what the government is doing is releasing an official document. McNayr v. Kelly gives state actors pure license to make false and malicious statements.

549.    Whether a private party has reproduced or reported the statements of government in a fair and true way, is much simpler than Ortega makes it out to be. Did the party say "The government released a document that said this", and then directly quote or post the document? Getting into whether anything else is "reasonably... fair" is an issue for the defamation jury or at least an investigation of actual facts, not a legitimate use of judicial discretion to deprive someone of a chance at getting to either of those.

550.    There can be no legal standard that immunizes private actors to accept or proceed as if government statements are true without any personal responsibility, as such a standard would enable the deprivation of rights in conflict with the Fourteenth Amendment. The government could lie to Joe Smith that Plaintiff is coming to kill Joe Smith, and Joe Smith should therefore shoot Plaintiff on sight in self defense. Self defense is as legitimate a legal interest as First Amendment rights. Joe Smith would be "under no duty to go behind" the government's statements.

551.  The government could thereby outsource all rights deprivations to private parties, by providing them with false statements which can be accepted as true to legally justify the private actions. Inciting the public against Plaintiff with the claim that he drove over a bridge not to post political fliers but to approach a housewife with stealth, differs from inciting Joe Smith to shoot Plaintiff in self defense, only in the type attack on Plaintiff that is incited.

**No Duty-Free Zone between Defamation and State Action**

552.  There is no such thing as a private actor given state-selected privilege to deprive rights by the state.

553.  It is a neat trick say Defendants are not state actors for 42 USC 1983, but enjoy an immunity created by the state not otherwise enjoyed by private actors. You can't say state actors are immune for defamation, and private actors are not state actors but are immunized by the First Amendment, but defamation is not protected by the First Amendment but immunized by the state. This is simply picking whether they are state actors or private actors from moment to moment depending on what sentence you are trying to respond to, like Floyd Mayweather dodging punches left then right. This is just shifting the characterization of their activity around, to put politically popular deprivation of rights without due process in a magical space that dodges all legal regulation no matter what direction it comes from.

554.   The keys are that it is civil defamation, but selectively encouraged and protected by state action. The question then, is can state action selectively turn false and malicious defamation into protected political speech, by participating in the defamation?

555.   An expansion of the First Amendment (or colored as such) at the selection of the state, in the interest of the state, beyond the line already established between defamation and helping readers petition their government for a redress of grievances, is state action.

556.   The moment the State of Florida creates a definition of what is "fair" different from the ordinary defamation standard of truth, and creates a legal immunity standard to dismiss civil actions on the face of the complaint based on the presence of an arrest, different from the defamation standard of actually examining facts, it becomes state action.

557.   If there are any material misleading statements injuring Plaintiff, it is either defamation, or state action. The action of Florida made it the second.

**State Action Tests**

558.   State action makes a resulting deprivation "under color of law" pursuant to 42

USC 1983. ("Having found state action under the Constitution, there was no further inquiry into whether the action of the political associations also met the statutory requirement of action 'under color of state law.'" Lugar v. Edmondson Oil Co., 457 U.S. 922, 929 (1982))

The US Supreme Court published a two-part test for state action by private actors: "(a) the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by it or by a person for whom it is responsible, and (b) the party charged with the deprivation must be a person who may fairly be said to be a state actor, either because he is a state official, because he has acted together with or has obtained significant aid from state officials" (Lugar v. Edmondson Oil Co., 457 U.S. 922, 923 (1982)).

559.   The Eleventh Circuit Court of Appeal "set forth the three primary tests the Supreme Court has used to determine whether state action exists: (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test." (Willis v. University Health Services, Inc., 993 F.2d 837, 840 (11th Cir. 1993), Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1982))

560.   State action includes both state participation in the activity through laws, regulations or policies, and state execution of the activity, including individual state acts necessary or essential to the activity, as well as interdependence, where the state

and private actor depend on each other's actions.

## Created by State Law and Action

561.    Defendant Schorsch basically said they were operating under a state-licensed program to defame people who have been arrested.

562.    Defendant Schorsch attributed Defendants' conduct to the state when he said "Your issue is with the state, not us."

563.    This is different from saying something like "your problem is with the truth, I just reported it". Schorsch went the other direction, saying "the state could literally say you intended to invade Mars and they've arrested you for threatening martians". Defendants themselves believe that their dishonest "conduct has sufficiently received the imprimatur of the State" (Blum v. Yaretsky, 457 U.S. 991, 1003 (1982)).

564.    Defendants' motion to dismiss Plaintiff's defamation complaint was filled with Florida law, not First Amendment law; it went beyond "The First Amendment says we can publish the truth by saying government said XYZ" to saying Florida law designed their behavior. ("Brooks was threatened with sale of her belongings pursuant to New York Uniform Commercial Code § 7-210" Flagg Bros., Inc. v. Brooks, 436 U.S. 149, (1978))

565.   Schorsch said he would not make statements he knows are false and which he
said will solve all his money problems, if not given license to by the government
when he said "An official criminal complaint has been filed. That is the basis of our
story and it is a shield against any intended litigation." ("we think it essential that he
act with the knowledge of and pursuant to that statute." Adickes v. Kress Co., 398
U.S. 144, 162 n.23 (1970))

566.   Schorsch said Florida courts give him special protection to attack a speaker
against government, rather than to criticize government, when he said "let me go to
court against the guy harassing a Florida House Speaker." Schorsch was right.

567.   "Civil rights, such as are guaranteed by the Constitution against State
aggression, cannot be impaired by the wrongful acts of individuals, unsupported by
State authority in the shape of laws, customs, or judicial or executive proceedings."
(Civil Rights Cases, 109 U.S. at 11-15) But where the alleged deprivation occurred
through the acts of a state agency or official, or involved a state law, regulation or
rule, the state action requirement was met ("by virtue of an act of the Pennsylvania
Legislature" Pennsylvania v. Board of Trusts, 353 U.S. 230, 231 (1957)).

568.   A state judge took the action of dismissing Plaintiff's defamation complaint,
because she had been awarded discretion to say Defendants' false statements were
loosely "fair" characterizations of "matters brought out" by state action (Ortega v.

Post-Newsweek Stations, 510 So. 2d 972, 975 (Fla. Dist. Ct. App. 1987)).

569.    Defendants never denied maliciously defaming Plaintiff with falsehoods

("could literally say you intended to invade Mars and they've arrested you for

threatening martians"), only that Florida law allowed them to do it in state-selected

situations. (Schorsch: "Im sure you, arrested Florida man, will be able to overturn

mountains of precedent about libel law.") According to Shelley v. Kraemer, if

Defendants' exceptional defamation license was only made possible by selective

enforcement by a Florida court, that makes the judge-approved private defamation

state action. ("secured only by judicial enforcement by state courts" Shelley v.

Kraemer, 334 U.S. 1, 13 (1948))

570.    If Plaintiff has an ordinary state right to relief from defamation, then depriving

Plaintiff of that right is depriving Plaintiff of a legal interest ordinarily protected by

state courts. ("as a result of the state action complained of, a right or status

previously recognized by state law was distinctly altered or extinguished." Paul v.

Davis, 424 U.S. 693, 711 (1976))

571.    If a defamation complaint is dismissed on its face by the state without

examination of witnesses or facts, and using a standard worse than a combination of

McNayr v. Kelly and Brown v. McKinnon - in fact casually fact copy-pasting false

statements as if the factual details are immaterial - that is a state actor. ("The

involvement of a state official in such a conspiracy plainly provides the state action

essential to show a direct violation of petitioner's Fourteenth Amendment equal

protection rights, whether or not the actions of the police were officially authorized,

or lawful" Adickes v. Kress Co., 398 U.S. 144, 152 (1970)).

572.   When a defamation complaint is dismissed in an unusually casual manner

because the presence of state action, using the color of the First Amendment by

saying that state action creates some public interest in being misled about "matters",

and where the misleading statements advance the interests of elected officials not the

public - or whether the statements are false is not even examined because of the

presence of state action or the interests of elected officials - that is state action.

573.   But judicial enforcement makes Defendants' defamation a state action even if

the Okeechobee proceeding had been otherwise fair (which it wasn't because Judge

White deemed it to be a waste of judicial resources because Plaintiff is an "arrested

Florida Man"). ("examples of state judicial action which have been held by this

Court to violate the Amendment's commands are not restricted to situations in which

the judicial proceedings were found in some manner to be procedurally unfair. It has

been recognized that the action of state courts in enforcing a substantive common-

law rule formulated by those courts, may result in the denial of rights guaranteed by

the Fourteenth Amendment, even though the judicial proceedings in such cases may

have been in complete accord with the most rigorous conceptions of procedural due

process." Shelley v. Kraemer, 334 U.S. 1, 17 (1948))

574.   In any case, Defendants looked to the Pinellas County government for support, when Plaintiff complained to them about their false statements. After this contact with the government, the statements remained broadcast on the web indexed to Plaintiff's name. "The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful" (Adickes v. Kress Co., 398 U.S. 144, 152 (1970)).

575.   Publishing in a one-sided way the statements of government officials, and ignoring that they are fishy and disputed by sworn firsthand witnesses, is "traditionally exclusively" performed by the government, i.e. a public function ("traditionally the exclusive prerogative of the State" Jackson v. Metropolitan Edison Co., 419 U.S. 345, 353 (1974)).

576.   In fact, getting a private individual like Defendants to do this function can only be achieved by the government selecting for immunization that narrow activity that matches the activity ordinary reserved to government. The private click promoter is thereby encouraged by the government to behave in a narrow way where artistic choices closely conform to the speech of the state. ("state action might be found in the exercise by a private party of 'some power delegated to it by the State

which is traditionally associated with sovereignty.'" Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 154-55 (1978))

## Encouragement, Symbiosis, and Nexus

577. Defendants have a symbiosis with government sources in general, a symbiosis in the particular activity of defaming people who have been arrested with privilege, and a nexus in the particular activity of crippling Plaintiff who reported the crimes of elected officials. To illustrate this by contrast with its absence, consider that Plaintiff writes his own actual criticisms about government on the web without any such symbiosis, and therefore considers a more traditional defamation and matters of public interest standard like "the state said XYZ... we can only speculate...".

578. Defendant Taylor more recently got a job working as a "communications director" for a local elected official (the Mayor of St. Petersburg) where she says her work was regulated by "bullying". (578.1) She now works for herself as a consultant under the name "Summit Communications Strategies", helping politicians in general communicate. (578.2) This shows Defendant Taylor's career specialty is to disseminate political narratives on behalf of politicians. Government employees compensate Taylor to spread their narrative.

579. Being Speaker of the Florida House super-majority makes Sprowls the most popular person among Defendants' sources. It would be a bad calculation to tell the

truth on behalf of Plaintiff and the public, at the expense of alienating Defendants'
cash cow, their sources. Better to attack a nobody like Plaintiff in concert with the
popular people. That is a nexus.

580.    There is a facially plausible interdependence between the floridapolitics.com
website, and its sources in government. Many publishers broadcast police blotters,
mugshots, and other publicly available government statements to make money. But
Defendants' take advantage of their location in the Tampa area and connections, to
publish information not otherwise publicly available. Many times floridapolitics.com
has named a government official as a source for a story or comment.

581.    In return Defendants appeared to give favor to state actors over Plaintiff,
whose information Defendants refused to publish, not even in any "when asked for
comment" section, and even though Plaintiff was the only firsthand witness.

582.    Defendants not only did not carry out the usual journalistic practice of
contacting the opposing party Plaintiff for comment, but Schorsch threatened
Plaintiff with false arrest under color of law when Plaintiff provided a single
comment to the contact email address advertised at the bottom of the story.
(Schorsch: "Any further attempts to contact me will be viewed as harassment and
will be addressed swiftly in the legal system you know so well.") Schorsch perceived
the state as protecting him from Plaintiff even offering a single comment.

583.   Plaintiff knows Defendants were in direct contact with the local cops, feeding

them this garbage story. It is reasonable to infer that Defendants refused to print any

comment from Plaintiff, their target, because Defendants wanted to preserve this

gossip pipeline to police by cooperatively giving police the story they wanted, not

helping Plaintiff who can provide Defendants with no future garbage they can

promote for money.

584.   The First Amendment was not designed to protect state speech from

infringement by broke nobodies like Plaintiff, but to protect critics of the state from

the state. Defendants' relationships flipped them in the opposite direction, criticizing

targets of the state rather than the state. That is a nexus with state interests.

585.   Any click promoter has a somewhat symbiotic relationship with public figures.

But Defendants and the state have a stronger and more unique specific quid pro quo,

when it comes to transferring immunity to defame and deprive enemies of the state.

They have an agreement on the type of statements, in the particular activity of

trashing people whom elected sheriffs have arrested. This is not publishing

grievances against or critical scrutiny of the state, but attacking the less powerful on

behalf of the more powerful in government, in exchange for money, a nexus.

586.   The state agreed to immunize Defendants, and in turn Defendants provides a

megaphone for the agenda of elected officials. It goes beyond symbiotic to a nexus, because they both want the same thing for different reasons, a legal avenue to trash people, and they get it by cooperating. It is a nexus because they both have an interest in the same outcome. This is different from a symbiotic quid pro quo, where you get one thing you want, and I get a different thing I want. A nexus means if we cooperate, we get one thing we both want.

587.   Plaintiff's case has a substantial difference compared to, for example, Ortega v. Post-Newsweek. In that case, Ortega was accused of committing crimes unrelated to the people who were accusing him. Plaintiff was falsely accused of committing crimes by the people whom Plaintiff was politically speaking against, where the crime was that speech against them.

588.   So prosecution and defamation were not just a tool to appear tough on crime like in Ortega, but specifically achieved the effect of stopping Plaintiff calling them perjuring scum and animals on social media. So in Plaintiff's case, it created a special tool for politicians. Whereas Ortega was not on Twitter insulting the profession of the dead friends of FDLE agents, and that was not what the FDLE then colored as a crime.

589.   Defendants and government have a symbiotic relationship in the specific activity of causing injury to Plaintiff. It then goes to a nexus not just to trash people

in general, but in particular to trash Plaintiff, because Plaintiff has also criticized

elected officials in addition to being arrested by one. The state benefits from

defaming and discrediting a dissident, rather than telling a balanced and accurate

story. ("The state must be shown to be sufficiently connected with the particular

aspect of the defendant's conduct complained of" Daniels v. Twin Oaks Nursing

Home, 692 F.2d 1321, 1333 (11th Cir. 1983))


590.    And given that non-first Amendment speech is done not in the interests of

truth but in the interests of the state, and immunized only to the extent it is supposed

to be a megaphone of state statements, Defendants are agents of the state and

therefore state actors. Even if their own interests dovetail with those of the state,

which provides the compensation necessary to induce them to act on behalf of the

state.


591.    And it's not merely a coincidence that Defendants' legal privilege just happens

to dovetail with what the state would like them to do (like if legislators were happy

there is a McDonald's near the capitol). It's a case where the state gives Defendants a

legal privilege which Defendants want, which then enables Defendants to do

something they want to do, but couldn't do without being given privilege by the state.

And as a result, Defendants' actions - what they choose to write - turn more toward

the interests of the state relative to the general interests of the public and Plaintiff.

592.   Giving someone immunity to invent and print false and misleading defamatory statements about someone for money - where the interests of both the state and the click promoter coincide - is strong encouragement. ("the government has coerced or at least significantly encouraged the action alleged to violate the Constitution" National Broadcasting Co. v. Communications Workers of America, AFL-CIO, 860 F.2d 1022, 1026 (11th Cir. 1988))

593.   Schorsch perceived that he was encouraged, when said he would be able to make money and stay in business ("You'll guarantee my business for the next eight years."), by coloring Plaintiff's First Amendment speech as some kind of sex story, and by saying Plaintiff is "harassing a Florida House Speaker".

594.   The affidavit did not say Plaintiff ever approached Plaintiff's most important state representative, and the word "harass" was not in the affidavit but Schorsch's own artistic color of Plaintiff's political speech to parties other than Sprowls. As such, the flexibility afforded Defendants by Florida law to invent a sexier and juicier headline and story, encouraged them to do so to make money.

595.   By not allowing essentially the same speech for people who have not been arrested, the government has coerced Defendants to give the government exclusive access to their gossip capabilities. ("the government has coerced or at least significantly encouraged the action alleged to violate the Constitution" National

Broadcasting Co. v. Communications Workers of America, AFL-CIO, 860 F.2d
1022, 1026 (11th Cir. 1988)) Whereas Plaintiff should have instead received
increased protection, because his speech petitioned government for a redress of
grievances.

596.   It is a nexus, for the specific reason that Defendants are immunized to recite
specifically statements of the state's choosing. Not with regard to whether they are
false or malicious - Schorsch essentially admitted they were with his "threatening
martians" bit - but with regard to whether the state selects to immunize them. If you
cannot maliciously defame someone except statements selected for immunity by the
state, then you are not just in a nexus with the state but an agent of the state.
Schorsch would not be immunized to state Plaintiff's true statements that Deputy
Weill lied on behalf of his local political cult.

597.   Plaintiff put up a blog post, comparing Florida law in Plaintiff's Gulfport
arrest to historic Gulfport sundown laws. This post later got hits that appeared to
come from the same user and Internet service in St. Petersburg, as one that hit
Plaintiff's server when Plaintiff emailed Defendants. And there were other similar
hits from cable Internet in St. Petersburg on a copy of Plaintiff's federal complaint
that he posted online. These are more circumstantial puzzle pieces that show
Defendants know exactly what the truth is and the truth could even be a more
interesting story, but their publishing decisions are shaped by what the government

immunizes them to publish.

598.   If the government selects and shapes what Defendants are allowed to say, something other than the truth - something separate from the defamation standard that specially dovetails with and serves the interests of elected officials - and they both seek and get benefit from the relationship, Defendants are in a nexus with government. ("the State has significantly involved itself" Reitman v. Mulkey, 387 U.S. 369, 380 (1967) and Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173 (1972))

599.   News websites are synonymous with bankruptcy lately, which Defendant Schorsch admitted his own version of, when he said printing this gossip would enable him to keep his business open for the next 10 years. Defendants also live in Pinellas County. So it is common sense how Defendants are going to choose between a) calling their local deputies felony perjurers, and risking getting a DUI every time they go to a restaurant, or b) publish what police want them to publish, and keep that relationship and pipeline open that provides them with malicious gossip which they believe they are immune to print with near zero costs from not needing editors, lawyers, or investigative journalists. That is interdependence and state coercion.

**Alito Says Government Approval Muffles Disfavored Viewpoints**

600.   When the government uses law to introduce a slant, that is the opposite of free

speech according to Justice Alito.

601.   Alito cautioned about the circumstances of this case in Matal v. Tam, when he said that government selecting favored speech as was done by the Okeechobee court (and elsewhere as a common practice according to Defendants), achieves the suppression of disfavored viewpoints, and inserts state action into First-Amendment expression. ("If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, we must exercise great caution before extending our government-speech precedents." Matal v. Tam, 137 S. Ct. 1744, 1758 (2017))

602.   In the simplistic way the law to suspend ordinary protection against defamation is applied in practice, Florida arresting someone confers important legal rights and benefits on private parties who are then given immunity to injure that person ("Federal registration, however, 'confers important legal rights and benefits on trademark owners who register their marks.' B & B Hardware, 575 U.S., at ——, 135 S.Ct., at 1317 (internal quotation marks omitted)." Matal v. Tam, 137 S. Ct. 1744, 1753 (2017))

603.   At issue in this case, is Ortega v. Post-Newsweek Stations, and its provision that gives license not even confined to what is contained in official documents, but

open-endedly allows artistic creations ("the court viewed the headline as a statement

of the newspaper, not as a reference to the contents of the official document" Ortega

v. Post-Newsweek Stations, 510 So. 2d 972, 976 (Fla. Dist. Ct. App. 1987)), with the

only conceivable rule that the immunized inventions are favorable to the state action.

("At issue in this case is one such provision, which we will call 'the disparagement

clause.' This provision prohibits the registration of a trademark 'which may disparage

... persons, living or dead, institutions, beliefs, or national symbols, or bring them

into contempt, or disrepute.' § 1052(a). Matal v. Tam, 137 S. Ct. 1744, 1753 (2017))

604.   Ortega was taken to protect Defendants' misleading headline, which led

readers to believe the state claimed Plaintiff approached a housewife with stealth

when the arrest affidavit said no such thing ("the court viewed the headline as a

statement of the newspaper, not as a reference to the contents of the official

document" Ortega v. Post-Newsweek Stations, 510 So. 2d 972, 976 (Fla. Dist. Ct.

App. 1987)). And Ortega was taken to protect Defendants' liberty with facts not even

in the arrest affidavit. ("the clause regulates the expressive component" Matal v.

Tam, 137 S. Ct. 1744, 1754 (2017))

605.   The way Ortega was enforced, giving Defendants' liberty to imagine what

crimes had been committed by the arrested person ("emails" plural), but not for

example by the police who Plaintiff swore lied in an email to Defendants, constitutes

the state enforcing viewpoint discrimination in private speech. ("Our cases use the

term 'viewpoint' discrimination in a broad sense, see ibid., and in that sense, the

disparagement clause discriminates on the bases of 'viewpoint.'" Matal v. Tam, 137

S. Ct. 1744, 1763 (2017), "'[T]he First Amendment forbids the government to

regulate speech in ways that favor some viewpoints or ideas at the expense of others,'

Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 394, 113

S.Ct. 2141, 124 L.Ed.2d 352 (1993)," Matal v. Tam, 137 S. Ct. 1744, 1757 (2017).


606.    The additional credibility attached to Defendants' speech by putting on an air

that their artistic expression of events came from an arrest affidavit, is a vehicle for

government to select specific viewpoints for enhanced credibility, where those

viewpoints enhance the interests of government. ("license plates 'are often closely

identified in the public mind' with the State, since they are manufactured and owned

by the State, generally designed by the State, and serve as a form of "government

ID." Id., at ——, 135 S.Ct., at 2249 (internal quotation marks omitted). Third, Texas

"maintain[ed] direct control over the messages conveyed on its specialty plates." Id.,

at ——, 135 S.Ct., at 2249." Matal v. Tam, 137 S. Ct. 1744, 1760 (2017))


607.    Matal v. Tam conflicts with arguments that Defendants' creative presentation

is immune government communication, with Defendants merely relaying what the

government has said as an amplifier and search and indexing service. ("The majority

also rejected the Government's argument that registered trademarks constitute

government speech" Matal v. Tam, 137 S. Ct. 1744, 1754 (2017)) Defendants' speech

is private defamation, which cannot legally be given license and selected for
enhanced credibility by action of the state. The Florida court basically permits false
advertising with a misleading headline about what elected officials did, as long as it
drives the right traffic. So it is the state doing something non-immune - lying to
deprive of rights - without due process, and colored as something else.


## Assuming Government Goodness and Truthfulness

608.   As you can find in so much case law that creates misguided loopholes to
encourage government lying, Ortega relies on the assumption that Plaintiff is an
organized criminal, saying "the press may often have to rely on materials the
government acquires if it is to report on organized crime at all." (Medico v. Time,
Inc., 643 F.2d 134, 142 (3d Cir. 1981)) This contains a Candyland assumption that
the government itself is never the organized criminal, where the purpose of the First
Amendment is to report on organized crime by government so that citizens can
regulate it. There is not much point having a media that does not bring out the
crimes of government, rather than solely their propaganda.


609.   This slant that the government is never the criminal, and their statements are
always true, is itself an example of government licensing speech in the interests of
government. Medico v. Time saying in essence "you are always allowed to report
that government is doing a great job breaking the mafia, because otherwise it is
impossible to know how great government is doing" is a ridiculous coloring of

government propaganda as First Amendment speech.

610.   James Madison might equally have said "Baptists are so obscure and secretive in their cult religious practices, that we have to rely on Church of England to investigate and tell us about their evils, to have any hope at all to know how evil they are".

611.   Plaintiff has documented and publicized organized crime in Seminole County that no government has brought out in any official proceeding. People like Defendants are afraid to publicly say what Plaintiff has said, because it is not on the side of police and supported by Florida courts.

**Florida Shapes Speech by Extending and Withdrawing Privilege**

612.   Ortega specifically calls Defendants' clickbait a "privilege" ("reporting privilege" Ortega v. Post-Newsweek Stations, 510 So. 2d 972, 976 (Fla. Dist. Ct. App. 1987)). Here, the state created a money-making privilege for Defendants which they have no inherent right to, as reward for their political support. This is colored as First Amendment activity reporting the activities of government, but that is just color for what is actually promoting and glorifying with song, the narrative of government. Police blotter stories "with no duty to go behind" (Ortega v. Post-Newsweek Stations, 510 So. 2d 972, 976 (Fla. Dist. Ct. App. 1987)) when the narrative is false, are little different from in-kind contributions to political campaigns, or political

campaign commercials recorded by government officials and broadcast as a quid pro quo by Defendants.

613.  According to O'Hare Truck Service, Inc. v. City of Northlake, the First Amendment prohibits government from shaping speech by granting and revoking privileges in proportion as the state approves of the speech (and then calling it either private action or government prerogative). The First Amendment argument is not legitimate in the expansive way it which it is used to protect artistically inventive defamation in Florida ("has not been shown to be a necessary part of a legitimate political system in all instances" O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712, 726 (1996)). The fact that Defendants are eager to get this arrangement when they can, rather than being angry about the government only immunizing government viewpoints, does not save it from being a First Amendment violation, but rather makes it a nexus in which Defendants are state actors. It's the news media asking the state what they can write and whom they can defame for clickbait, and the state granting them a license to cash in on trash clickbait when it advances the state's interest.

614.  In the present case, the State of Florida created a benefit that protects constitutionally unprotected defamation. But inherent in the creation, is the revocation of the privilege if the judge finds the artistic expression of the story distasteful at her pure whim. The State of Florida could legally deny the defamation

privilege to Defendants' at the discretion of a judge, if the judge decided that Defendants' inventions did not sufficiently dovetail with the interests of her faction. The Florida judge could have revoked the privilege if Defendants' headline instead said "Dumb Florida Judge Signs Sketchy Affidavit For Same Reason We Publish Article - Because It Has Name Sprowls In It".

615.   Power was vested in a Florida judge to choose her own obscure and esoteric legal definition for the word "stalking", which is different from the definition in common use, to say something is "substantially true", when it is ordinarily the right of Plaintiff to have a jury define words in the common, non-legal way readers will define them. Florida vests in a state judge the power specifically to decide how the activities of police can be described.

616.   So the "privilege" created by Ortega and related case law, is actually that of a Florida judge to approve or disapprove of expressive speech that is not merely posting copies of arrest affidavits on Scribd.com. As a practical matter, Defendants are allowed to memorialize state lies in song without regard to Plaintiff's rights, as long as the state approves of the song. So Ortega as written and practiced, is illegal and just makes Defendants an arm of government.· ("[W]e have held that the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit.' " Agency for Int'l Development v. Alliance for Open Society Int'l, Inc ., 570

U.S. ——, ——, 133 S.Ct. 2321, 2328, 186 L.Ed.2d 398 (2013))

**Interdependence With Due Process**

617.    According to Florida law, court officers are not regulated from Tallahassee but by voters. So the very regulation of officer behavior - the protection of rights necessary to create due process - is facilitated by the reporting on state action to voters which Ortega v Post-Newsweek claims to advance. When this speech does not serve regulation but rather subverts it by sending readers far off the course of what actually happened, it cannot serve the Constitutional purpose it is given color of.

618.    The speech flows not just through the private functions of the First Amendment, but through the public regulatory functions of the Fourth, Fifth, Sixth, and Fourteenth Amendment. The court system has an interdependence with the private speaker to discover and comply with its own restraints.

619.    The idea that judges and judicial officers are regulated by local voters is a fad among Federalists and other recent legal theorists. The result implicit is reporting of accurate information is not just necessary to avoid defamation, but rises to the level of being a necessary element of due process, where license to defame is a tool for the state to subvert due process. State actors depend on control of the narrative to interact with their legally intended regulator, while click promoters depend on their quid pro quo for juicy local gossip they can print with immunity.

620. It makes no sense to have a prosecutor to stop witnesses committing perjury, and a judge to stop the common people holding witch trials, and then make both subject to election so that they only get elected if they use exactly as many lies as they need to give the people exactly as many witch trials as they want. But that is what happens when the sheriff gets elected for producing probable cause, and the prosecutor and judge get fired by the voters if beyond reasonable doubt does not match probable cause.

621. The sheriff says "I arrested this dangerous evil person because he is guilty, we took a bad, bad man off the street today", and the paper is immune to print only that. Then if the prosecutor prosecutes lies instead of letting witnesses out of prison for lying, and the judge allows an honest defense presentation to the jury, the judge and prosecutor have to say "We let him go because the jury said he is not guilty. If you believe the sheriff from our same political party whom we stand next to at every news event, we screwed up." So there is inescapable black hole of political pressure to make probable cause match beyond reasonable doubt using any means available, which is all means given absolute immunity.

622. The point of due process is for courts have an elevated or at least different standard of guilt compared to the public. The public does not know what the jury is supposed to know. But public promotion of the state narrative pushes in the opposite

direction, with social pressure for witnesses to conform testimony and political pressure for government employees to use discretion, to make court outcomes match public opinion. Decisions that move court outcomes toward public preferences, make public information forming those preferences a part of due process.

623.    Suppose my neighbor John Smith goes to buy weed. He doesn't like the weed, but when he tries to get his money back by wrestling and reaching into the dealer's pocket, he gets shot.

624.    If the paper published "John Smith walks up and attacks random black man minding his own business", I would come forward as a witness to say "no, John Smith was buying weed". But the papers would never have that slant, because the sheriff would never get elected with that slant, and the slant of the paper is the slant chosen by the sheriff.

625.    Police frequently lie in arrest affidavits about what video shows, edit out key parts of video, and even fake video times, to maximize the crime. (625.1) So next thing I read in the paper "Video shows John Smith walking to church when a black man came out of nowhere, demanded his money, and shot him." I know John Smith wasn't going to church, he was going to buy weed. But based on what I have read in the paper it seems like there is no point for me to come forward and provide what I know, as it is not relevant to the narrative to tell police I smoke weed, and would

only obstruct justice.

626.    Whereas if I knew something that helped the narrative, like if I knew John Smith owned a $5,000 watch which he may or may not have been wearing, I might think wow I need to tell them that. So next thing the papers will say "John Smith was found without his $5,000 watch on way to church."

627.    Then a jailhouse witness will read that, and say the black guy confessed to stealing the watch, that John Smith wasn't even wearing. The convictions prosecutors have won based on the lies of jailhouse confession witnesses who simply recited what they got from the news, is too many to count (particularly when the state doesn't want you to count).

628.    Actual experience is prosecutors use news media to get their narrative onto the witness stand through every avenue. Police hold press conferences where they say what happened and then solicit tips, where all any witness has to say is "I saw the guy in the picture running away from the crime scene", which essentially took place in many exonerated convictions. Harry Connick Senior and many others The Innocence Project can tell you about, got numerous black people falsely identified using this process.

629.    The news stories put social pressure on witnesses that are not coerced by the

prosecutor, to conform their testimony to the popular narrative, to not stand in the way of the public perception of justice. Everyone from jurors to investigators knows what evidence to seek and look at and what evidence to steer away from and not collect or send to the lab, to arrive at the prevailing public narrative. Finally if electronic media networks are unable to synchronize all these actors - if the police and the witnesses and the jury don't all agree - the judge and prosecutor get fired.

630.   It also goes in the opposite direction. Ever since backpage classified ads went online, local news is dependent on the benevolence of the local government purchasing public notices, holding news conferences, and feeding them immune gossip, to make money.

631.   McNayr v. Kelly makes police the monopoly provider of malicious false gossip with local relevance. And when the majority of the local civically engaged people voted for the sheriff, telling tales of the glory of the sheriff is a mathematically inescapable strategy to sell print subscriptions to those same people. Elected officials and newspapers end up producing just another hour of fiction between the sitcoms, the sports events, and the law-and-order shows. And there is usually not critical mass for there to be a second channel, often the other side is just one person like Plaintiff.

632.   But some appeals judge who lives in Atlanta may never have experienced small-town newspapers like that, and imagines there are still investigative journalists,

liberal muckrakers, and idealistic journalism students who think they are going to be catching bad politicians and smoking cigarettes like in "La Dolce Vita". Those days are over.

633.   Today's fluff local news is also a punishment rather than public information, to a degree different from past newspaper headlines. Today's fluff news doesn't get thrown in the trash after a day like real news did, rather clickbait garbage gets indexed to your name forever, and has enough disk space to mention every single person who gets arrested. It thereby becomes more a punishment, and less a story of government, over time. In 10 years, nobody is going to be searching your name to scrutinize current elected officials, but to scrutinize you.

634.   Because First Amendment speech to voters is a designed part of due process; And because local news produces the information input into that determination of due process to substitute for federal courts; And because local officials depend on local news to make probable cause match beyond reasonable doubt and get elected; And because the local news in turn depends on elected officials in these same activities to produce local content, "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise" (Burton v. Wilmington Pkg. Auth, 365 U.S. 715, 725 (1961)).

635.   Plaintiff is not saying Defendants and local police cooperate at all times, only

that there is a strong nexus in the particular activity of glorifying elected officials with song, and few countervailing forces for independence, in the type of crime story Defendants published. Enforcement would rather be required to prevent such arrest stories from becoming a nexus, where the Florida courts have instead reinforced it by letting a judge review creative expression to see if it is state-glorifying enough to win immunity.

636.   And remember, it was Imbler that said judges will ignore justice to help prosecutors in different courtrooms. So a device like Ortega that puts judges in that position to protect the local sheriff, is against the public interest. News media need to be "fearless" for the truth, not of the local government.

**Interdependence With Prosecutorial Immunity**

637.   Local news is even used to fake the conditions necessary for prosecutor crimes to be immunized. The whole idea of Imbler v. Pachtman is if a prosecutor is worried about his own self interest, he won't serve the public interest. ("the broader public interest" Imbler v. Pachtman, 424 U.S. 409, (1976)) So if you could show his decision did not serve the public interest, but was motivated by his own self interest in getting elected, such as by faking a case to avoid an embarrassing loss, then the reasoning of Imbler fails to apply.

638.   News stories spreading the prosecution narrative make the prosecutor winning

the case, and the public interest, appear to dovetail. Whereas if the public had no opinion whether the defendant was guilty, then the prosecutor orchestrating liars to not lose a case would not appear to serve any public interest, just save the prosecutor from looking dumb.

639.   If no paper ever said John Smith was guilty, then prosecutors orchestrating liars who said he was guilty, would not be acting in some public interest. The prosecutor's action is in the public interest, only after local news has recited what the public interest is. Where what that interest is broadcast to be, is invented at the whim of the sheriff, to get elected. So the sheriff tells the public what their interest is - through actors like Defendants - out of fear of not getting reelected. The prosecutor then orchestrates liars not just to save himself from losing the case and the next election, but in support of that perceived public interest created by Defendants spreading the narrative.

640.   Having liars like jailhouse witnesses recite the prevailing public narrative, also makes it appear as if rewarding their testimony is in the public interest "to bring out all the relevant facts" ("triers of fact in criminal cases often would be denied relevant evidence" Imbler v. Pachtman, 424 U.S. 409, 426 (1976)). The testimony has relevance to the narrative and therefore public value, only because the sheriff and prosecutor have originally invented and propagated the narrative which the testimony then becomes relevant to. Even though the whole narrative was originally

published and manufactured motivated by the sheriff's fear of not getting elected, and then the prosecutor's fear that if beyond reasonable doubt did not match to probable cause, the prosecutor would lose an election.

641.   If the sheriff said a death was an accident rather than a murder, then a claimed jailhouse confession to motive or premeditation would not be relevant. Or if the sheriff said it was murder, but Defendants broadcast their own investigation that it was probably an accident, the public would say why did you let a dangerous felon out of prison for lying about this poor innocent person, when Defendants' news story said it was an accident? They would say the prosecutor is faking cases by making them look more serious than they are to look good, rather than bringing out information "relevant" to what actually happened.

642.   The orchestrated perjured testimony is relevant to the self-interest of officials who fear losing elections, but this interest is laundered through news media telling the public what their interest is, to appear as if the fake confessions are "relevant" to some public interest, and support the immunity.

643.   The action of Defendants spreading a narrative can go even further than protecting civil immunity, to influencing a federal prosecutor's decision whether to prosecute a state official under 18 USC 242, and affecting that state official's ability to defend himself.

644.  Propagating a narrative also moves most of the production of jailhouse witnesses out of the non-immune investigative phase ("A prosecutor may not shield his investigative work with the aegis of absolute immunity" Buckley v. Fitzsimmons, 509 U.S. 259, 276 (1993)). Jailhouse witnesses are said to "come forward" with some nonsense based on what they heard in the news. The prosecutor's investigation is then limited to selecting the ones that support his narrative, before he begins coaching their testimony in the immune judicial phase. And he can then claim his policy of never prosecuting them when DNA proves they always lie, is in the public interest because they recited the popular narrative, and he would therefore lose an election if he did prosecute them.

645.  So the state propagates their narrative to jailhouse witnesses during the investigative phase - not in a room in the jail but through the local news - with a local judge even approving of what is propagated, and then color it as First Amendment speech.

646.  The purpose of not immunizing the investigative phase, is to not immunize prosecutors faking evidence and manufacturing witnesses, rather to fearlessly present what the prosecutor is handed. Testimony which is faked in the investigative phase using click promoters as agents, is then called First Amendment speech, not state action. Because the source of the fake evidence - the state lying, and then

immunizing click promoters to broadcast their narrative - is laundered as private speech before the narrative circles back to the state in the mouths of witnesses. ("a prosecutor who assists, directs or otherwise participates with, the police in obtaining evidence prior to an indictment... is functioning more in his investigative capacity" Marrero v. City of Hialeah, 625 F.2d 499, 505 (5th Cir. 1980))

647.  So prosecutors have an interdependence with publishers reciting their narrative to produce jailhouse witnesses who "come forward" without speaking to them directly in the investigative phase. There are real stories of police handing newspapers to inmates for this purpose. Plaintiff witnessed perjured testimony claiming newspapers with the prosecution narrative were never handed to inmates in the Seminole County jail, when ample evidence proved it happened.

## STIGMA AND PLAINTIFF'S PROTECTED RIGHTS

### Stigma Deprived Plaintiff of Reputation and Opportunity

648.  Inaccurate stigma has a great social cost, to the extent it feeds false information into the decision-making process of how free people discover beneficial associations.

649.  A judge can just sign lies and throw someone out of her courtroom. But an employer who sends one applicant away and hires another based on lies, can be stuck with the costs of being misinformed for hours a day every day for years, it could cost him his business.

650.    Hiring decisions are not just determined by skills, rather experts and gurus will tell you it is based on character and values, and whether someone "is a good fit". In reality this is not as high-minded as it sounds. Being a good fit to join a caucus in a legislative body or a business network, can mean having a similar taste in underage girls and ability to keep quiet about it.

651.    All the other choices people make such as working at a shoe store or living in Cleveland or hiring someone who can type fast, orbit around their primary impulses of meeting sexual partners and people who share their morals and life goals.

652.    Plaintiff has even seen attractive people hired, to make the work environment more attractive to the crowd of unattractive employees the business depended on. Though it may be illegal to say it, the sexual character of employees is critical to hiring decisions.

653.    Plaintiff's technical skills are less important in hiring decisions, than whether people want to associate or "hang out" with Plaintiff for the next five years, and whether Plaintiff reciprocates.

654.    In light of these realities, the difference between sending Phil Archer bitchy political emails unrelated to Shannon Sprowls, and driving over a bridge to approach

Shannon Sprowls with multiple sexual or "lewd" reasons, are not so insignificant as
Florida courts have the discretion to consider them.

655.    Words that the State of Florida can use its power and discretion to carelessly
conflate - Cyberstalk, harass, stalk, ambush (when cops get shot it is called an
ambush) - in reality all have very materially different meanings. The differences in
meaning are important to people like employers who must make use of the words. If
the discretion is given to someone other than a state official to decide, if there is a
genuine inquiry into what is fair for whom, and if the purpose of the discretion is
something other than to trash Plaintiff, then the meanings of the words matter.

656.    Stalk comes from Middle English steal, and eventually turned into "approach
quietly" or "pursue quietly". Plaintiff did not steal anything, Plaintiff spoke, and
loudly.

657.    Defendants believed the difference between just two words - "stalking" and
"Cyberstalk" - was substantial enough to go to court over, and create the mountain of
paperwork this sentence is now a part of, rather than just change the words.

658.    Approaching a housewife with sexual motives is another thing still, which was
not supported in the affidavit, but which Defendants encouraged their readers to
infer, including by their headline and by listing emails that never existed. This

misinformation has significant connotations for real people who are thereby misled, even if a Florida judge is not legally compelled to care.

659.    The difference between stalking and verbally attacking or threatening is stealth. Plaintiff was never alleged to have used stealth. No witness said anything was perceived as a threat. Plaintiff never could have been remotely charged with a threat, based on his speech being directed to an unrelated elected official, not threatening a private person like in Counterman v. Colorado. No matter how many courts want to color anything Plaintiff did as having anything to do with stalking Shannon Sprowls or any sexual motive, for the purpose to deprive Plaintiff, zero of them have any law, witness, document, proceeding, or due process to support it.

660.    Plaintiff's speech was at all times political, and was never honestly construed any other way by any witness. Plaintiff never approached a housewife with stealth or sexual motive, and the arrest affidavit did not say he did.

661.    One of many resulting stressful situations occurred when a middle-aged woman who read Defendants' story asked if Plaintiff wanted to get together, and Plaintiff had to turn her down. The general feel of such a conversation is something like "You want to get together?" No. "But you drove to another county to be with that other woman, are you saying I'm ugly?" No, I'm just occupied with other interests like my website Cops2Prison.org. "You took time out from your website for

that Shannon Sprowls woman. Is she prettier than me?" A woman took a big risk inviting Plaintiff, because Defendants portrayed Plaintiff as sexually desperate or with a penchant to talk dirty, which many women like. It is very insulting to get turned down by an obviously desperate person, and makes Plaintiff her enemy.

662.    It is impossible to broadcast such an extreme mischaracterization of someone's personality and interests as Defendants did, without damaging that person's prospects for mutually beneficial relationships in housing, employment, political association, and many other areas.

663.    Plaintiff saw a case where a carpenter was defamed by someone who said he was a bad carpenter. That is at least in the normal range of things people say about a carpenter. People understand everybody has an opinion or a nasty motive, and you just have to show people you are a good carpenter. But if instead someone gets the top Google result saying you are a bad plumber, you are not going to get that chance to say you are a good carpenter, because your phone is going to be ringing all day with people looking for plumbing. There is a difference between a bad Yelp review, and a Yelp profile that says a sushi restaurant is a nail salon.

664.    There's a common area where Plaintiff lives, where people sometimes sell honey or boiled peanuts, and Plaintiff was maybe curious to look at the honey. A woman started looking at Plaintiff as happy and smiling as can be. She came up to

Plaintiff and said "Hi" like she knew Plaintiff, which made no sense because Plaintiff doesn't get out much. Plaintiff could not understand how he aroused so much amusement in a woman he never met before, and was wondering is there something funny about me, like do I have sticker on my forehead that says laugh at me?

665.    Maybe a month later, a guy who Plaintiff had seen around asked Plaintiff at the dumpsters something along the lines of "Hey, would you want to hook up with this woman you never met? She loves sex. This guy who is a rapist went over to her house and walked right in the door and they hooked up. But she said she wants you to come to her house. You're not interested?" Plaintiff was thinking this is the craziest thing I ever heard, how did some lonely woman pick Plaintiff out of the blue, and why tell Plaintiff the story about a rapist?

666.    Then Plaintiff was sitting at home and a lightbulb went on. People in Plaintiff's area knew Plaintiff's name somehow. A stranger around that time asked Plaintiff his first name out of the blue. Someone Googled Plaintiff's name. And Defendants' story came up, and now people in his area  think Plaintiff is a swinger.

667.    Plaintiff has a lot of great housing options now, everything from renting a room in a swinger commune, to renting a room from a rapist. These consequences are real. When Plaintiff first moved to South Beach, the guy behind the desk at a motel on Collins Avenue encouraged Plaintiff to check in at that hotel by giving

Plaintiff a discount. When he figured out Plaintiff was not interested to hang out with him, suddenly the motel was full and the price went way up for the following week.

668.   The Okeechobee court would probably have a problem if Defendants said Plaintiff is a lawyer, and people should call Plaintiff if they need help with civil lawsuits. But the court has no problem promoting a fraud on employers, landlords, housewives, and swingers.

669.   This misleading stigma deprives Plaintiff of freedom of political and religious affiliation. Plaintiff can't meet any new like-minded people who share his politics and values. Because all the people Plaintiff meets online search his name, and see Plaintiff is someone who likes approaching housewives with stealth with a sexual motive, more so than having a disposition to go out on the street and advocate about policing issues, which Plaintiff is never reported to have done.

670.   Plaintiff has not taken time out from his political interests to pursue any sexual or dating interests in years. Plaintiff has not emailed any prospective romantic partners in years. The arrest affidavit did not say he did. But Defendants mislead people to believe Plaintiff places primary weight on such activities rather than politics. Differences in details about people's core private business are material. It's not "all stalking" when one is sexual and the other is political, or else Defendants

would have just said it was political with nothing else to gain.

671.   Plaintiff once worked for a mover, where the other laborers told disgusting stories in the truck about having sex with cheating wives and such. Plaintiff found their stories uninteresting, and had none of his own to offer. Plaintiff was less popular as a result. Plaintiff was eventually not called for the small jobs, seemingly because Plaintiff was seen as less useful for not acting like he could hook the boss up with trashy sex.

672.   That is now the only type of person Plaintiff could get hired to work with; some guy with a moving van who likes to stalk housewives, and needs an employee who will look the other way when he rifles through their belongings and steals their private items.

673.   Plaintiff would be helped in his ability to obtain employment, if the characterizations that Plaintiff drove across a bridge to stalk a middle-aged housewife or likes to talk dirty to girls were true. In that case, Plaintiff could find a job where he fit in among other wife-stalkers, rather than among nerds who sit at home every night studying politics and protocols like Plaintiff really does.

674.   If Deputy Weill had really investigated Plaintiff's calls with girls in prison rather than lying about it, he might had found out that when girls want to talk dirty,

Plaintiff is not inclined to participate. Plaintiff is not a public figure, and managing these aspects of his reputation is an important right that has been lost.

675.   It is as inescapable as sunrise, that false statements totally opposite from the truth about someone's personality result in him getting hired in jobs that are a bad fit, and the burden would be to prove that it does not in some rare case. (As hard as it may be for people in the Tampa area and Republican judges to imagine such people exist, who aren't at all times fighting their impulses to stalk housewives.)

676.   In the employment setting, statements that "seriously damage [the employee's] standing and associations in his community" or "impose on [him] a stigma... that foreclose[s] his freedom to take advantage of other employment opportunities" can stigmatize. (Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972); Tibbetts v. Kulongoski, 576 F.3d 529, 536 (9th Cir. 2009) (quoting Roth))

677.   This forces an unemployable man to waste years of his life trying to get discovery and a court hearing to clear up malicious lies attached to his name, because he did not know he was posting cops2prison.org fliers on the home turf of professional liars and one of the most corrupt and legally insular state majority factions in the nation.

**Loss of Employment Opportunity is Between Witness and Jury**

678.   Plaintiff alone can be a witness of Plaintiff's inability to obtain future rental housing, employment, or political association. It is normal for someone over 30 years old through his life experience, to know the type of jobs he has a realistic chance of getting. Would you apply to be CEO of Exxon, or to be a Hooter's waitress? You know without them needing to tell you, that you would not get hired.

679.   What would Justice Thomas have to do to prove in court that he could not get hired as a Playboy Bunny? It would be evident without any witness, or even contrary to any witness. That's how it is that Plaintiff knows he can never get the types of jobs he had in an office building again, so long as Defendants index their inaccurate story to Plaintiff's name.

680.   Plaintiff has no college degree, is old, overweight, and lacking charm, and therefore can only obtain jobs working on complex technical problems that usually involve secure applications. Plaintiff's recent jobs included managed-server hosting specializing in HIPAA and PCI compliance for data security, contracting on military bases, and software that automates the operation of miles-long freight trains with multiple engines.

681.   Plaintiff knows from his own experience of the type of quick Google investigation that employers do, and the experience of other people in his field who

were falsely accused of various things, that Plaintiff would have difficulty getting a job in his most recent areas of employment, and would waste years trying.

682.    Nobody can hire Plaintiff to work on secure servers much less containing credit-card and HIPAA data, when they have been misled to believe Plaintiff illegally approached a government official with stealth. They might wonder if Plaintiff was applying for the job as part of a stealthy effort to get the credit-card data. This is a sharp contrast to if they heard Plaintiff sent bitchy emails, which Plaintiff often does at his jobs, and which does not threaten data security, but is taken as a sign of honesty among engineer types.

683.    One of Plaintiff's supervisors was explaining the vulnerability of the technology Plaintiff was working on, and said Plaintiff could paralyze the largest rail yard in the Midwest, or at the Port of Los Angeles - and cause freight company stock to drop 10% - by hiding in the woods nearby with a few dollars of radio equipment. That is the definition of stealth, and practically the definition of stalk. Employers like that can't have people who do secretive things.

684.    Plaintiff hypothetically might not pass the security check to enter military bases (there is a lot of myth in this area), and therefore nobody will hire Plaintiff for a job that might need a security clearance based on the risk alone. Plaintiff does not need to compel someone to testify "we would not hire Plaintiff to manage secure

data", for a jury to reasonably conclude Plaintiff has lost this opportunity based on Plaintiff saying it.

685.   As Plaintiff mentioned in Okeechobee court, even a slight change in the type of job someone is able to get can be costly. Plaintiff will prove this with a story.

686.   Plaintiff once worked a job where he had to take two drug tests, and was not paid the rate that was agreed to. Plaintiff was told that he had to take a second drug test and also that he would not be paid the agreed rate, in the same meeting. Plaintiff's supervisor told Plaintiff to get clean urine from someone, and put it in the microwave at 7-11 so that it would be body temperature. Plaintiff does not use any illegal drugs. Plaintiff quit that day after being shortchanged, implicitly described as a drug user, and supervised to obtain another person's urine and put it in a public microwave.

687.   Plaintiff applied for a number of new jobs, and got a lot of interest such as a job for $65/hour at Universal, but the jobs never panned out at the last minute. Plaintiff was able to figure out that Plaintiff's old boss or co-workers listed as references of Plaintiff's technical skill, were telling prospective employers that Plaintiff smoked a lot of weed, and that Plaintiff quit because Plaintiff did not want to take a drug test.

688.   Plaintiff finally got a job for around $50 an hour. Plaintiff's new boss took Plaintiff to lunch on the first day, for the specific purpose to warn Plaintiff there would be a drug test and to not smoke weed that week. When Plaintiff got back to the office, Plaintiff's co-workers asked Plaintiff how much weed he smoked and how much he liked it.

689.   Plaintiff did not realize what he had walked into, and said he did not smoke weed, and said legal weed was stupid. Several of the other employees took offense. Plaintiff eventually figured out that his coworkers were going to smoke weed at lunch, and Plaintiff was not invited. Plaintiff was hired by people who smoked weed and shunned by employers who did not, and ended up being disliked in his workplace, based on nothing but false gossip which not a single person ever said to directly to Plaintiff's face.

690.   Plaintiff was never told why his supervisor thought Plaintiff liked to smoke weed. Plaintiff also was never told how on his first day at a new job, his coworker knew the name of the hotel Plaintiff checked into the previous night. Plaintiff heard that nicotine helps you concentrate when you work for days without sleep, which was Plaintiff's habit at the time. Plaintiff therefore had some cheap cigars to see if it was true, which were the same cigars some people use to wrap blunts. Plaintiff can only conclude that his coworkers rifled through his zipped inner jacket pocket while Plaintiff was in the bathroom, and saw the cheap cigars and the hotel room key

jacket.

691.    Office politics and hiring decisions are secretive, including because people don't want to get sued. And neither does God tell you that someone went through your jacket, and nor is there any computer you can hack into to find out why you weren't hired. The way the real world works, is it is left up to the employee to figure out why things happen to him and react to this data.

692.    Plaintiff is therefore the witness and expert, and the only necessary witness or expert, that his opportunities for housing, employment, political speech and association, and other things, have been reduced by Defendants' false statements indexed to Plaintiff's name in search engines under the color of law. ("It is clearly a 'reasonable inference . . . that can be drawn from [the] facts' in the Amended Complaint, see Ethypharm, 707 F.3d at 231, n.14, that the employment and monetary harms that Plaintiffs suffered stemmed directly from the contemporaneous public accusations" Tarbox v. Butler Twp. & Shawn M. Butler, 3:14-CV-01346, 17 (M.D. Pa. Oct. 19, 2015))

**Stigma and Political Grievance**

693.    Some small percentage of the politicians Plaintiff contacted, maybe 5%, would respond to Plaintiff such as by answering their phone or calling the number Plaintiff provided in their web form. They would say things like "What kind of work do you

do out there in Okeechobee?" It gave the impression that when they saw someone with strong interests in specific issues, they are basically saying "If you have money and you want to be a donor, then we can emphasize your issues." Or they would strongly encourage Plaintiff to show up for their door-knocking or phone-bank activities next election, based on Plaintiff's passion for issues.

694.    After Defendants published their misleading story, the number of politicians who were willing to talk to Plaintiff about issues made an obvious and sudden drop from whatever small percentage it was, to zero. It gave the impression these people were Googling Plaintiff to try to figure out if Plaintiff had money and where Plaintiff lived, which was kind of the gatekeeper for talking to Plaintiff. But when the top result came up that Plaintiff was approaching an elected official with stealth with sexual motive, obviously they are not going to want to cultivate that kind of person as a donor or for campaign activity.

695.    Whereas in reality Plaintiff had not been approaching anyone with stealth or sexual motive, but doing the exact same thing those politicians were responding to, sending bitchy emails about the Republican Party. Plaintiff's personality is exactly what they saw in the email, no hidden side as invented and broadcast by Defendants.

696.    People who do things like hire a cute secretary because they want to have sex with her, are not going to come into court and admit it. Plaintiff cannot immunize

people like the state can, to come into court say the real reasons why they made the decisions they made, whether in hiring, rental housing, or political cooperation and association.

**Stigma and Political Speech About the Mulrenin Case**

In 2021, Adam Avitable was a popular podcaster of his "Dating Kinda Sucks" podcast. Avitable had also written for "Orlando Weekly" which was the sort of "underground" flavor news outlet for the Orlando area. Avitable lived in Altamonte Springs for a long time, was a regular strip-club patron, and had a lot of the same friends or connections as James Mulrenin.

697.    In January of 2020, Avitable asked Plaintiff for permission to use Plaintiff's book "Seminole Scam" in a podcast. Plaintiff misunderstood that Avitable was going to refer to the book in an episode of "Dating Kinda Sucks", perhaps to talk about meeting strippers as a form of dating that "sucks". Plaintiff gave Avitable permission, and any limits of that permission are not relevant in the present matter.

698.    Avitable subsequently made a "true crime" podcast based on reading and colorfully critiquing Plaintiff's "anonymous book". Avitable used this podcast to discredit Plaintiff's documentation of fake evidence and police lies. Avitable detailed to Plaintiff that Avitable was socially pressured to contradict Plaintiff and conform to the popular local narrative in Altamonte Springs. Avitable is free to speak his own

opinion on such matters of public interest, so long as he is not in collusion or an agent to cover up crimes and obstruct justice.

699.    Avitable somehow found out right away that Plaintiff had been arrested in Pinellas in January 2021, and told Plaintiff in an email that he imagined Plaintiff would be going to prison for being caught red-handed driving over the bridge to stalk the housewife.

700.    Avitable then started using Plaintiff's real name rather than pen name on his podcast, to make a connection between the character in Plaintiff's book and Defendants' misleading story. Avitable used Defendants' false narrative in his podcast and on social media, to discredit Plaintiff's documentation of perjury, and thereby protect the state actors whose crimes Plaintiff was publicizing.

701.    Whatever Avitable's motive, he took the opportunity of Defendants' mischaracterization of Plaintiff's activity, to discredit Plaintiff's documentation of Phil Archer's misconduct in Plaintiff's book "Seminole Scam". This followed originally from an arrest affidavit with Phil Archer as the only witness. Archer's misconduct was thereby protected and enabled through Florida courts, using stigma, without ever a charge, witness, or discovery.

**Defamation Deprived Plaintiff of Due Process**

702.    Rights in Florida were not litigated in court but in the public square in Plaintiff's specific case, according to the state's own responses to Plaintiff's complaints to Tallahassee. When Plaintiff reported cop perjury and judge and prosecutor misconduct, the state said that is not our business, rather sheriffs and prosecutors answer to voter for lying in court and detaining Plaintiff and such without going to court in violation of the 14th Amendment. The Office of the Governor of Florida said it was up to the voters to pass judgment on whether Plaintiff's rights had been violated.

703.    Judge White was relieved of the painstaking work of obtaining legal outcomes, to the extent she could just pick a politically convenient outcome that nobody but Plaintiff would care about. That is what Judge White did, when she copy-pasted objectively false statements, and accepted Defendants' baseless averments that Plaintiff threatened Shannon Sprowls in multiple lewd emails.

704.    Plaintiff's state defamation complaint was dismissed after a hearing in which the judge displayed a lack of information which would have been available by reading the pleadings, and opposing counsel told straight lies contradicted by exhibits which the judge ignored, where the judge was given license to do so because Plaintiff was convicted in the public square.

705.    Compared to lawsuits that don't involve the scrutiny of statements of fellow elected officials from the same faction which are therefore decided by a jury, Judge White had a conflict of interest that was awarded to her by another judge. Judge White was given cover to copy-paste false statements by the subversion of public oversight which not just Defendants but Judge White herself then became a party to. It's not quite as bad is if the Pinellas judge decided how it is "fair" to characterize his own arrest affidavit, but the same interests operate. Judge White was able to give cover to her own negligence, by shaping the media coverage of her own discretion.

706.    Deputy Weill was never prosecuted for perjury, nor were deputies prosecuted for trespassing or false imprisonment of Plaintiff. It is reasonable to conclude no voter in Pinellas or Okeechobee County was aware of, much less believed, any of their cops or judges broke the law or did anything unusual.

707.    No voter will complain in defense of Plaintiff's rights, that Deputy Robert A. Weill committed material perjury in the Pinellas arrest affidavit. Because they have not been led to believe Weill committed perjury. They have been misled by Defendants using the color of law, to believe Plaintiff sent a housewife multiple threatening and lewd emails and approached her with stealth. This despite Plaintiff swearing to Defendants that Weill lied and their story is wrong, and the arrest affidavit being abandoned without charge or discovery. This is the regulatory structure by which they enable cop perjury to subvert courts in favor of manipulating

the public mob as decision maker.

708.    By favorably moving the boundaries of speech allowed and disallowed - introducing a slant and muffling disfavored viewpoints as Alito said - the Florida government can get away with rights violations like a criminal moving furniture over a blood stain.

709.    Broadcasting malicious lies against the targets of government is not just a way to get elected, but a way to subvert as a practical matter this only regulatory process which exists in Florida to enforce the 14th Amendment and due process.

710.    There is then no practical guarantee of any remedy or recourse. The dismissal of Plaintiff's extremely politically inconvenient defamation complaint was affirmed per curiam by an appeals court with a judge Edward Artau who was appointed by parties to the events, thereby depriving Plaintiff of venue in any higher court.

711.    Saying it is Plaintiff's own fault for using the word "whore" - the general idea that when police lie, it is a direct and inevitable consequence of other people's poor life decisions - is an enticement to mob justice over law - wearing the color of law - which no court can accept. That is not a legal process, it is a public-opinion process. Plaintiff petitions this Court to fulfill your obligation to turn it from an illegal process into a legal one, rather than join such an illegal process.

712.   Defendants are part of the intended process regulating court activity and thereby protecting Plaintiff's rights in Florida, and their false and misleading statements are a device intended to subvert and deny Plaintiff that intended process.

713.   Florida government officials can only grant that "privilege" used by Defendants within the constraints and considerations of the Bill of Rights, which explained but did not completely enumerate the broad protections of the common citizen from attacks designed by the powerful without regard to law.

714.   By the self-executing nature of the 14th Amendment courts are compelled to protect due process from state action, wherever the opportunity to do so presents itself (in an otherwise authorized jurisdiction or action). (714.1) False and malicious defamation has never been protected speech, but protection from being injured by government lies has always been the mandate of this Court, whether done under false color, or without the opportunity for relief in any state court. (714.2) This Court has no choice but to find Defendants acted not as protected speakers but an arm of a government attack, and any mischaracterization of what actually happened is anticipated in 42 USC 1983 as "color".

715.   Plaintiff argues that reciting false and reckless unsubstantiated hearsay, false statements, perjury, embellishments, and disputed and controverted statements in a

scheme and process that subvert rights, is an infringement of rights in general, and was in his particular case. It was done in a process that is designed to affect rights and did, and which process is therefore governed and constrained by the Constitution. Court proceedings cannot be perfect, and some of these effects are inevitable. But the process in Florida goes beyond inevitable to an intentional design.

716.   And certainly the state deputizing private actors with special privileges and protections to damage state targets outside due process as an attack on political speech directed at that same state, is a violation of the First Amendment.

717.   If the United States is to survive the Internet better than Germany survived broadcast media, these matters demand urgent remedy.

**Due Process in the Pinellas Case**

718.   Deputy Weill sent out a fake bond condition never signed by a judge, and hid the arrest affidavit with his lies for 10 days, until a lawyer relative of Plaintiff called the prosecutor asking to see it. The action of Defendants did not "censor" this activity as intended by Miami Herald Publishing Co. v. Ane, but gave it political cover in the mechanism designed to regulate due process.

719.   Then they held Plaintiff and kept Plaintiff off social media for five months without charge, discovery, or a witness, not even a police report, in violation of the

rules of criminal procedure. The action of Defendants did not "censor" this activity as intended by Miami Herald Publishing Co. v. Ane, but gave it political cover in the mechanism designed to regulate due process.

720.   When a few weeks had passed without the prosecutor filing any "information", is when the fake news story conveniently appeared, and Plaintiff saw police and Defendants hitting Plaintiff's website at the same time immediately after Plaintiff told Defendants their story was wrong, as if they were colluding and conferring. As Plaintiff said, it is commonly known to be a pattern in Florida, that state actors start feeding garbage criminal defamation to click promoters for charges they cannot prove, around the same time they start pressuring defense attorneys to persuade their clients to take a plea bargain. As such, the timing and content of Defendants' story was shaped in concert with state actors, at the moment they could not injure Plaintiff with real due process in a court.

721.   The state colluded with Defendants to publish the fake story giving the state cover, and then tried to pressure Plaintiff to take a plea bargain and sign that he would never email the crime victim again, which Plaintiff never did in the first place, and sign that he would never go within 1,000 feet of the crime victim again, which Plaintiff never did in the first place. (Plaintiff told his lawyer that he would be willing to stipulate to not engage in pimping, but never heard back.)

722.   This is standard procedure to sweep their cop lies under the rug, and have a Plaintiff agree that he can never get discovery to prove the cops lied about him. And where the defense attorney advocates to his client on behalf of the state with scare stories about 10 years in prison, to save the lawyer's own self from being bankrupted by litigation going to trial in every case, if he doesn't deliver the politically convenient outcome to prosecutors. This may work on the guilty, and even coerce new "witnesses" of their guilt, but it deprives the innocent of due process.

723.   Pinellas elected officials would have been too embarrassed to hold Plaintiff without charge and shut down his political speech for five months and refuse to provide any discovery, if they were given proper public scrutiny rather than cover by a fake news story. But because they were able to control the narrative with government-selected immunity, they were able to control what voters think and get away with it, including perjury and judicial misconduct.

724.   Plaintiff is a crime victim by the felony perjury of Deputy Robert Weill, so that if Marsy's law were followed Plaintiff's name never should have been released. But court processes don't follow law, they follow public narrative and voter opinion, so the state was able to stalk and "Cyberstalk" and damage Plaintiff without a crumb of evidence or a day in court. Not one of their voters ever said a thing, because throughout that five months they illegally held Plaintiff and to this day, the voters have been lied to by their supposed news media, who in this case are state actors

colored as "censors".

725.   The jury can imagine what would have happened if instead Defendants published the true facts "man whose political speech criticized dead prosecutor held for five months based on a sheet of lies without charge, discovery, or a day in court, in violation of rules of criminal procedure". Such a story would have exposed Defendants to political regulation at the hands of the local faction.

726.   Defendants were flipped from censors to enablers of government misconduct against Plaintiff's due process rights because Florida law and the action of a Florida judge, encouraged and protected them and made them state actors in that process.

**Due Process after Inspector General Complaint**

727.   Before these events, Plaintiff mistakenly believed that government institutions, rather than voters, forced Florida government employees to follow the law.

728.   Plaintiff was surprised to see that when he petitioned elected officials about perjury, the response was a judge could sign even more perjury and hold Plaintiff's speech without evidence, without anything in Florida to stop them.

729.   In August of 2021, Plaintiff still hoped to get some credible and visible means to clear up his name - some official documents and things that might come up on

Google - rather than waste years arguing with misled employers trying to get jobs and such.

730.    On the evening of August 15, 2021, Plaintiff filed a whistleblower complaint about perjury in the Mulrenin case and in Plaintiff's January 2021 arrest, on the Florida Inspector General website using the web form.

731.    The next morning Plaintiff was located at a remote gas station, detained for 40 minutes, and threatened by at least six deputy sheriffs in at least six cars that Plaintiff would be locked up without going before a judge under color of a "welfare check" unless Plaintiff promised to never file another complaint with the Florida Inspector General. The cops said "The Governor" sent them to do this, and admitted neither they nor "The Governor" had any information calling Plaintiff's welfare into question.

732.    Detaining someone under false pretense of a welfare check with threats, to prevent reporting of felonies by his political faction, is a felony.

733.    Plaintiff has posted about this event on social media. In response Plaintiff has witnessed other Florida citizens saying it could not really be true that it happened, when the only "legitimate news story" they can find is one that says Plaintiff was approaching a housewife with stealth after sending her multiple lewd and multiple

threatening emails, none of which actually happened.

734.    Plaintiff was denied protection from felons, and DeSantis got reelected without his apparent brazen felony ever being mentioned, because anyone who hears about it goes online and finds out from Defendants' misleading story that "what really happened" is Plaintiff was approaching a housewife with stealth and sending her lewd and threatening emails, and that is why he was detained at a gas station seven months later after the Pinellas case was abandoned without evidence. Defendants were successfully perverted by government into a tool to obstruct oversight and help government violate the Fourth Amendment.

735.    The legal mechanism is the same as whether or not Trump is on the ballot in a given state, and whether Deputy Weill is allowed to victimize Plaintiff with felony perjury; Whether cops are allowed to detain and threaten Plaintiff at a gas station under admittedly false pretense is determined by whether the voters care or not. Plaintiff is betting if the voters don't care, no judge will ever even read this line.

## PARTIES, JURISDICTION AND VENUE

### Plaintiff and Defendants

736.    Plaintiff Stephen Lynch Murray is a citizen of Okeechobee County, Florida, and of the United States in the Southern District of Florida.

737.    Defendant, Janelle Irwin Taylor, an individual, is a legal resident of  Pinellas

County, Florida, who conducts business as an author on the website floridapolitics.com, which is based out of Pinellas County, Florida, and which website transmits files, media, and general content to visitors in Okeechobee County, Florida and throughout the world. Taylor also joined Defendant Schorsch in a new venture "Southeast Politics".

738.    Defendant, Peter D. Schorsch, an individual, is a legal resident of Pinellas County, Florida, who conducts business as "publisher" of the website floridapolitics.com, which is based out of Pinellas County, Florida, and which website transmits files, media, and general content to visitors in Okeechobee County, Florida and throughout the world.

739.    Defendant, Extensive Enterprises Media, LLC, is a Florida LLC with a principal address at 204 37TH AVENUE NORTH, #182 ST. PETERSBURG, FL 33704, in Pinellas County, Florida, which conducts business as the website floridapolitics.com, which website transmits files, media, and general content to visitors in Okeechobee County, Florida and throughout the world.

## Jurisdiction, Venue, and Jury Trial

740.    Plaintiff brings Claims created by 42 USC 1983 and possibly 42 USC 1988, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments, to redress the deprivation under the color of state law of rights secured by the U.S. Constitution.

741.   This Court has subject-matter jurisdiction to hear Plaintiff's Claims pursuant to 28 USC 1331, 28 USC 1343, and possibly 28 USC 1367(a) (such as if protection against defamation is a right ordinarily provided in Florida).

742.   This Court's jurisdiction to hear the specific subject matter of this case includes the "stigma plus" standard for Fourteenth Amendment violations in Paul v. Davis (424 U.S. 693, 711 (1976)).

743.   Plaintiff invokes the jurisdiction of this Court to provide remedies where Florida state law is inadequate, as well as where remedies are available in Florida in theory but not in actuality, and even where other federal remedies may be available in theory, but not in actuality.

744.   This Court's authority to enter any declaratory judgment and to provide preliminary and permanent injunctive relief is invoked pursuant to Rule 65 and, if applicable, Rule 57 of the Federal Rules of Civil Procedure, and pursuant to the general legal and equitable powers of the Court, including the Court's authority to enforce the supremacy of federal law as against contrary state law.

745.   This Court is authorized to grant Plaintiff's petition for injunctive and monetary relief, and any additional relief the Court may deem just and proper, by 28

USC 2202 and if necessary 28 USC 2201.

746.   Venue in this District is proper under 28 USC 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Brevard County and Pinellas County, Florida, which is within the territorial jurisdiction of the United States District Court for the Middle District of Florida, owing to Defendants and the government employees with whom they acted in concert, operating their offices out of these locations.

747.   Plaintiff hereby demands a jury trial on all claims.

## LIST OF CLAIMS

### CLAIM I - STIGMA PLUS A PROTECTED INTEREST

748.   All Defendants as state actors violated Plaintiff's 14th Amendment rights, through stigma coincident with deprivation of an additional liberty or property interest, without being protected by due process under color of law.

749.   The moment of violation came when Plaintiff was deprived of reputation and opportunity, and even character credibility necessary to communicate political grievances, without being given the opportunity to clear his name in any court proceeding, encouraged and made possible by acts of the state, based upon the selection or blessing of the state, in an activity that was symbiotic and in nexus with functions and activities of state officers.

750.  Plaintiff "was deprived of his liberty interest in his reputation 'without opportunity for any meaningful procedure.'" (Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006))

751.  "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.' When such a deprivation occurs, the employee is entitled to a name-clearing hearing." Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006)

752.  If the First Amendment is a law, and public benefits from speech are measured against case law, then malicious misleading statements or defamation called First Amendment speech or public information, is the color of law.

753.  Defendants' headline and article still to this day leads every reader to believe Plaintiff sent multiple threatening and multiple lewd emails to Shannon Sprowls and was then caught in the act of approaching her with stealth with such sexual motive, which never happened, which was never alleged to have happened, which Defendants reasonably knew didn't happen because Plaintiff swore to them it didn't happen and Plaintiff was never charged and Schorsch said he was free to say Plaintiff was "threatening martians" regardless, so that Defendants' reasonably expected their headline and article would mislead readers and injure Plaintiff, and they didn't care

because they knew it would give them juicier click traffic, and Ortega lets Florida judges approve the false artistic component of songs glorifying state action, and gives judges to discretion to characterize such intentionally misleading defamation for money as "fair" when the subject has been arrested and is playing the bad guy in the theater of local elected officials.

754.   Defendants portrayed and discredited Plaintiff not as somebody with any actual grievance about real police perjury which really happened, but as a sort of clumsy oaf who was caught driving over a bridge to stalk a housewife. As a result, Plaintiff's subsequent communications with elected officials, were perceived by them as coming from a sort of incontinent sexual deviant, not a person who had witnessed felonies committed by government employees, or who found Trump's January 6th raid on the Capitol and those who supported it distasteful, or who had a grievance about local prosecutors using discretion to protect VIP's and members of their own faction in sex crimes.

755.   Defendants' action also deprives Plaintiff of employment, housing, and other association opportunities. Anyone can tell by reading this document, Plaintiff's impulse is to sit alone at home writing about minutia, not approach housewives. But Plaintiff is deprived of any opportunities to do computer work, either in the high-security environments he is used to, or even something having to do with law or politics which are his interests. Plaintiff cannot even imagine the types of jobs he

could instead get with people who like to go out and chase housewives, maybe something working for the Florida Republican Party under Christian Ziegler. And how quickly Plaintiff would lose his welcome in those jobs, when he chose to sit at home on his computer rather than go out chasing housewives with his coworkers.

756.    To this day Plaintiff has never been given any court hearing where he could dispute the allegations or obtain evidence of the fraud against his name, and has met only the shield of government-like immunity.

757.    It's hard to see how cops lying about someone in court wouldn't be a "plus", on the stigma of Defendants adopting and embellishing, or even merely reporting those lies like Codd v. Velger. If Defendants' are agents enhancing an injury to Plaintiff by bad state actors, then they are depriving Plaintiff even if their role is limited to using the tool of stigma. ("Freedom from false incarceration is one of the oldest and most important protections of the Due Process Clause; thus, to be imprisoned for a crime that one did not commit clearly constitutes 'deprivation of an additional right or interest.'" Tarbox v. Butler Twp. & Shawn M. Butler, 3:14-CV-01346, 17 (M.D. Pa. Oct. 19, 2015))

758.    The counterargument is that adopting cop lies as true and embellishing them somehow protects rights and government accountability, and helps the citizens petition their government for a redress of grievances. Plaintiff disputes that there is

real value for such a separate standard to be considered by Defendants other than "is this defamation or not". (Plaintiff writes this with full awareness that federal courts are in the business of protecting state officers who lie in court, as a sort of professional courtesy in criminal justice.)

759. Marking, branding, and shaming people has been a criminal punishment in many cultures for thousands of years. Posting mugshots, and publicly shaming people who have been arrested, is considered to be a designed and intended part of punishment and deterrent by many in the United States. This is different from defamation, for the precise reason that it is considered lawful or fair to injure someone who has committed a crime.

760. It seems like an error for federal law to say that stigma alone is not a deprivation of rights when it is done in the context of criminal justice, and when the people pushing the stigma themselves consider it to be not a defamation but a punishment. In this case stigma is done by the government as considered fair punishment for a perceived crime of Plaintiff being an undesirable, without due process, rather than as a defamation by a private individual.

761. Any moral calculation, such as "Plaintiff deserves the consequences of his actions" or "when police lie, it is a direct and inevitable consequence of other people's poor life decisions" - rather than a standard like "was there adequate process

to stop readers from being negligently misled in a nexus with government" - puts the stigmatization of Plaintiff in the context of a criminal punishment, and therefore demands more not less due process than Plaintiff has yet been afforded, such as actual witnesses and discovery.

762.    The government substituting its own hasty judgment for that of the jury when it has a stake in the outcome, is injury deprived of due process. The trick by which judges might imagine they are doing the same thing the jury normally does - judging what is "fair" but given broad discretion under a different standard compared to defamation not involving official proceedings - is color. Particularly when it is colored by judges who think there is some subtle moral justification to defame a person who has done some bad thing to be arrested.

763.    The U.S. Supreme Court said "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." (Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974)) But in Plaintiff's case, the state has created multiple standards, without a due process to sort between them.

764.    Florida has created a different standard of protection for people who have been arrested, called matters "brought out in official proceedings". Even if they color this as some special First Amendment interest of official proceedings, it is still not

clear why actual witnesses and a jury would not be required to determine if the different standard has been met. But when in practice this second standard takes the form of the state retracting defamation protections in the interest of the elected officials without news readers actually getting true facts, it makes the defaming speaker an arm extending and amplifying state action. And when it takes on a general character of stripping reputed criminals of protection because they deserve it, it demands elevated due process.

765.    It wouldn't matter if there were no other protections against defamation, and protections were created for the first time exclusively at the discretion of the Florida legislature, or in this case Florida courts. The moment you create protections for defamation, but then enforce and withdraw them in the interests of the state, it is the state managing speech and deputizing the defaming speaker as a state agent to injure people in the state's interest. If the government picks whom to injure, it is regulated by due process. But the reality is having protections against defamation is our natural state, so it is always going to be the government selecting when to retract those protections to injure people.

766.    Even if you injure someone for the public benefit, it still requires due process. Which means more discovery of true facts than Plaintiff was ever afforded.

767.    Even if you think it is a necessary inevitability to injure Plaintiff with stigma,

to arrest him based on honest probable cause before you know reasonable doubt, and also for the public to know what was going on, Plaintiff never got a due process to find out if that is the injury that took place and get relief if it was not.

768.    Plaintiff does not even need to prove any additional loss of liberty or property from the stigma, other than spreading lies about Plaintiff makes Plaintiff unhappy, and this was knowingly done to inflict punishment and distress to chill Plaintiff's political speech.

## CLAIM II - PLUS DEPRIVED OF POLITICAL SPEECH

769.    All Defendants as state actors violated Plaintiff's First and Fourteenth Amendment rights under color of law and First Amendment.

770.    The moment of First Amendment rights violation came when Defendants acted in concert with the state to punish Plaintiff, for comparing January 6th rioters to bikers in an email to an elected official, and for advocating police should go to prison using fliers posted at a law school.

771.    As Plaintiff said in the opening paragraphs of this Complaint, the stigma alone qualifies as "an adverse action" in retaliation for speech, according to the three criteria in Mount Healthy v. Doyle.

772.    They stripped Plaintiff of ordinary defamation protections in the course of an attack on political speech. Therefore the stigma was done as part of an attack on political speech. The only witness - Plaintiff - has said it was all political speech. It has never been proven in any court that any activity by Plaintiff in these events was not political speech, or even examined. No copy of Plaintiff's supposedly criminal speech was ever provided to any court by any of Plaintiff's adversaries.

773.    Plaintiff was deprived at the very least, of the process necessary to protect his First Amendment speech and determine if Plaintiff's actions were protected speech. Defendants worked together with Florida courts, to maliciously defame Plaintiff without any chance for a fair hearing into what Plaintiff actually did. So Plaintiff was defamed in an attack on his speech, without due process to even find out what Plaintiff said to whom, or any court even knowing what Plaintiff actually said, prerequisite to due process

774.    Whether there was political speech at the heart of the events was foreclosed from ever being discovered and examined by any court.

775.    To this day, none of Plaintiff's emails have ever been seen in any court, and the people who claim there was probable cause have never produced any discovery or witness statement, not even a police report, nothing to contradict Plaintiff's sworn affidavits that Deputy Weill used material perjury.

776.    Probable cause is an easy burden to meet, to call political speech "Cyberstalk"
when a cop can lie without penalty, and doesn't need a witness of the crime. More so
when the "Cyberstalk" speech can be a private email to any person on the planet
other than the victim, not naming the victim or not even having anything to do with
the victim, and when being in the same county as someone can be called a threat.
Worse still when "Cyberstalk" can be changed out for "approached with stealth", to
say almost any political speaker anywhere can be defamed as a sex criminal.

777.    Suppose your girlfriend emailed you that she was voting for Ron DeSantis,
and you emailed back "Fuck that bitch Ron DeSantis, I will make him my whore!"
(which does not have a Greenberg/Epstein/Mulrenin context the way Plaintiff's
speech did). Is it different if you email the same thing to a politician, so that you can
be defamed as a sex criminal against another person, without the politician needing
to be a witness? The Court would create an easier attack surface to chill political
speech to a government official, than speech to an ex-girlfriend, which is not the
intention of the First Amendment.

778.    Florida's vague Cyberstalk statute and the ambiguity of Ortega v. Post-
Newsweek seem almost designed to be combined, to create state discretion to attack
political speech with stigma. (Particularly when coupled with the already ample
discretion of prosecutors to preempt all law with perjury.) After the case failed in

criminal court (after Plaintiff had already suffered from it, was denied speech rights for five months, and had his future speech rights chilled), the first actor in this case to knowingly and explicitly classify political speech as criminal and cause for arrest was Defendants' civil defense attorney who wrote that in a proposed order containing false and misleading statements. So they literally deputized the criminalization of political speech by laundering it through a private actor in civil court like in Whole Woman's Health v. Jackson.

779.    The government can't punish political speech. The government can't claim to arrest Plaintiff for political speech, or punish him for it (certainly not without witness or discovery the way the defamation complaint was dismissed in civil court). And a web promoter can't falsely and maliciously defame Petitioner for clicks, without the government. So if the government arrests Petitioner for political speech, and then claims they are arresting him for Cyberstalk (probable cause needs only a possibility), it will never hold up in criminal court. But the web promoter is then allowed to punish Plaintiff for political speech with defamation because the government said it. So the government can punish political speech by creating the opportunity for a non-government actor to do it, and then protecting the punishment. Private citizens have a right to attack political speakers, government has a right to lie or speculate, together they can punish speech.

780.    A Florida civil court defined speech as criminal rather than political and

punished it, without witness or discovery of that speech or examination of alleged perjury about that speech, and even in the face of a sworn statement by the political speaker and only official witness.

781. Government selected whether or not to protect the lies, or selected to not even investigate if they were lies or if Plaintiff engaged in political speech, without any due process. They chose false statements over political speech, without even examining whether one was one and the other was the other, without any process to discover whether one was one and the other was the other. And in fact with a process designed to insulate cops lying in support of their faction, the same faction which Plaintiff's political speech attacked.

782. The burden to determine it was not protected speech, would take more than the premature and reckless facial dismissal prior to discovery or testimony which was the standard applied by Florida courts. This Court would have to 1) hear from actual witnesses of what happened, 2) give reasons for discarding Plaintiff's sworn statements as firsthand witness, 3) state an accepted set of facts, and 4) state the authorities those facts are measured against, to arrive at the determination of what Plaintiff said and whether it was protected speech. That what Plaintiff said was not protected but was attacked is not in dispute. (That it was political speech seems not in dispute by the Pinellas prosecutor who had access to all the state's evidence, and none of Plaintiff's firsthand knowledge.)

783.   There was no legal roadblock checking what was true, between Plaintiff communicating political speech against the Florida government, and Defendants being awarded privilege by that same government to defame Plaintiff as a sexual predator, thereby discrediting and chilling any efforts to hold members of their faction accountable for felonies.

784.   The legal justification for stigmatizing Plaintiff depends on an email to an elected official Phil Archer mentioning an elected official Tyler Sirois, referring to the January 6th mob at the time they were raiding Congress, and having nothing to do with any crime victim. This is in fact a collusion with elected officials to deprive Plaintiff of his First Amendment rights. Any law or case law which would support this activity cannot be constitutional.

785.   Long story short, when the government was faced with the fact they hated Petitioner and his website but had nothing to charge him with, they arranged for someone to defame Petitioner as a the common definition of "stalker" and then protected that person, as a legal consequence of Petitioner petitioning his government with grievances.

786.   And big surprise, the "Cyberstalk" statute was not used to protect Petitioner's ex girlfriend, or anyone Petitioner had ever met in person or expected to or anything

like that. Not a female pop star like Dido or even an OnlyFans model. It was used on behalf of the same distant elected officials toward whom Petitioner's political grievances were directed, exactly as must have been expected when they wrote the First Amendment. The civil case law and process affirmed in this case to this point abridge Petitioner's right to petition his government with grievances.

787.    Defendants didn't faithfully report the actions of government; They didn't even faithfully recite the statements of government; They simply were handed license to defame anyone whom the government picks. That's fine, but not when it is created and protected by a cop who lied because he doesn't like "COPS2PRISON.ORG" fliers, and in turn protects the cop in his crime.

788.    Defendants' action successfully punished, deterred, and discredited Plaintiff's efforts to hold Phil Archer accountable for using perjury, in the public forum intended for that purpose. And Defendants stopped Plaintiff's political speech for five months, by way of subverting due process but that is the next claim.

## CLAIM III - PLUS DEPRIVED OF DUE PROCESS

789.    All Defendants as state actors deprived Plaintiff of his Fourth, Fifth, Sixth, and Fourteenth Amendment Due Process rights in state criminal proceedings. Defendants did so under color of law and First Amendment as state actors, by propagating a false narrative to the voter as ultimate regulator of the courts, which

subverts the process through which Florida provides due process.

790.   The moment of violation came when Defendants were empowered and encouraged by the state, to mislead voters about what actually happened, and thereby subvert due process in Plaintiff's arrest and various detentions and infringements by police, which is ultimately regulated by the approval of voters. Plaintiff was deprived of that protection by voters, which is philosophically designed to be the ultimate regulator of the conduct of elected officials, and particularly of police and courts. The voters get whatever they want, and this is given the weight of law in Plaintiff's case by being built into everything from the election of judges and prosecutors to the legal discretion of court officers, Imbler v. Pachtman, and AEDPA.

791.   Defendants violated due process by acting as arms of the state to cover up and get away with various crimes, such as felony perjury in an affidavit, and detaining and threatening and trespassing on Plaintiff's property without probable cause of a crime or court regulation. Not just covering up these crimes, but generating political support for these crimes.

792.   They subverted the designed legal processes and the intended voter regulation of due process, by using a misleading news story to put up a cute little fake narrative of a clumsy man crossing a bridge to stalk a housewife, and by never mentioning all

of Plaintiff's actual activities that day - posting political fliers - and speech to Pinellas prosecutors and to the only supposed witness State Attorney Phil Archer whom Plaintiff emailed about the January 6th rioters. This disadvantaged Plaintiff in the legal process that was supposed to protect him from these infringements, by stripping from Plaintiff the protection of the voter as regulator of what elected officials do.

793.    This subverts and deprives Plaintiff of protection from a) cops lying to judges in affidavits, detaining plaintiff, and seizing Plaintiff's property, in violation of the Fourth Amendment, b) the due process necessary to protect Plaintiff's rights under the Fifth and Fourteenth Amendment, and c) the right to a fair jury trial (or bench trial), where jurors are not influenced and prosecutors are not condoned to orchestrate lies, in the Sixth Amendment.

## RELIEF REQUESTED

WHEREFORE, Plaintiff asks this Court:

**Relief – A**    To permanently enjoin Defendants from posting articles or speaking about Plaintiff in public again.

794.    Enjoining Defendants limited to the specific act of negligent and misleading defamation might be legally appropriate, except neither Defendants nor Florida courts seem competent to fulfill such a legally intricate task.

**Relief – B**   To award Plaintiff compensatory damages from all Defendants jointly and severally in an amount to be proven at trial.

**Relief – C**   To award such punitive damages as may be appropriate to deter the infringement of important rights, including political speech about government, and due process, and protect citizens against threats and seizure, without honest court proceedings.

**Relief – D**   To Grant any other and further relief as the Court may deem just and proper; to grant all other relief that this Court deems reasonable, just, and lawful under the circumstances, and necessary to promote future lawful behavior by the State of Florida and her agents, including declaratory and injunctive relief.

## CONCLUSION

795.   The license to injure Plaintiff with the process actually afforded Plaintiff, was exceeded.

796.   Plaintiff reminds the Court that to this day, none of Plaintiff's emails has ever been shown in any court or by any witness, and nor have any of the documents claimed by Deputy Weill in his arrest affidavit.

797.   Plaintiff actually posted political grievance fliers. Defendants lied that Plaintiff approached a housewife with stealth and sexual motive. Only one is protected by the

First Amendment. Only one has a witness. Nobody ever disproved the first or proved
the second, or even gave an opportunity for hearing on the facts. Until that time,
Plaintiff's political speech must be protected by due process. It was attacked without
due process, and Defendants are an arm of that attack.

798.   For the aforementioned reasons, Plaintiff hereby petitions this Court, for an
order of injunctive and monetary relief against Defendants, curing, remedying,
stopping, and deterring, their state-selected chilling and deprivation of sacred rights
without due process under color of law.

Respectfully submitted on January 22, 2024 by:

/s/Stephen Lynch Murray

Stephen Murray
3541 US Hwy 441 S  Box 141
Okeechobee, FL 34974
stephenmurrayokeechobee@gmail.com
+1 305.306.7385